Brent D. Barlow, Esq. (Bar No. 168645)
Email: brent@barlowlegal.com
20929 Ventura Boulevard, Suite 47
Woodland Hills, California 91364-2334
Telephone: (818) 369-4432
Facsimile: (818) 887-0528
*Attorney for Defendant, Brent David Barlow, In Propria Persona*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTERMARKETING MEDIA, LLC et al, | ) **No. 8:20-cv-00889** )<br>) |
| Plaintiffs, | ) **NOTICE OF MOTION AND** )<br>) **MOTION TO DISMISS** |
| *vs.* | ) **PURSUANT TO RULE 12(b)(1)** )<br>) **OR, IN THE ALTERNATIVE,** )<br>) **12(b)(6)** |
| Brent David Barlow et al, | )<br>) |
| Defendants. | )<br>) |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on December 11, 2020, at 10:30 a.m. in Courtroom 10A in the United States Courthouse located at 411 West 4th Street, Santa Ana, CA 92701-4516, the Honorable Josephine L. Staton presiding, defendant Brent David Barlow ("Barlow") will move pursuant to Fed. R. Civ. P. 12(b)(1) to dismiss the Amended Complaint For Injunctive Relief And Damages (Doc. 9, the "Amended Complaint") of plaintiffs Intermarketing Media, LLC et al for plaintiffs' lack of standing and the Court's lack of subject-matter jurisdiction

or, in the alternative, 12(b)(6) for plaintiffs' failure to state a claim upon which relief can be granted.

This Motion is based on this Notice of Motion and attached Memorandum of Points and Authorities, on all judicially noticeable documents, on all pleadings and papers on file in this action, and on other such matters and arguments as may be presented to this Court in connection with this Motion.

This Motion is made following the written request of the moving party sent on May 17, 2020.

Dated this 28th day of July 2020            Respectfully submitted,

_s/ Brent D. Barlow_
Brent D. Barlow, Esq. (Bar No. 168645)
Email: brent@barlowlegal.com
20929 Ventura Boulevard, Suite 47
Woodland Hills, California 91364-2334
Telephone: (818) 369-4432
Facsimile: (818) 887-0528
*Attorney for Defendant*
*Brent David Barlow, In Propria Persona*

NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO
RULE 12(B)(1) OR, IN THE ALTERNATIVE, 12(B)(6)

1

# TABLE OF AUTHORITIES

**CASES**

*Albertson v. Raboff*

46 Cal.2d 375, 295 P.2d 405 (1956)..................................... 19

*Associated Gen'l Contractors v. Metro. Water Dist.*

159 F.3d 1178 (9th Cir. 1998) .......................................... 4

*Briscoe v. La Hue*

460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983) ...................... 18

*Caira v. Offner*

126 Cal.App.4th 12, 24 Cal.Rptr.3d 233 (2005) .............................. 22

*Carney v. Santa Cruz Women Against Rape*

221 Cal.App.3d 1009, 271 Cal.Rptr. 30 (1990) ................................ 22

*Colwell v. Dep't of Health & Human Servs.*

558 F.3d 1112 (9th Cir. 2009)............................................. 3

*Dickerson v. Superior Court*

135 Cal.App.3d 93, 185 Cal.Rptr. 97 (1982) .................................. 18

*Hasler v. Howard*

120 Cal.App.4th 1023, 16 Cal.Rptr.3d 217 (2004) ........................... 22

*HLC Properties, Ltd. v. Superior Court*

35 Cal.4th 54, 24 Cal.Rptr. 3d 199, 105 P.3d 560 (2005) ................. 18

*In re Grand Jury Investigation*

974 F.2d 1068 (9th Cir. 1992)............................................. 19

*Kashian v. Harriman*

98 Cal.App.4th 892, 120 Cal.Rptr.2d 576 (2002) ........................... 18

NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO
RULE 12(B)(1) OR, IN THE ALTERNATIVE, 12(B)(6)

*Kendall v. Visa U.S.A., Inc.*
518 F.3d 1042 (9th Cir. 2008) .............................................................. 4

*Kingman Reef Atoll Invs., LLC v. United States*
541 F.3d 1189 (9th Cir. 2008) ............................................................ 3

*Leeson v. Transamerica Disability Income Plan*
671 F.3d 969 (9th Cir. 2012) .............................................................. 3

*Miranda v. Reno*
238 F.3d 1156 (9th Cir. 2001) ............................................................ 3

*Padilla v. Yoo*
678 F.3d 748 (9th Cir. 2012) .............................................................. 4

*Roberts v. City of Palmdale*
5 Cal.4th 363, 20 Cal.Rptr.2d 330, 853 P.2d 496 (1993) .................. 18

*Saeta v. Superior Court*
117 Cal.App.4th 261, 11 Cal.Rptr.3d 610 (2004) ............................. 21

*Silberg v. Anderson*
50 Cal.3d 205, 266 Cal.Rptr. 638, 786 P.2d 365 (1990) ............. 18, 19

*St. Clair v. City of Chico*
880 F.2d 199 (9th Cir. 1989) .............................................................. 3

*Trammel v. United States*
445 U.S. 40, 100 S.Ct. 906, 63 L.Ed. 2d 186 (1980) ................. 18, 19

*Travelers Casualty and Surety Co. v. Superior Court,*
126 Cal.App.4th 1131, 24 Cal.Rptr.3d 7511 (2005) ........................ 21

*Upjohn Co. v. United States*
449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) ....................... 19

*Watson v. Weeks*

    436 F.3d 1152 (9th Cir. 2006) ............................................................. 4

*Welfare Rights Organization v. Crisan*

    33 Cal.3d 766, 190 Cal. Rptr. 919, 661 P.2d 1073 (1983)................ 17

*White v. Lee*

    227 F.3d 1214 (9th Cir. 2000) ............................................................. 3

**STATUTES**

15 U.S.C. § 1602(f) ...................................................................................... 14

18 U.S.C. § 4 .................................................................................................. 19

Cal Bus & Prof Code § 6068 ....................................................................... 20

Cal Evid Code § 1115 ................................................................................... 21

Cal Evid Code § 1152 ............................................................................. 21, 22

Cal Evid Code § 1154 ............................................................................. 21, 22

Fed. R. Civ. P. 12(b)(1).................................................................................. 3

Fed. R. Civ. P. 12(b)(6).................................................................................. 4

Fed. R. Civ. P. 501 ....................................................................................... 17

Fed. R. Evid. 408 .......................................................................................... 21

**OTHER AUTHORITIES**

8 John Henry Wigmore, Evidence § 2290 (John T. McNaughton, ed. 1961) 19

ABA Canons of Professional Ethics, Canon 15 (1908)............................... 20

American Bar Association ("ABA") Model Rule 1.3 (Diligence)............... 20

Ca. Practice Guide Civil Trials and Evidence, Rutter Group, 8:2831.20..... 21

Cal. Law Revision Com. com., West's Ann.Cal.Evid.Code, foll. § 911 ...... 18

Cal. Law Revision Com. com., West's Ann.Cal.Evid.Code, foll. § 1154 .... 22

Cal. Rules of Prof. Conduct, Rule 1.3 Diligence......................................... 20

# MEMORANDUM

## OVERVIEW

Plaintiffs complain because they got caught with their *hand in the cookie jar*. The characterization of defendants' actions as a conspiracy to extort is an attempt to cast blame away from plaintiffs' own wrongful conduct.

The central theme of this dispute is <u>the timeshare contract</u>.

Each defendant who sought Resort Advisory Group's assistance was led to believe that a timeshare contract creates an enforceable obligation by delivering something of value to the purchaser. However, this is not true: The "value" and "credit" purportedly delivered and extended are illusory and but notions in an artifice. Plaintiffs tacitly and overtly participate in creating the illusion of a loan of credit from the timeshare developer, but, as proven below, there is no such loan and the timeshare contract is void ab initio for failure of consideration.

Plaintiffs' business relies upon identifying disgruntled timeshare customers and convincing them that plaintiffs can "terminate/transfer" their timeshare contract. Holding themselves out to the public as professionals with specialized knowledge, and having been informed by defendants of the actual nature of the timeshare contract, plaintiffs knew or should have known it is impossible to deliver the services that plaintiffs offer and sell. Defendants at all times acted in good faith, provided plaintiffs with commercially reasonable notice, and allowed plaintiffs every opportunity to act ethically and correct any mistake plaintiffs may have made.

Nonetheless, plaintiffs come to this Court complaining of an avoidable condition they brought onto themselves. For the reasons stated below and upon the evidence available in this case, defendants request the Court (1) find that each

**1**

timeshare contract between a timeshare company and a defendant is void for failure of consideration; (2) that each of plaintiffs' contracts with a defendant is void for failure of consideration (nothing in the subject matter) and no meeting of the minds; and (3) dismiss plaintiffs' complaint for lack of standing.

## INTRODUCTION

Defendants John Pressney, Pamela Pressney, Herman Abel, Debora Abel, Morris Hannah, Virginia Hanna, Lee Harris Turk, Bernardo Bettinelli, Carol Bettinelli, Lari Castle, Gilbert Castro, Eva Castro, Paul Martinez, Renee Martinez, Glenn Perley, and Connie Perley are individually a "Defendant" and collectively the "Defendants."

Defendants with the same surname are referred to collectively by said surname.

Defendants and Barlow are all new members of Cooperative Dispute Resolution Society ("CDRS"), a private association which, to Barlow's knowledge, has no offices, address, telephone, bank account, executives, or managers, only *founding members*—none of whom is Barlow or a Defendant—and *members*.

Ultimate origin of all claims in the Amended Complaint is the subject of plaintiff Resort Advisory Group's alleged contract with each Defendant: what appears to be a valid and enforceable consumer-credit contract between a timeshare developer ("Developer") and a Defendant.

Plaintiffs allege and assert existence of a valid contract between (1) a Developer and each Defendant, (2) Resort Advisory Group and each Defendant, and (3) Resort Advisory Group and Barlow, but are incapable of producing admissible evidence to support fact thereof.

NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO
RULE 12(B)(1) OR, IN THE ALTERNATIVE, 12(B)(6)

**LEGAL STANDARD**

Pursuant to Fed. R. Civ. P. 12(b)(1), a district court must dismiss an action if it lacks jurisdiction over the subject matter of the suit. *See* Fed. R. Civ. P. 12(b)(1). "Subject matter jurisdiction can never be forfeited or waived and federal courts have a continuing independent obligation to determine whether subject-matter jurisdiction exists." *Leeson v. Transamerica Disability Income Plan*, 671 F.3d 969, 975 n.12 (9th Cir. 2012) (internal quotation marks and citations omitted). On a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), it is the plaintiff's burden to establish the existence of subject matter jurisdiction. *Kingman Reef Atoll Invs., LLC v. United States*, 541 F.3d 1189, 1197 (9th Cir. 2008).

A challenge to the court's subject matter jurisdiction under Rule 12(b)(1) may be a facial challenge or a factual challenge. *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). In evaluating a facial challenge, the court accepts the factual allegations in the complaint as true. *See Miranda v. Reno*, 238 F.3d 1156, 1157 n.1 (9th Cir. 2001). Where a defendant brings a factual challenge, on the other hand, "a court may look beyond the complaint to matters of public record without having to convert the motion into one for summary judgment." *White*, 227 F.3d at 1242 (citation omitted). Once the moving party has made a factual challenge by offering affidavits or other evidence to dispute the allegations in the complaint, the party opposing the motion must "present affidavits or any other evidence necessary to satisfy its burden of establishing that the court, in fact, possesses subject matter jurisdiction." *Colwell v. Dep't of Health & Human Servs.*, 558 F.3d 1112, 1121 (9th Cir. 2009) (quoting *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989)).

NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO
RULE 12(B)(1) OR, IN THE ALTERNATIVE, 12(B)(6)

Rule 12(b)(6), in turn, provides for dismissal of an action for "failure to state a claim upon which relief can be granted." *See* Fed. R. Civ. P. 12(b)(6).  For a 12(b)(6) motion, "all well-pleaded allegations of material fact [are accepted as true] and construe[d] in the light most favorable to the non-moving party." *Padilla v. Yoo*, 678 F.3d 748, 757 (9th Cir. 2012).  "[C]onclusory allegations of law and unwarranted inferences" are insufficient. *Associated Gen'l Contractors v. Metro. Water Dist.*, 159 F.3d 1178, 1181 (9th Cir. 1998).  A complaint must state "evidentiary facts which, if true, will prove [the claim]," *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008), otherwise it will be dismissed.  *See Watson v. Weeks*, 436 F.3d 1152, 1157 (9th Cir. 2006).

Plaintiffs are unable to establish this Court's jurisdiction over this case and have failed to advance a claim upon which relief can be granted.  Therefore, this Motion to Dismiss should be granted and plaintiffs' claims dismissed.

## STATEMENT OF MATERIAL FACTS

Each Defendant appeared to enter into one or more timeshare contracts with one or more of the following Developers: Diamond Resorts International, Inc. ("DRII"); (2) Wyndham Vacation Ownership, Inc. ("WVOI"),[1] (3) Hilton Resorts Corporation, and (4) Welk Resorts Group, Inc.

Each timeshare contract ("Alleged Timeshare Contract") sets forth terms and conditions for a Defendant to purchase, with a loan of credit from the Developer payable in monthly installments, *"a form of right-to-use time share interest in a*

---

[1]  WVOI is the parent company of two Developers with whom at least one Defendant appears to have entered into a timeshare contract: Wyndham Vacation Resorts, Inc. and Wyndham Resort Development Corporation.

NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO
RULE 12(B)(1) OR, IN THE ALTERNATIVE, 12(B)(6)

*time share use plan"* (Exhibit G, *infra*) and Defendant appears to sign and tender a promissory instrument in exchange therefor, with respect to which Developer issues a standard Truth In Lending Disclosure Statement ("TILDS") or the equivalent thereof, a true and correct copy of a TILDS for Defendant Pressney from Developer DRII, which agrees in substance with that of every other Defendant, is hereby incorporated herein by reference and attached hereto as Exhibit A.

At varying points thereafter, each Defendant either became dissatisfied with the Alleged Timeshare Contract or appeared to default on payments required thereunder or both and came to know of and appear to enter into contract with plaintiff Resort Advisory Group.

The alleged Resort Advisory Group contract with each Defendant comprises a *Services Agreement* and *STATEMENT OF UNDERSTANDING* (collectively the "Alleged RAG Contract"), a true and correct copy of which for Defendant Abel, which agrees in substance with and is essentially identical to the Alleged RAG Contract for every other Defendant, is hereby incorporated herein by reference and attached hereto as Exhibit B.

The Alleged RAG Contract provides in paragraph 1a on page 1 of the Services Agreement that "RA-Group will terminate/transfer Your current Timeshare."

In or about January 2017, Barlow and Resort Advisory Group agree that (1) Barlow will review and evaluate certain Resort Advisory Group customer files and Resort Advisory Group will pay for Barlow's services, and (2) some of the Resort Advisory Group customers whose matters Barlow reviews will engage Barlow under a separate written retainer / attorney-client agreement whereby Barlow

agrees to "…take every pre-litigation step required to seek a withdrawal from and/or cancellation…" a timeshare contract (*see* Exhibit H, Affidavit of Brent David Barlow, ¶¶ 5, 6).

By happenstance some two years ago, Barlow came to speak with a fellow who goes by "Dan" whom Barlow later would learn is a founding member of CDRS and with whom Barlow ultimately shared Barlow's consternation with the timeshare industry and Developers and asked for Dan's evaluation of one of Defendant Pressney's two Alleged Timeshare Contracts with Developer DRII (*id.* at ¶¶ 17-19).

Dan reviewed Defendant Pressney's Alleged Timeshare Contract and discovered and shared with Barlow that Defendant Pressney received nothing from the Developer for which Defendant Pressney had not prepaid in full; the promissory note was not supported by consideration; there was no fact suggesting Defendant Pressney owed anything to the Developer; and Defendant Pressney was entitled to return of all sums mistakenly given with respect thereto.

Once Barlow determined, with Dan's help, that the above evaluation is accurate and that CDRS is experienced in resolving such matters (*id.* at ¶ 20), Barlow joined CDRS and began the process of introducing every Defendant to CDRS, so Defendants could receive assistance, if desired, in recovering all sums mistakenly given to a Developer (*id.* at ¶ 37).

Thereupon, four particular Defendants, with the help of other CDRS members, undertook comprehensive efforts to recover the sums mistakenly given to Developer DRII, beginning with a demand for treble the total amount so-given and followed up with lodgment with five different district attorneys and five U.S. attorneys against Developer DRII, a total of 16 criminal complaints (individually a

NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO RULE 12(B)(1) OR, IN THE ALTERNATIVE, 12(B)(6)

"DRII Criminal Complaint," collectively the "DRII Criminal Complaints")— *which affidavits (DRII Criminal Complaints) are hereby made fully part hereof and incorporated herein by reference*—a true, correct, and complete copy of the DRII Criminal Complaint sworn to by Defendant Abel and lodged with the Clark County, Nevada, and Broward County, Florida, District Attorneys and U.S. Attorney for the District of Nevada which agrees in substance with every other DRII Criminal Complaint, is hereby incorporated herein by reference and attached hereto as, respectively, Exhibit C-1, C-2, and C-3 (a duplicate original or certified copy of any DRII Criminal Complaint is available as the Court needs).

At the time of the events described in the above paragraph, Barlow arranged a meeting with Michael Krieck of Resort Advisory Group, who arrived at Barlow's offices in Woodland Hills, California, with another individual previously unknown to Barlow who identified himself as "Bo" (later identified as William James "Bo" Wilson) and the owner of another timeshare exit company, Timeshare Compliance. At said meeting was Dan, whom Barlow also invited (*see* Affidavit of Brent David Barlow, ¶ 35).

The purpose of the meeting was to see if there were anything on which Resort Advisory Group, Dan, and Barlow could collaborate against a Developer and to inform Mr. Krieck of the aforesaid breakthrough with the Alleged Timeshare Contract (*id*. at ¶ 34).

At the meeting Dan detailed the analysis of the plain language of the timeshare contract, demonstrated how each contract reviewed lacked the essential element of consideration, and explained the potential jeopardy facing each Developer that refuses to admit its mistake and make whole the timeshare customer defrauded by Developer.

NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO RULE 12(B)(1) OR, IN THE ALTERNATIVE, 12(B)(6)

Sometime after the reality of Developer fraud had settled in, Defendants realized that it is impossible to "terminate/transfer" a void or unenforceable Alleged Timeshare Contract and that the guarantee in the Alleged RAG Contract is meaningless: Defendants Pressney, Abel, Hannah, Turk, Bettinelli, Castle, Castro, and Martinez sent plaintiffs a *Demand, Notice, and Warning of Commercial Grace* (the "DNWCG") demanding of Resort Advisory Group principals confession of incompetence and treble the amount of all sums mistakenly given to Resort Advisory Group, a true and correct copy of USPS Proof of Delivery of said DNWCG and accompanying notarized Affidavit of Mailing sent to plaintiff Intermarketing Media, LLC by Defendant Abel—*which DNWCG agrees in substance with all others sent to plaintiffs by said other Defendants*—is hereby incorporated herein by reference and attached hereto as, collectively, Exhibit D (a duplicate original or certified copy of any notarized Affidavit of Mailing is available to the Court as needed).

When plaintiffs failed to comply with Defendants' demands, Defendants carried out the measures of which Resort Advisory Group principals were forewarned in the DNWCG, ultimately lodging with three district attorneys and two U.S. attorneys a total of 33 criminal complaints (individually a "RAG Criminal Complaint," collectively the "RAG Criminal Complaints")—*all of which affidavits (RAG Criminal Complaints) are hereby made fully part hereof and incorporated herein by reference*—and a true, correct, and complete copy of the RAG Criminal Complaint sworn to by Defendant Abel and lodged with the San Diego County, California, District Attorney and U.S. Attorney for the Southern District of California—*which two RAG Criminal Complaints agree in substance with every other RAG Criminal Complaint*—is hereby incorporated herein by

NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO
RULE 12(B)(1) OR, IN THE ALTERNATIVE, 12(B)(6)

reference and attached hereto as, respectively, Exhibit E-1 and Exhibit E-2 (a duplicate original or certified copy of any RAG Criminal Complaint is available as the Court needs).

Prior to service on Barlow of plaintiffs' *Ex Parte* Application for Temporary Restraining Order with Expedited Discovery, Other Equitable Relief, and Order to Show Cause Why Preliminary Injunction Should Not Be Issued (*Ex Parte* App., ECF No. 10), Barlow on May 17, 2020, sent by email to counsel for plaintiffs Bryan C. Altman and William I. Rothbard a letter giving notice of the infirmity of any such contemplated action and warning of the liability associated therewith, a true and correct copy of which letter is incorporated herein by reference and attached hereto as Exhibit F.

## ARGUMENT

## I.

### MATERIAL TERMS AND CONDITIONS OF ALLEGED TIMESHARE CONTRACT

A true and correct copy of the document entitled "CREDIT SALE CONTRACT" and subtitled "Diamond Resorts Hawaii Collection" and "Purchase and Security Agreement" from an Alleged Timeshare Contract between Developer DRII and Defendant Abel, which agrees in substance with the purchase agreement of every other Alleged Timeshare Contract between a Developer and a Defendant, is hereby incorporated herein by reference and attached hereto as Exhibit G (the "Alleged Purchase Agreement") (a true and correct copy of any other Developer-Defendant purchase agreement is available to the Court as needed).

At the time of apparent execution of the Alleged Purchase Agreement, Developer DRII appears to sell to Defendant and Defendant Abel appears to

NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO
RULE 12(B)(1) OR, IN THE ALTERNATIVE, 12(B)(6)

purchase from Developer DRII for $189,315.00 plus closing costs of $900.00, what Developer DRII represents as a "Membership."[2]

The Alleged Purchase Agreement provides, in pertinent part (Underline emphasis added.):

5.   Vacation Ownership Plan.

(a) The Collection is a time share use plan under Hawaii law, and your Membership is a form of right-to-use time share interest in a time share use plan. . . .

6.   Assessments and Personal Charges.

(a) *Assessments* are fees charged by the [Diamond Resorts Hawaii Collection Members] Association to pay the Collection costs. Collection costs are the costs of owning, operating, and maintaining the Collection and the Collection Accommodations, operating the Association, and conducting its business. . . .

There are two kinds of assessments: standard assessments and special assessments.

(b) The *standard assessment* is an annual fee charged by the Association to the Members for their share of the annual Collection costs.  You must pay the standard assessment starting with your initial use year and for each year after that.  Your initial standard assessment will be due and you must pay it before you first use and occupy a

_____

[2] Other Developers refer to the equivalent of the Developer DRII Membership as an "ownership interest" or "home week" or "vacation ownership (timeshare estate)" or "vacation ownership interest" or any of various other names.

NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO
RULE 12(B)(1) OR, IN THE ALTERNATIVE, 12(B)(6)

1  <u>Collection Accommodation during the year in which your closing</u>

2  <u>occurs</u>. . . .

3  . . .

4     (c) . . . *Personal charges* are expenses incurred as a result of the

5  act or omission to act or a Member or of someone else occupying a

6  Collection Accommodation assigned to a Member during the time

7  periods reserved of scheduled for use by that Member.

8     (d) . . . <u>Under no circumstances will you be allowed to reserve, use,</u>

9  <u>or occupy any Collection Accommodation, or to exercise any other</u>

10  <u>rights, benefits, or privileges of a Member, unless and until all</u>

11  <u>assessments and other amounts that you owe to the Association or the</u>

12  <u>Seller have been paid in full</u>.

13  10.  Default.

14     (a) You will be in default under this Agreement if (a) you do not

15  pay, or (b) you do not pay on time, or (c) you do not keep any other

16  promise in this Agreement, or (d) you do not perform all of your

17  obligations under this Agreement, your Note, and/or the Collection

18  Instruments . . . <u>If you default then you cannot reserve, use, or occupy</u>

19  <u>a Collection Accommodation and you cannot use any other rights,</u>

20  <u>benefits, or privileges of your Membership</u>.

21     . . .

22     (2) If you fail to keep all of your promises or perform, on time,

23  all of your obligations under the Note, this Agreement, or any of the

24  collection instruments after closing, then the seller will give you

25  written notice of your failure.  <u>If you do not cure your failure within</u>

NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO
RULE 12(B)(1) OR, IN THE ALTERNATIVE, 12(B)(6)

<u>ten days (in the case of failure to pay money) . . . after the seller gives such a notice, then you will be in default and the seller may . . . (ii) terminate your Membership and keep all amounts previously paid by you as liquidated damages</u> . . .

At apparent execution of the aforesaid Alleged Timeshare Contract with Developer DRII January 12, 2017, Defendant Abel gives Developer DRII $11,172.00 in legal tender, $23,136.30 in trade-in value credit, and $155,906.70 in a signed promissory instrument entitled "PURCHASE MONEY NOTE" (the "Alleged Note") for a total of $190,215.00, and Developer DRII gives Defendant Abel the Membership.

### No Debt Incurred

Notwithstanding that the Alleged Purchase Agreement represents in subparagraph 5(a) that *"your Membership is a form of right-to-use time share interest in a time share use plan,"* at apparent execution thereof and purchase of the Membership January 12, 2017, Defendant Abel acquires no "right-to-use time share interest" of any kind.

Paragraph 6 (*supra*, pp. 10-11) and subparagraphs 10(a) and (a)(2) (*supra*, pp. 11-12) of the Alleged Purchase Agreement establish that:

- There are **two essential elements** of the right to "reserve, use, or occupy a Collection Accommodation": (1) Membership, and (2) assessments and personal charges; and

- Membership alone confers no right to "reserve, use, or occupy a Collection Accommodation" or any other "form of right-to-use time share interest in a time share use plan"; and

*///*

12

NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO
RULE 12(B)(1) OR, IN THE ALTERNATIVE, 12(B)(6)

*Whereas:* Upon execution of the Alleged Purchase Agreement and Alleged Note January 12, 2017, Defendant Abel enjoys no right or interest which Defendant Abel does not have *prior* thereto; and

*Whereas:* "Membership," as acquired by Defendant Abel January 12, 2017, has no value, utility, or effect unless supplemented, at additional expense, with timely payment in full of the standard assessment for the "initial use year" and then every year thereafter, along with all other assessments and personal charges described in the Alleged Purchase Agreement; and

*Whereas:* The representation in subparagraph 5(a) of the Alleged Purchase Agreement that *"your Membership is a form of right-to-use time share interest in a time share use plan"* is a **materially false and misleading representation**; and

*Whereas:* Membership does not fall under the legal definition of *property* because it can never actually be owned by any "purchaser"; to wit: Membership—<u>even if paid in full by Defendant Abel</u>—is always subject to summary suspension or termination by Developer DRII should Defendant Abel miss any assessment or personal charge or fail to cure such default within a matter of days; and

*Whereas:* Developer DRII sold Defendant Abel not *"a form of right-to-use time share interest in a time share use plan"* but an assortment of papers on some of which the word "Membership" appears—i.e., a *bill of goods*; and

*Whereas:* There is no fact that shows that upon apparent execution of the Alleged Note by Defendant Abel January 12, 2017:

- Developer DRII gave consideration to Defendant Abel; or
- Defendant Abel received consideration from Developer DRII; and

*Whereas:* In the absence of consideration no debt is incurred,

///

NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO RULE 12(B)(1) OR, IN THE ALTERNATIVE, 12(B)(6)

*Wherefore*: Defendant Abel incurred no debt upon "receipt" of Developer DRII's Membership at apparent execution of the Alleged Purchase Agreement and Alleged Note January 12, 2017.

## VOID NOTE

*Credit* is defined as follows:

> The term "credit" means the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment.  15 U.S.C. § 1602(f).

There being no evidence of fact that Defendant Abel (1) was a debtor to Developer DRII at any time prior to apparent execution of the Alleged Timeshare Contract between Developer DRII and Defendant Abel January 12, 2017, or (2) incurred any debt upon receipt of what Developer DRII calls "Membership":

- Defendant Abel received no loan of credit from Developer DRII;
- There is no valid or enforceable consumer-credit contract between Developer DRII and Defendant Abel;
- The TILDS associated with Defendant Abel's Alleged Timeshare Contract with Developer DRII is a false document; and
- The Alleged Purchase Agreement, Alleged Note, and Defendant Abel's Alleged Timeshare Contract with Developer DRII are void ab initio for failure of consideration.

## II.

## ALLEGED RAG CONTRACT VOID FOR FAILURE OF CONSIDERATION

Defendant Abel's Alleged RAG Contract (Exhibit B) provides, in pertinent part:

*///*

NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO RULE 12(B)(1) OR, IN THE ALTERNATIVE, 12(B)(6)

- "RA-Group will terminate/transfer Your current Timeshare. . . ." (Services Agreement, subparagraph 1a, p. 1)
- "You are still responsible for the mortgage until the termination/ transfer is completed." (*id.* at subparagraph 1b, p. 1)
- "[S]ome resorts/clubs may require a cancellation fee or the like to end an ownership. . . . Should this be the case You will be required to pay the fee(s) to the Developer/Club for a successful termination/transfer." (*id.* at subparagraph 4d, p. 3)
- "Our services are designed to relieve You of Your current mortgage debt and ownership connected to that debt. . . ."  (STATEMENT OF UNDERSTANDING, p. 1)

Whereas, (1) validity and enforceability of the Alleged RAG Contract is predicated exclusively on existence of a valid and enforceable timeshare contract between a Developer and a Defendant, and (2) every Alleged Timeshare Contract is void and unenforceable ab initio for failure of consideration: Plaintiffs are incapable of producing admissible evidence to support fact of substance in the subject matter of the Alleged RAG Contract and the Alleged RAG Contract is unenforceable and void ab initio for failure of consideration.

### III.

#### NO CONTRACT WITH BARLOW

The Amended Complaint (ECF No. 9) provides, in pertinent part:

> Plaintiff provides timeshare resolution services both directly and indirectly, through attorneys retained by it and to whom it refers timeshare purchasers who have met its qualifications for assistance in

NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO
RULE 12(B)(1) OR, IN THE ALTERNATIVE, 12(B)(6)

cancelling and withdrawing from their timeshare contracts. . . . (Page 14 of 101, lines 5-8.)

Timeshare purchasers who credibly appear to have been victimized by a timeshare developer and are qualified and accepted as a suitable client are referred to an attorney on retainer with Plaintiff Resort Advisory Group who will then provide legal representation to the client to help it attempt to cancel and withdraw from the timeshare contract. . . . (Page 20 of 101, lines 8-12.)

Plaintiff Resort Advisory Group has signed valid contracts with each of its clients, including the Barlow 10, for representation of their legal interests to remove or eliminate their timeshare contract obligations. (Page 70 of 101, lines 21-23.)

Because none of the above assertions can be properly supported, yet collectively are a general depiction of plaintiffs' business model, plaintiffs misrepresented to Barlow that:

1. The measures being taken against Defendants by Developers are authorized by contract; and

2. Plaintiffs, with Barlow's assistance, could "terminate/transfer" the timeshare contracts giving Developers the right to enforce those measures.

In support of the foregoing, Barlow hereby incorporates herein by reference as Exhibit H, the attached Affidavit of Brent David Barlow.

There being no fact of an enforceable contract between any Developer and any Defendant or Resort Advisory Group and any Defendant, there can be nothing

NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO
RULE 12(B)(1) OR, IN THE ALTERNATIVE, 12(B)(6)

1  in the subject matter of any purported contract between Resort Advisory Group

2  and Barlow and any such contract is void ab initio.

3                                              **IV.**

4                 **PLAINTIFFS' CLAIMS RELY ON PRIVILEGED CONDUCT**

5       Notwithstanding any additional defense offered by Defendants (e.g., *Truth*,

6  Anti-SLAPP, Noerr-Perrington, etc.) and while bearing in mind distinctions in the

7  application of "privilege" between Federal and state court matters, plaintiffs have

8  constructed a 25-claim complaint to redress conduct that is privileged as a matter

9  of law and cannot form the basis of any cause of action.[3]

10      Federal evidentiary privileges are almost entirely based on case law (*see*

11 Fed. R. Civ. P. 501) while California recognizes only statute-based privileges.

12 California has no common law evidentiary privileges.  *See Welfare Rights*

13 *Organization v. Crisan*, 33 Cal.3d 766, 768-769 (1983).  California courts have no

14 power to "create" an evidentiary privilege.  *See* Cal. Law Revision Com. com.,

---

17      [3] The principal facts and gravamen of Plaintiffs' action is contained in paragraphs 3 and 4 of the First Amended Complaint:

18      3.  Through this enterprise ("Barlow Racketeering Enterprise"), Defendants, at Barlow's direction, guidance, and encouragement, filed knowingly frivolous state court claims against Plaintiff Resort Advisory Group in this District and lodged numerous false and baseless, but, nonetheless, intimidating criminal complaints against Resort Advisory Group and one of its attorneys, Plaintiff David Alan Klein, principal of Plaintiff Law Offices of David Alan Klein, P.C. ("Attorney"), with federal and state law enforcement agencies in Southern California and New Jersey and the Pennsylvania and New Jersey state bars as to Attorney.

21      4.  The intended purpose of these false allegations was to harass and harm the business, reputation and profitability of Resort Advisory Group to facilitate a planned extortion attempt on Plaintiffs, and to harass, intimidate and harm the business, reputation and profitability of Attorney. Moreover, through this enterprise, defendants, orchestrated by Barlow, have attempted, and are continuing to attempt, to extract over $800,000 from Plaintiffs as a condition of ceasing Barlow Racketeering Enterprise's lawsuits, criminal complaints, and bar complaints targeting Plaintiffs and the professional reputation and licensure of Attorney. Further, Defendant Barlow, acting on behalf of the Barlow Racketeering Enterprise, has threatened Plaintiffs with further frivolous civil and criminal charges unless the extortion demand is paid, stating they would not stop until Plaintiffs were ruined and out of business. The imminence of these continuing threats, made within the last two months and renewed as recently as May 5, 2020, highlight the urgent need for judicial intervention.

NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO
RULE 12(B)(1) OR, IN THE ALTERNATIVE, 12(B)(6)

West's Ann.Cal.Evid.Code, foll. § 911; *HLC Properties, Ltd. v. Superior Court*, 35
Cal.4th 54, 59-60 (2005); *Roberts v. City of Palmdale*, 5 Cal.4th 363, 373 (1993).
Federal courts, by contrast, have "the flexibility to develop rules of privilege on a
case-by-case basis." *See Trammel v. United States*, 445 U.S. 40, 47 (1980); *see*
*Dickerson v. Superior Court*, 135 Cal.App.3d 93, 99 (1982).

## LITIGATION PRIVILEGE

"The immunity of parties and witnesses from subsequent damages
liability for their testimony in judicial proceedings was well
established in English common law (citations omitted). Some
American decisions required a showing that the witness' allegedly
defamatory statements were relevant to the judicial proceeding, but
once this threshold showing had been made, the witness had an
absolute privilege. The plaintiff could not recover even if the witness
knew the statements were false and made them with malice. ¶ In the
words of one 19th-century court, in damages suits against witnesses,
"the claims of the individual must yield to the dictates of public
policy, which requires that the paths which lead to the ascertainment
of truth should be left as free and unobstructed as possible. . . ."
*Briscoe v. La Hue*, 460 U.S. 325, 331-333, 103 S.Ct. 1108, 1113-
1114, 75 L.Ed.2d 96, 105-106 (1983)

Under California Civil Code section 47(b), the litigation privilege protects
any "publication or broadcast . . . made . . . in any . . . judicial proceeding." The
privilege is absolute and precludes a claimant from establishing a probability of
prevailing on the merits of his claim. *See Kashian v. Harriman*, 98 Cal.App.4th
892, 926 (2002). The litigation privilege generally applies to "any communication

18

NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO
RULE 12(B)(1) OR, IN THE ALTERNATIVE, 12(B)(6)

(1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." *Silberg v. Anderson*, 50 Cal.3d 205, 212 (1990).  The privilege pertains not only to statements made during a trial, but also to steps taken before trial and statements made "to achieve the objects of the litigation, even though the [statement] is made outside of the courtroom and no function of the court or its officers is invoked." *Albertson v. Raboff*, 46 Cal.2d 375, 381 (1956).  The privilege is intended to "afford litigants and witnesses . . . the utmost freedom of access to the courts without fear of being harassed subsequently . . . . [] [with] protracted and costly lawsuits." *Silberg*, 50 Cal.3d at pp. 213-214.

Each affidavit submitted by a Defendant, of which plaintiffs complain, was sworn *true, correct and complete*, carries the same evidentiary value as any other witness testimony proffered in the judicial process, was tendered in discharge of a legal duty to disclose (*see*, 18 U.S.C. 4) in furtherance of a legitimate judicial purpose, and no credible or admissible evidence has been offered contrary to the facts therein stated.

### ATTORNEY-CLIENT PRIVILEGE

"The attorney-client privilege protects confidential disclosures made by a client to an attorney in order to obtain legal advice, as well as an attorney's advice in response to such disclosures." *In re Grand Jury Investigation*, 974 F.2d 1068, 1070 (9th Cir. 1992) (citations omitted).   The privilege protects communications between a client and their attorney from compelled disclosure in a court of law. *See, Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).  It is a long recognized principle that "the advocate and counselor [needs] to know all that

NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO
RULE 12(B)(1) OR, IN THE ALTERNATIVE, 12(B)(6)

relates to the client's reasons for seeking representation" if he is to provide effective legal advice. *Trammel v. United States*, 445 U.S. 40, 51 (1980); *see also* 8 John Henry Wigmore, Evidence § 2290 (John T. McNaughton, ed. 1961). The privilege is recognized to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co*., 449 U.S. at 389. The suggestion that Defendants acted at the "direction, guidance, and counseling" of Barlow is speculation based on privileged communications protected by the attorney-client privilege.

### DUTY OF ZEALOUS REPRESENTATION

As first articulated in 1908, in ABA Canons of Professional Ethics, Canon 15 (". . . *a lawyer owes entire devotion to the interest of the client, warm zeal in the maintenance and defense of his rights and the exertion of his utmost learning and ability* . . ."), an attorney owes a duty of zealous representation to a client. *See* California Rules of Professional Conduct, Rule 1.3 Diligence; American Bar Association ("ABA") Model Rule 1.3 (Diligence); California Business and Professions Code section 6068.

When plaintiffs referred clients, including Defendants, to Barlow for legal representation and the attorney-client relationship was thereafter established between such referred client and Barlow, the fiduciary obligations on Barlow required Barlow zealously represent those clients wherever the evidence led. In this case, it led back to plaintiffs, which for example charged one of Barlow's clients $118,515.47 for timeshare "cancellation" services. *See* Exhibit I.

Even if the fact is overlooked that the underlying timeshare contract lacks consideration and is therefore unenforceable by the Developer, once the matter was

NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO
RULE 12(B)(1) OR, IN THE ALTERNATIVE, 12(B)(6)

referred to Barlow, plaintiffs' continued involvement was merely incidental. Plaintiffs knowing referral of clients to Barlow, which imposed a duty of zealous representation on Barlow, did not insulate plaintiffs from the consequences of any wrongful conduct towards the referred client. When the evidence led back to plaintiffs, Barlow referred such clients to other representation given the potential conflict of interest.

### MEDIATION CONFIDENTIALITY / SETTLEMENT PRIVILEGE

Federal Rule of Evidence 408—which forms the basis of a number of state's mediation privilege—makes inadmissible statements made in compromise discussions "when offered to prove liability for, invalidity of, or amount of a claim that was disputed . . . ." Fed. R. Evid. 408(a). California Evidence Code section 1115(a) defines mediation as "a process in which a neutral person or persons facilitate communication between the disputants to assist them in reaching a mutually acceptable agreement." In *Travelers Casualty and Surety Co. v. Superior Court*, 126 Cal. App. 4th 1131, 1138-1139 (2005), citing, *Saeta v. Superior Court*, 117 Cal. App. 4th 261, 269 (2004), the court noted that "[a]lthough mediation takes many forms and has been defined in many ways, it is essentially a process where a neutral third party who has no authoritative decision-making power intervenes in a dispute to help the disputants voluntarily reach their own mutually acceptable agreement." The scope of confidentiality in mediation is quite broad, and it protects virtually anything that is said, done or produced, regardless of the purpose for which disclosure is sought. And it applies to all participants, not just the parties and their attorneys. Ca. Practice Guide Civil Trials and Evidence, Rutter Group, 8:2831.20.

///

NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO
RULE 12(B)(1) OR, IN THE ALTERNATIVE, 12(B)(6)

California Evidence Code Section 1152, subdivision (a), provides, "Evidence that a person has, in compromise … furnished or offered or promised to furnish money or any other thing … to another who has sustained … loss or damage, as well as any conduct or statements made in negotiation thereof, is inadmissible to prove his or her liability for the loss or damage or any part of it." Section 1154 provides, "Evidence that a person has … offered … to accept a sum of money or any other thing … in satisfaction of a claim, as well as any conduct or statements made in negotiation thereof, is inadmissible to prove the invalidity of the claim or any part of it."  Both provisions are based on the public policy in favor of the settlement of disputes without litigation and are intended to promote candor in settlement negotiations: "The rule prevents parties from being deterred from making offers of settlement and facilitates the type of candid discussion that may lead to settlement." (*Carney v. Santa Cruz Women Against Rape*, 221 Cal.App.3d 1009, 1023, 271 Cal.Rptr. 30 (1990); *see Caira v. Offner*, 126 Cal.App.4th 12, 32, 24 Cal.Rptr.3d 233 (2005); *Hasler v. Howard*, 120 Cal.App.4th 1023, 1026, 16 Cal.Rptr.3d 217 (2004); *see generally* Cal. Law Revision Com. com., 29B West's Ann. Evid. Code (1995 ed.) foll. § 1154, p. 532 ["Section 1154 stems from the same policy of encouraging settlement and compromise that is reflected in Section 1152"].)

Given Barlow's preexisting relationship with each party and with no interest in the outcome, at the parties' request, Barlow consented to mediate the dispute between plaintiffs and Defendants.  To this end, Barlow initially conferred with each party separately to determine the breathe of the dispute and in recognition of the geographic challenges in bringing the parties together (most Defendants reside outside southern California).  An opening session with principals of Resort

NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO RULE 12(B)(1) OR, IN THE ALTERNATIVE, 12(B)(6)

Advisory Group (Jason Krieck, Mike Krieck, Bo Wilson, and Rich Folk) was held in Barlow's offices on March 2, 2020.  These conversations were designed to facilitate a resolution of the dispute between the plaintiffs and Defendants and explore the potential terms of a settlement.  As such and in this context, any offer to settle is subject to the mediation privilege.  Even if the mediation privilege does not apply in this situation, for whatever reason, the settlement privilege bars introduction of such evidence to prove the validity or amount of the claim.

## V.

## CONCLUSION

The Amended Complaint contains a recycled set of allegations designed to punish those who placed trust in plaintiffs and who have only sought plaintiffs' ethical conduct towards Defendants.  Plaintiffs' allegations rely on privileged conduct, hypothesis, legal conclusions, and misleading supposition.  The Court has before it no fewer than ten *affidavits* factually supporting this Motion and establishing that no Defendant received anything of value when entering into the timeshare contract with a Developer.  Plaintiffs must provide admissible evidence of such gravity, solemnity, and liability as to overcome the material facts therein stated.

Defendants have acted at all times in good faith and provided commercially reasonable notice of every action taken about which plaintiffs complain.  Plaintiffs have been afforded the opportunity to admit their mistake but choose rather to solicit this Court's assistance in furtherance of their design relying on conclusory allegations of law and unwarranted inferences to advance their argument.

There being no valid or enforceable contract between (1) any Developer and any Defendant, (2) Resort Advisory Group and any Defendant, or (3) Resort

NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO
RULE 12(B)(1) OR, IN THE ALTERNATIVE, 12(B)(6)

Advisory Group and Barlow, nor any admissible evidence supporting a claim of wrongdoing by Barlow, there is no justiciable matter before the Court and warranting plaintiffs be permitted to proceed with the instant action.

Therefore, plaintiffs' Amended Complaint should be dismissed with prejudice for plaintiff's lack of standing and the Court's lack of subject-matter jurisdiction or, in the alternative, for plaintiffs' failure to state a claim upon which relief can be granted.

Dated this 28th day of July 2020          Respectfully submitted,

                                          *s/ Brent D. Barlow*
                                          Brent D. Barlow, Esq. (Bar No. 168645)
                                          Email: brent@barlowlegal.com
                                          20929 Ventura Boulevard, Suite 47
                                          Woodland Hills, California 91364-2334
                                          Telephone: (818) 369-4432
                                          Facsimile: (818) 887-0528
                                          *Attorney for Defendant*
                                          *Brent David Barlow, In Propria Persona*

NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO
RULE 12(B)(1) OR, IN THE ALTERNATIVE, 12(B)(6)

1

2

3

4

5

6

7

8

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTERMARKETING MEDIA, LLC et al, | )<br>) | **No. 8:20-cv-00889** |
| | ) | |
| Plaintiffs, | ) | **[PROPOSED] ORDER** |
| | ) | |
| *vs*. | ) | |
| | ) | |
| Brent David Barlow et al, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

The Court having read and considered Defendant Brent David Barlow's Motion to Dismiss, and good cause appearing,

IT IS HEREBY ORDERED granting the Motion to Dismiss with prejudice.

IT IS SO ORDERED.

DATED: _____

_____
Honorable Josephine L. Staton
United States District Court

**[PROPOSED] ORDER**

# EXHIBIT A



Diamond Resorts

17689341-Truth in Lending Disclosure Multisite Collection

# TRUTH IN LENDING DISCLOSURE STATEMENT

**DEBTOR:**

**John Arthur Pressney**
Name

26753721
Promissory Note Number

**Pamela Morgon Pressney**
Name

_____
Name

Confidential
Confidential
Home Telephone

~~Address~~
Confidential

Confidential
City/State/Zip

Confidential
Business Telephone

CREDITOR:   Diamond Resorts U.S. Collection Development, LLC,   c/o Diamond Resorts Financial Services, Inc.
10600 West Charleston Boulevard, Las Vegas, Nevada 89135

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | AMOUNT FINANCED | TOTAL OF PAYMENTS | TOTAL SALE PRICE |
|---|---|---|---|---|
| The cost of your credit as a yearly rate: | The dollar amount the credit will cost you: | The amount of credit provided to you or on your behalf: | The amount you will have paid after you have made all payments as scheduled: | The total cost of your purchase on credit including your down payment of: $58,345.20 |
| 12.1629 % | $73,797.20 | $100,682.80 | $174,480.00 | $232,825.20 |

Your payment schedule will be:

| Number of Monthly Payments | Amount of Each Payment | | | Payments are due monthly beginning |
|---|---|---|---|---|
| | P & I | + Collection Fee = | Total Payment | |
| 120 | $1,448.00 | + $6.00 = | $1,454.00 | February 13th, 2017  (e) |

**Security:**   You are giving a security interest in the property being purchased in this transaction.

**Late Charge:**   If a payment is more than ten (10) days late, you will be charged a late charge equal to the lesser of: (i) Twenty-Five
**Default Rate:**   Dollars ($25.00) or (ii) ten percent (10%) of the overdue installment. In addition, we may, at our option, increase the rate of finance charge to the maximum lawful rate under applicable law or, if there is no such rate, twenty-five percent (25%) per annum.

**Variable Rate:**   ☐  (This paragraph applies only if checked.) You have agreed to the terms of our "Pre-Authorized Draft Plan" (the "SurePay Plan"). Your participation in the SurePay Plan will terminate immediately upon the occurrence of any of the following events: (i) at any time prior to the Maturity Date, you elect to terminate your participation in the SurePay Plan; (ii) you close the designated bank account; or (iii) on more than one occasion, a SurePay payment is not made when due for any reason (including your failure to maintain a sufficient balance in the designated bank account to cover any required payment). In such event, your interest rate will increase by Zero percent (0.00%) per annum and your monthly payment will increase to the level sufficient to repay all principal, interest and collection fees by your final payment date through equal monthly payments on each payment date. The increase in the interest rate will be effective retroactively to the date of the last payment made under the SurePay Plan, and the increase in payment amount will apply to the next payment due after the last such SurePay payment. If you were to make a single payment under the SurePay Plan and one of the above events were then to occur, your total monthly payment of principal and interest would increase from **$1,454.00 to $1,454.00.**

**Prepayment:**   If you pay off early, you will not have to pay a penalty.

**Contract**
**Reference:**   See your contract documents for any additional information about non-payment, default, any required repayment in full before the scheduled date, and prepayment rebates and penalties.

"(e)" means estimate

**SEE ITEMIZATION OF AMOUNT FINANCED AT PAGE 1 OF PURCHASE AND SECURITY AGREEMENT
OR THE "PURCHASE TERMS" SECTION OF CREDIT SALE CONTRACT, AS APPLICABLE**

The undersigned Buyer(s) acknowledge(s) receipt of a fully completed copy of this disclosure on this date.

_____
**John Arthur Pressney**
Printed Name

_____
**Pamela Morgon Pressney**
Printed Name

_____
Printed Name

_____
Printed Name

**December 30th, 2016**
Date

Rev 08/10 - (10072010)_e_sig_03_21_2016

# EXHIBIT B



**RESORT ADVISORY**

## Services Agreement

This Services Agreement (the "Agreement") is made and entered into as of _7/5_____, 20_/8_ by
and between Resort Advisory Group hereinafter ("RA-Group"), whose service address is 1800 Thibodo
Road, Suite 100, Vista, CA., 92081 and _DAVID & DEBORAH ABE/_____(Individually and
collectively "You or "Your") having an address at:
Confidential _____

### Recitals

Whereas prior to the execution of this Agreement, You entered into an agreement to purchase a
Timeshare, Timeshare Unit, Vacation/Travel Club, and/or Club Points from a person or entity who
developed, sold or otherwise brokered same to You ("Timeshare"); and Whereas You desire to
obtain, but do not expect any refund of any of the monies paid by You in connection with the
Timeshare, and understand that the services of RA-Group should not be construed as legal advice as
such RA-Group is not a law firm and will endeavor to perform Your objective to end Your Timeshare
ownership and all the associated financial obligations. However, certain of the termination related
Services may require that you be represented by a referred attorney ("Attorney"). To that end, RA-
Group will pay the legal expenses related to any such representation.

Therefore, in consideration of the mutual promises and consideration set forth herein, the receipt and
sufficiency of which is hereby acknowledged, You and RA-Group agree as follows:

## 1. Services

    a.    RA-Group will terminate/transfer Your current Timeshare. If Your Purchase
Agreement is not terminated, transferred, or current contract not rolled back to a
previous contract or agreed to be by the Developer (collectively "Terminate") within
eighteen (18) months of RA-Group's receipt of the entire FEE and all information and
documentation as indicated in Section 1d, You will then have the option to either
keep Your Timeshare after signing a release terminating this Agreement and seek a
REFUND under Section 5 of this Agreement (*Guarantee*), or to extend this Service
Agreement for a period of six (6) months.  IF YOU FAIL TO ADVISE RA-GROUP THAT
YOU WISH TO TERMINATE THIS AGREEMENT BY THE END OF THE EIGHTEEN (18)
MONTH PERIOD AS DESCRIBED HEREIN, THIS AGREEMENT WILL AUTOMATICALLY
RENEW FOR A PERIOD OF SIX (6) MONTHS.

    b.    Except in the case where You obtained a developer offered mortgage, You understand
that You are responsible to continue to make all payments on any financing used to
pay for any part of the Timeshare, such as; Bill Me Later/Pay Pal Credit, Developer
offered Credit Cards, or any other financial or credit instruments. You are still
responsible for the mortgage until the termination/transfer is completed.

1

c. Certain of these Services may require You to be represented by an Attorney, RA-Group is not a law firm and cannot perform such services. However, RA-Group agrees to pay the legal expenses related to any such representation of the referred attorney.

d. You agree to provide RA-Group with copies of any and all documents, agreements, and any other written materials relating to Your Timeshare, and in connection therewith. You further understand that if all of the materials are not received by RA-Group within (30) days from the receipt of the FEE, each additional day thereafter will delay the start of eighteen (18) month Guarantee period. If all of the materials have not been received by RA-Group within ninety (90) days following RA-Group's receipt of Your FEE, RA-Group reserves the right to cancel this Agreement without any further obligation to You as indicated in Section 5 Guarantee.

e. You agree to follow and otherwise comply with all of RA-Group's instructions and procedures as a part of the RA-Group Services and not to deviate therefrom without the written consent of RA-Group and/or any of the Attorneys retained.

f. RA-Group will not render any services that conflict with, or are otherwise prohibited by California, or Federal law. Furthermore RA-Group and/or any of the Attorneys retained will not: request, expect, direct, suggest or encourage You to engage in any unethical, un-truthful, deceptive or misleading activity(s).

g. You understand that any use of Your Timeshare, Timeshare Unit, Vacation/Travel Club, and/or Club Points after the execution of this Agreement may prevent or otherwise interfere with RA-Group's ability to Terminate Your Timeshare, Timeshare Unit, Vacation/Travel Club, and/or Club Points. RA-Group reserves the right to cancel this Agreement without any further obligation to You if RA-Group determines that you are planning to or have used your Timeshare, Timeshare Unit, Vacation/Travel Club, and/or Club Points anytime after the execution of this Agreement. You understand and agree that should this occur, You will FORFIET any FEE paid to RA-Group and VOID Section 5, (*Guarantee*) of this  Agreement

Initial: _____

## 2. Term

Unless extended as indicated in Section 1,a, the term of this Agreement shall be eighteen (18) months and shall terminate upon the earlier of: (i) the termination/transfer, or current contract roll back of Your Timeshare, (ii) violation of any of the terms or conditions of this Agreement VOIDING SECTION 5, (*Guarantee)*, and any REFUND in connection therewith; (iii) Your retention of Your Timeshare(s); or (iv) the expiration of the eighteen (18) months, or the extension thereof.

Initial: _____

## 3. Timeshare/Clubs

DIAMOND

Purchase Date & Location: 7/17/17 HAWAII Collection Mortgage Balance: $169,755.56

Purchase Date & Location: _____ Mortgage Balance: $_____

Purchase Date & Location: _____ Mortgage Balance: $_____

Purchase Date & Location: _____ Mortgage Balance: $_____

Contract #'s 17583190
1769421

Initial: A DA

## 4. Fee

a.  You agree to pay to RA-Group the sum of $55,854.53 plus a processing fee of $549 for a combined total of $56,403.53 (the "Fee"). The Fee will be paid as follows: $9,000.00 Deposit, making the balance due to RA-Group $47,403.55 to be paid in monthly installments of $3,500.00 per month for 13.5 Months, due on the 7th of every month ("Payment Date"). RA-Group reserves the right to discontinue all services contained within this Agreement and consider the Agreement satisfied in the event You become sixty (60) days or more in default of your monthly installment.

b.  You agree to pay the Fee within seven (7) calendar days following the full execution of this Agreement (the "Payment Date"). The Fee becomes immediately non-refundable except as may be set forth herein regarding Section 5 Guarantee. In the event that RA-Group does not receive the entire Fee by the Payment Date, You will be considered in default, and in addition to all other rights and remedies RA-Group may have against You, nothing contained in this Agreement will prevent, negate, or otherwise diminish Your obligation to pay the entire Fee in a timely basis.

c.  In the event that an Attorney is retained and the recovery of some or all of the monies paid by You in connection with the Timeshare is successful, the Attorney may elect to keep up to 33.33% of the refunded monies.

d.  You understand there will be no additional Fees owed to RA-Group and/or any of the Attorneys retained. However, some resorts/clubs may require a cancellation fee or the like to end an ownership. These fees will be no greater than the amount of twelve (12) month's maintenance fees, except in the case where all past maintenance fees are also required. Should this be the case You will be required to pay the fee(s) to the Developer/Club for a successful termination/transfer.

Initial: A DA.

3

## 5. Guarantee

Notwithstanding anything to the contrary contained herein, and provided that You have followed, complied with, and adhered to the terms and conditions of this Agreement, **and** Your Timeshare(s) was not terminated/transferred as set forth in this Agreement, **or** You did not opt to keep Your Timeshare, RA-Group will then refund Your FEE to You within thirty (30) business days after receipt of Your Refund election, said Notice of Refund ELECTION to be made within sixty (60) days following the expiration of the Term of this Agreement as set forth herein. This Guarantee is considered met even though You may not accept the terms of the Developers/Clubs; termination / transfer / current contract roll back agreement. You hereby acknowledge and agree that this Agreement does not provide for, and **RA-Group does not guarantee** that You will receive any reimbursement of any monies which You have already paid to the Developer in connection with the Timeshare. Furthermore You do not have any basis for cancellation of this Agreement, and are not entitled to receive a refund of the FEE in the event that you do not receive such reimbursement. You are guaranteed that your Timeshare will be terminated/transferred; that you will receive an offer from the Assignor of Your Timeshare; Your Timeshare will be placed back to a previous traded Timeshare; or that You can be relieved of Your entire ownership subject to your full compliance with the terms and conditions set forth in this Agreement.

Initial: _____

## 6. Obligations to Developer

You understand and agree that RA-Group has not advised You to breach, in any way, Your contractual obligations to Your Timeshare, Vacation/Travel Club, and/or Club Points Developer. RA-Group has advised and urged You to continue to honor any and all obligations that you may have with Your Timeshare(s), and, furthermore, You agree to comply with the terms and conditions of Your Timeshare(s) Vacation/Travel Club, and/or Club Points agreement(s) during the entire term of this Agreement, and any extension thereof.

Initial: _____

## 7. Confidentiality

a. You and RA-Group acknowledge and agree that each will be given access to certain Confidential Information belonging to the other in connection with the services offered and provided by RA-Group, and that said Confidential Information, which includes RA-Group's proprietary processes and procedures, is revealed by one party (the "Disclosing Party") to the other party (the "Receiving Party") in strict confidence solely for the purpose of facilitating the performance of this Agreement. The Disclosing and Receiving parties acknowledge and agree that without prior written consent of the other, neither party may use or disclose such Confidential Information in any manner at any time except as is reasonably necessary to further the purpose of this Agreement. Each party agrees and acknowledges that if a violation of this Section of this Agreement occurs, or is threatened,

4

such violations may cause irreparable harm to the affected party, and that the monetary damages for any such violation or threatened violation may be inadequate and that the affected party shall be entitled to seek appropriate legal **and** equitable relief, such remedies being cumulative and non-exclusive, including, without limitation, injunctive relief against breach of this Agreement.

b. For purposes of this Agreement, Confidential Information shall include, but not be limited to, RA-Group's processes and procedures and proprietary information that is marked or otherwise identified by the Disclosing Party as confidential and shall include, without limitation, information relating to each others clientele and competitors. Confidential Information shall not include information that the Receiving Party can document: (a) was in public domain at the time it was communicated to the Receiving Party by the Disclosing Party; (b) entered the public domain subsequent to the time it was communicated to the Receiving Party by the Disclosing Party; (c) was in the Receiving Party's possession, free of any obligation of confidence at the time it was communicated to the Receiving Party by the Disclosing Party; (d) was rightfully communicated to the Receiving Party by a third party free of any obligation of confidence subsequent to the time it was communicated to the Receiving Party by the Disclosing Party; or (e) was developed by employees or agents of the Receiving Party independently of any information communicated to the Receiving Party by the Disclosing Party. In addition, the Receiving Party may disclose the Disclosing Party's Confidential Information in response to a valid order by a court or other governmental body as otherwise required by law, or as necessary to establish the rights of either party under this Agreement; provided, however, that the Receiving Party shall provide the Disclosing Party with prior written notice of any such disclosure.

Initial: _____

## 8. Warranty and Representations

You warrant and represent that (i) You have the right, power, and authority to enter into this Agreement; (ii) all of the information and materials that You furnish or otherwise provide to RA-Group are true, accurate, and does not contain any false information to the best of Your knowledge; (iii) You have the right, power, and authority to engage RA-Group in connection with the RA Group Services; (iv) You agree to complete, follow and otherwise comply (without change, alteration, amendment) with each component, element and phase of RA-Group's directions, consultations, and instructions in a timely manner; and (v) RA-Group and You are independent contracting parties, and nothing contained in this Agreement shall be deemed to create a partnership, joint venture or agency relationship between You and RA-Group.

Initial: _____

## 9. Indemnification

You agree to defend, indemnify, and hold RA-Group and its officers, agents, employees, attorneys, directors, and shareholders harmless from and against any and all liability, claims, penalties, damages, injuries, costs, attorney fees of other expenses of any nature whatsoever paid or incurred in connection with claims by any person directly or indirectly arising from or relating to any breach of this Agreement by You or any of Your warranties and representations.

Initial: _____

## 10. Dispute Resolution and Waiver of Jury Trial

Other than as set forth in Section 7, *Confidentiality*, You and RA-Group hereby agree that any dispute, controversy, or claim between the parties arising out of or related to this Agreement, in whole or part, that cannot be otherwise resolved between the parties shall be solely and exclusively subject to and otherwise submitted for resolution by and through binding arbitration under the control, administration and auspices of the American Arbitration Association (hereinafter "AAA") and through no other person, entity or forum. You and RA-Group agree to be subject to the rules and conditions established by the AAA in connection with their binding arbitration procedures and each party shall bear their own respective costs in connection therewith. **YOU AND RA-GROUP HEREBY WAIVE ANY RIGHT TO BRING ANY ACTION AGAINST THE OTHER PARTY IN ANY COURT AND, FURTHER WAIVE ANY RIGHT TO REQUEST A TRIAL BY JURY IN CONNECTION WITH THIS AGREEMENT**. Notwithstanding anything to the contrary contained herein, any decision rendered in such AAA arbitration shall be final and binding on you and RA-Group and such decision may be entered (but not challenged or otherwise appealed) in a court of competent jurisdiction. The Parties' obligation to utilize the aforementioned binding AAA arbitration process as the sole and exclusive means of resolving any disputes shall be an independent covenant and be binding by and between the Parties in perpetuity. Notwithstanding the foregoing, neither Party shall be liable to the other Party for any special, punitive, incidental, indirect or consequential damages, losses, costs or expenses, including but not limited to, any loss or profits of business arising out of this Agreement, however caused, and whether based in contract, tort, negligence, products liability or any theory of liability regardless of whether the Party has been advised of the possibility of such damages, losses, costs or expenses. FURTHER, YOU HEREBY ACKNOWLEDGE AND AGREE THAT ANY AND ALL SUCH DISPUTES, CONTROVERSIES, OR CLAIMS BETWEEN THE PARTIES SHALL BE VENUED AND TAKE PLACE IN THE COUNTY OF SAN DIEGO, STATE OF CALIFORNIA.

Initial: _____

## 11. Complete Agreement

This Agreement contains the entire understanding and agreement between the Parties with respect to the subject matter addressed, and supersedes any and all prior understandings and agreements, whether written or oral, between and among the Parties relating to the subject matter of this Agreement. Each Party specifically acknowledges, represents and warrants that they have not been induced to sign this Agreement by any belief that the other will waive or modify provisions of this Agreement in the future. This Agreement may not be assigned or transferred. No change or modification of this Agreement will be valid unless in writing and signed by the Parties. The invalidity of unenforceability of any particular provision of this Agreement will not affect the other provisions hereof, and the Agreement will be construed in all respects as if such invalid or unenforceable provisions were omitted. Failure of either Party to enforce any provision of this Agreement shall not constitute a breach thereof and shall not constitute a waiver of either Parties right to enforce the other provisions hereof.

Initial: _____

## 12. Applicable Law Binding Effect and Counsel

The parties hereby acknowledge and agree that: this Agreement was made in the state of California; is and shall be governed and interpreted under the laws of the State of California; any and all claims and will inure to the benefit of and be binding upon the Parties hereto and their heirs, personal representatives, successors and assigns. Each Party acknowledges that they either retained independent counsel to review this Agreement or that they elected to execute this Agreement without the advice of counsel. RA-Group asserts and You hereby acknowledge that RA-Group is not a law firm and any information provided is not a substitute for legal advice. RA-Group is not a law firm or an entity authorized to practice law in any of the United States of America and You acknowledge that RA-Group has not represented itself as such to You.

Initial: _____

## 13. Mailing Address

Any payments and correspondence that are not communicated to RA-Group through electronic methods such as email or wire transaction, shall be mailed to the following address:

**Resort Advisory Group**
**1800 Thibodo Road**
**Suite 100**
**Vista, CA. 92081**

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their dully authorized representatives as of the day and year first set forth above.

READ, AGREED TO AND ACCEPTED BY:

Resort Advisory Group                                    "You"

By: _____                    Sign: _____
An Authorized Signatory

Title: CASE ADVISOR                                      Print: David Abel

                                                         Date: 7/3/18

                                                         Sign: _____

                                                         Print: Debora Abel

                                                         Date: 7/3/18

8

# STATEMENT OF UNDERSTANDING

1. ___ The Fees paid by You to RA-Group are not for the payoff or settlement of any previous or existing loans or mortgages in connection with the Timeshare. Our services are designed to relieve You of Your current mortgage debt and ownership connected to that debt. You also understand that RA-Group does not engage in any negotiations with:
   _____ *DIAMOND* _____.

2. ___ This usually is not the case but You are aware that Your credit may be affected.

3. ___ RA-Group does not represent any financial institutions.

4. ___ RA-Group does not represent: _____ *DIAMOND* _____.

5. ___ RA-Group does not guarantee that any money will be refunded from the Developer in the event Your Timeshare is terminated.

6. ___ All existing and future reservations 30-60 days after the process begins may be cancelled by the Developer.

7. ___ This is not typical, however, You may receive a 1099 form should the Developer terminate your Timeshare from this process. We would suggest consulting your tax professional.

8. ___ Other than in the case where You obtained a Developer offered mortgage, You understand you are still responsible to make all payments on any financing used to pay for any part of the Purchase Agreement such as; Bill Me Later/Pay Pal Credit, Developer offered credit cards, or any other financial or credit instrument.

9

# EXHIBIT C-1

# Certification

The undersigned, Herman David Abel, residing at 64 Montego Key, Novato, Marin County, California 94949, hereby swears that the attached reproduction of Affidavit of Information: Criminal Complaint for Public Notice Filing, Form AOI-022020-CCDA, fourteen (14) pages in length and dated and notarized February 20, 2020, by Herman David Abel and Debora Susan Abel and time-stamped "RECEIVED" at 10:17 A.M. February 24, 2020, by the Office of the Clark County, Nevada, District Attorney, is a true, correct, and complete photocopy of a document in my possession.

Date: March 2, 2020

_____

Herman David Abel
Affiant

A notary public or other officer completing this certificate
verifies only the identity of the individual who signed the
document to which this certificate is attached, and not the
truthfulness, accuracy, or validity of that document.

State of California      )
                         )      ss.
County of Marin          )

# Jurat

Subscribed and sworn to (or affirmed) before me this ___2___ day of ___March___, 20_20_, by
_____, proved to me on the basis of satisfactory evidence to

be the person who appeared before me.

_____
Notary Public

DEBRA J. FOX
Notary Public - California
Marin County
Commission # 2239656
My Comm. Expires May 21, 2022

Form CCDA-022520-CERT

# AFFIDAVIT OF INFORMATION
## CRIMINAL COMPLAINT
## FOR PUBLIC NOTICE FILING

2020 FEB 24 A 10: 17

RECEIVED
DISTRICT ATTORNEY
RECEPTION

| | | |
|---|---|---|
| Herman David Abel, and<br>Debora Susan Abel,<br><br>    Complainant Affiants,<br><br>    v.<br><br>Michael Allen Flaskey,<br>Kenneth Steven Siegel,<br>Charles Alan Bentley,<br>Brian Paul Garavuso,<br>Lisa Marie Gann,<br>David Francis Palmer,<br>Stephen J. Cloobeck,<br>Howard Samuel Lanznar,<br>Jason Frederic Cohen,<br>Corrine Leah Gaxiola, and<br>Diamond Resorts International, Inc.,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | NO. _____<br><br>AFFIDAVIT OF INFORMATION<br><br>CONSPIRACY [8 COUNTS]. |

Introduction.

Complainant affiants Herman David Abel and Debora Susan Abel **(collectively "Complainant Affiant")** hereby present this Affidavit of Information upon probable cause pursuant to Nevada Revised Statutes **("NRS")** § 199.480(3)(d), in respect of which, evidence of the above offense, committed by the above-named defendants, is provided herewith.

Defendants Michael Allen Flaskey, Kenneth Steven Siegel, Charles Alan Bentley, Brian Paul Garavuso, Lisa Marie Gann, David Francis Palmer, Stephen J. Cloobeck, Howard Samuel Lanznar, Jason Frederic Cohen, Corrine Leah Gaxiola, and Diamond Resorts International, Inc. **(collectively the "Defendant")** are charged with conspiracy beginning January 5, 2014, and

continuing to the present day, but only as perpetrated during each said defendant individual's

respective tenure of employment at Diamond Resorts International, Inc.[1]

Background.

Diamond Resorts International, Inc. **("DRII")** is a timeshare developer who in Kauai

County, Hawaii, and Marin County, California (and other places), sells timeshare interests,

called memberships, associated with certain DRII timeshare resort properties.

A common DRII practice is to upgrade a customer's membership by accepting a trade-in

of the previous timeshare contract, crediting sums given, and executing a new contract.

Complainant Affiant has (a) two (2) such transactions with DRII in Kauai County,

Hawaii, with DRII, January 5, 2014, and January 12, 2017, and (b) five (5) in Marin County,

California, May 30, 2015, August 24, 2015, March 11, 2016, October 10, 2016, and July 7, 2017.

On January 5, 2014, in Kauai County, Hawaii, DRII appears to sell HERMAN DAVID

ABEL and DEBORA SUSAN ABEL **(collectively "ABEL")** a timeshare interest in alleged

DRII timeshare contract no. 17009411T—a true and correct digital copy of which is available on

the Internet at **https://gofile.io/?c=DbD45h** and hereby made fully part hereof as Exhibit A—

where, in exchange for an alleged down payment, "financed" closing costs, and a signed

promissory note for the benefit of DRII, Defendant promises to give Complainant Affiant *"a*

---

[1]  Based on admissions of Diamond Resorts International, Inc. found online, it is Complainant Affiant's belief that the following defendant-individuals were employed by Diamond Resorts International, Inc. during the following respective periods:

| | | |
|---|---|---|
| • | Michael Allen Flaskey: | 2010 to the present day |
| • | Kenneth Steven Siegel: | January 2017 - January 2019 |
| • | Charles Alan Bentley: | April 2007 - December 2017 |
| • | Brian Paul Garavuso: | April 2008 - April 2019 |
| • | Lisa Marie Gann | April 2007 to the present day |
| • | David Francis Palmer: | 2010 through December 2018 |
| • | Stephen J. Cloobeck: | April 2007 - September 2016 |
| • | Howard Samuel Lanznar: | 2012 - 2016 |
| • | Jason Frederic Cohen: | June 2016 to the present day |
| • | Corrine Leah Gaxiola: | 2016 to the present day |

*loan from the seller"* to purchase from DRII certain intangible personal property, specifically *"Membership in the Diamond Resorts Hawaii Collection vacation plan"* (**the "Alleged Membership"**), requiring of ABEL fees and payments of alleged principal, interest, and various other related periodic sums to DRII.

ABEL on May 30, 2015, August 24, 2015, and March 11, 2016, in Marin County, California, appears to purchase / upgrade and enter into a new contract, alleged DRII timeshare contract nos. 17159350, 17204479, and 17396537, respectively—a true and correct digital copy of each of which is available on the Internet at **https://gofile.io/?c=DbD45h** and hereby made fully part hereof as, respectively, Exhibit B, Exhibit C, and Exhibit D—each time appearing to trade in the original alleged DRII timeshare contract, receiving credit for sums given thereunder, and appearing to execute another.

At the time of the above four (4) alleged DRII timeshare contracts, DRII is a publicly traded company on the New York Stock Exchange.

In or about September 2016, Apollo Global Management, LLC purchases DRII and takes DRII private.

ABEL on October 10, 2016, in Marin County, California, appears to upgrade and enter into alleged DRII timeshare contract no. 17634273—a true and correct digital copy of which is available on the Internet at **https://gofile.io/?c=DbD45h** and hereby made fully part hereof as Exhibit E.

On January 12, 2017, in Kauai County, Hawaii, ABEL appears to enter into alleged DRII timeshare contract no. 17694421 and upgrade ABEL's Alleged Membership—a true and correct digital copy of which is available on the Internet at **https://gofile.io/?c=DbD45h** and hereby made fully part hereof as Exhibit F.

ABEL on July 7, 2017, in Marin County, California, appears to upgrade and enter into alleged DRII timeshare contract no. 17583190— a true and correct digital copy of which is available on the Internet at **https://gofile.io/?c=DbD45h** and hereby made fully part hereof as Exhibit G.

In or about June 2018, ABEL ceases giving money to Defendant and appears to default under terms of the last alleged DRII timeshare contract (i.e., Exhibit G), whereupon Defendant cuts off all of ABEL's rights to reserve, use, or occupy any DRII accommodation or to exercise any other right, benefit, or privilege appurtenant to the Alleged Membership.

No later than November 1, 2018, APOLLO conspires with DRII, who conspires with Greenspoon Marder LLP, who appears to commence against ABEL, American Arbitration Association Case Number: 01-18-0004-0924[2] **(the "Alleged Arbitration")**—a true and correct digital copy of which proceeding is available on the Internet at **https://gofile.io/?c=DbD45h** and hereby made fully part hereof as, Exhibit H—for alleged default under the alleged promissory note associated with alleged DRII timeshare contract no. 17583190 (*see* Exhibit G).

<u>Preamble.</u>

With intent to defraud ABEL of property and deprive ABEL of ABEL's money, defendants Michael Allen Flaskey, Kenneth Steven Siegel, C. Alan Bentley, Brian Paul Garavuso, Lisa Marie Gann, David Francis Palmer, Stephen J. Cloobeck, Howard Samuel Lanznar, Jason Frederic Cohen, and Diamond Resorts International, Inc. on seven (7) occasions conspired with certain other Diamond Resorts International, Inc. employees (identified *infra*) to employ and employed an artifice which operated as a deceit upon ABEL by means of a (a) false representation of a loan of DRII's money that Defendant knew to be false and upon which

---

[2] Defendant will never sue ABEL or any other timeshare "customer" in a court of law for an unpaid balance on an alleged DRII purchase-money loan because DIAMOND cannot prove that anything was purchased with DRII's money (i.e., that DRII gave value).

Defendant intended ABEL to rely and upon which ABEL relied, and (b) material misrepresentation of fees, principal, interest, and other periodic related sums due and owing with respect to a nonexistent loan, and wherein co-conspirators in Kauai County, Hawaii, and Marin County, California, under the control of Defendant, obtained ABEL's signature to numerous documents and instruments and obtained ABEL's property (money) by material misrepresentation with intent to deprive ABEL of said property, ultimately resulting in multiple felonies under both the Hawaii Penal Code **("HPC")** and California Code, Penal Code **("CCPC")**; specifically:

- HPC felonies of *Criminal solicitation* (HPC § 705-510), *Criminal conspiracy* (HPC § 705-520), *Theft in the first degree* (HPC § 708-830.5), and *Ownership or operation of business by certain persons prohibited* (HPC § 708-842-2); and
- CCPC felonies of *Conspiracy* (182(a)(4)) and *Grand theft* (487(a)).

## Affidavit.

Wherefore, Complainant Affiant hereby solemnly swears, declares, and deposes as follows:

1.    Complainant Affiant is competent to state the matters set forth herein.

2.    Complainant Affiant has knowledge of the facts stated herein.

3.    All the facts stated herein are true, correct, and complete in accordance with Complainant Affiant's personal knowledge, and if called upon as a witness Complainant Affiant shall so testify.

## Plain statement of facts.

## Alleged DRII timeshare contract no. 17009411T (January 5, 2014, Exhibit A).

## Kauai County, Hawaii.

4.      With the intent to facilitate commission of the crime of theft and obtain ABEL's property by deception with intent to deprive ABEL of ABEL's property, Defendant no later than January 5, 2014, conspires criminally with Diamond Resorts International, Inc. employees Colin Jackson, Kerry Rath, David Jones, and Brandi Lynn-Hiranaka and, with fraudulent intent not to perform any such promise, command said employees to promise in behalf of DRII to give ABEL a purchase-money loan of DRII's money for ABEL to use to purchase the Alleged Membership and cause said employees to obtain from ABEL (a) ABEL's signature or initials to the alleged *"CREDIT SALE CONTRACT Diamond Resorts Hawaii Collection Purchase And Security Agreement"* (**"Alleged Purchase Agreement 17009411T"**), *"CREDIT SALE CONTRACT PURCHASE MONEY NOTE $41,803.00,"* and other documents of alleged DRII timeshare contract no. 17009411T (Exhibit A), and (b) an *"initial deposit"* of $5,747.00.

5.      The documents comprising Exhibit A make scores of references to an alleged loan, e.g., "purchase loan amount," "a loan," "Lender," "Amount Financed," "loan from the seller," "Borrower," "unpaid Principal," "unpaid Interest," etc.

6.      Alleged Purchase Agreement 17009411T (*see* Exhibit A) at subparagraph (a) of paragraph 10 "Default" provides in pertinent part:

> You [ABEL] will be in *default* under this Agreement if (a) you do not pay, or (b) you do not pay on time, or (c) you do not keep any other promise in this Agreement, or (d) you do not perform all of your obligations under this Agreement, your Note, and/or the Collection Instruments . . . . If you default then you cannot reserve, use, or occupy a Collection Accommodation and you cannot use any other rights, benefits, or privileges of your Alleged Membership.

7.      Beginning in or about early 2019 and ending in or about late 2019 Complainant Affiant examines all of Complainant Affiant's personal records and every record provided by Defendant with respect to alleged DRII timeshare contract no. 17009411T and determines that during the tenor of alleged DRII timeshare contract no. 17009411T:

- **The only rights in the Alleged Membership which ABEL had, used, or**
  **enjoyed were purchased with ABEL's money**; and

- **No aspect of the Alleged Membership was purchased with DRII's**
  **money**.[3]

Alleged DRII timeshare contract no. 17159350 (May 30, 2015; Exhibit B).

Marin County, California.

8.      With intent that certain co-conspirators promise to make a loan to ABEL for

ABEL to use to purchase from DRII the Alleged Membership, but with fraudulent intent not to

perform that promise, Defendant on May 30, 2015, conspires with DRII employees Binni

Thomas, Kyle Ziegler, and Quan Nguyen to obtain / collect (a) ABEL's signature to the alleged

*"DIAMOND RESORTS HAWAII COLLECTION PURCHASE AND SECURITY AGREEMENT*

*(California)"* (**"Alleged Purchase Agreement 17159350"**), *"PROMISSORY NOTE Note No.*

*23528542,"* and various other documents of alleged DRII timeshare contract no. 17159350

(Exhibit A), and (b) and *"Wrap Fee(s)"* $75.00 and a *"Down Payment"* of $425.00.

9.      The documents comprising Exhibit A make several hundred references to the

"loan, "finance," "finance charge," "Amount Financed," or the like or inferences thereto.

10.     Alleged Purchase Agreement 17159350 (*see* Exhibit A) at subparagraph (a) of

paragraph 14 "DEFAULT" provides:

> Subject to any notice and right to cure provided below[4], Purchaser [ABEL] shall
> be in default under this Agreement if Purchaser fails to pay on time, keep any

---

[3 Whereas, there is no evidence that DRII gave value to ABEL: The alleged *"CREDIT SALE CONTRACT
PURCHASE MONEY NOTE $41,803.00"* associated with alleged DRII timeshare contract no. 17009411T is void
for failure of consideration (Hawaii Code, Uniform Commercial Code § 104.3303(2)).]

[4 *"Dolus circuitu non purgator.* Fraud is not purged by circuity." John Bouvier, *Bouvier's Law Dictionary*,
3rd rev. (8th ed.), rev. by Francis Rawle (St. Paul, Minn.: West Publishing Co., 1914), 2131.]

[The subject of the referenced *"right to cure provided below"* is found in subparagraph 14(e), but does
not prevent enforcement of the measures set forth in subparagraph 14(a). Rather, said provision raises another issue:
*"enforce[ment] of the Seller Security Interest against the Collateral."* Because Abel received no value from DRII

promise, or fulfill any agreement or obligation contained in the Note, this
Agreement or any of the Collection Instruments.  In the event of a default by
Purchaser, Purchaser shall not be entitled to reserve, use, or occupy any
Collection Accommodation, or to exercise any other rights, benefits, or privileges
appurtenant to his or her Alleged Membership.

11.      Beginning in or about early 2019 and ending in or about late 2019 Complainant

Affiant examines all of Complainant Affiant's personal records and every record provided by

Defendant with respect to alleged DRII timeshare contract no. 17159350 and determines that:

- **The only rights in the Alleged Membership which ABEL had, used, or
  enjoyed were purchased with ABEL's money**; and

- **No aspect of the Alleged Membership was purchased with DRII's
  money**.[5]

Alleged DRII timeshare contract nos. 17204479 (August 24, 2015; Exhibit C),
17396537 (March 11, 2016; Exhibit D), and 17634273 (October 10, 2016; Exhibit E).

Marin County, California.

12.      With intent that co-conspirators promise to make a loan to ABEL for ABEL to

use to purchase the Alleged Membership, but with fraudulent intent not to perform that promise,

Defendant on:

a.      August 24, 2015, conspires with DRII employees Binni Thomas, Kyle

Ziegler, and Quan Nguyen to obtain / collect, in Novato, Marin County, California, (a)

ABEL's signature to the alleged *"DIAMOND RESORTS HAWAII COLLECTION*

*PURCHASE AND SECURITY AGREEMENT (California)"* (**"Alleged Purchase**

**Agreement 17204479"**), *"PROMISSORY NOTE Note No. 23778663,"* and various other

---

(*see* paragraph 11), there can be no security interest, and therefore no collateral (California Code, Commercial Code
9203(b)), and said reference to that which is found subparagraph 14(e) is misleading.]

[5 Whereas, there is no evidence that there is no evidence that DRII gave value to ABEL: Alleged Note No.
23528542 is void for failure of consideration (California Code, Commercial Code 3303(b)).]

documents of alleged DRII timeshare contract no. 17204479 (Exhibit C), and (b) *"Wrap Fee(s)"* of $75.00 and a *"Total Down Payment"* of $1,500;

      b.     March 11, 2016, conspires with DRII employees PAUL HOOKS, Kyle Ziegler, and ROBERT NELSON to obtain / collect, in Novato, Marin County, California, (a) ABEL's signature to the alleged *"DIAMOND RESORTS HAWAII COLLECTION PURCHASE AND SECURITY AGREEMENT (California)"* (**"Alleged Purchase Agreement 17396537"**), *"PROMISSORY NOTE Note No. 24866155,"* and various other documents of alleged DRII timeshare contract no. 17396537 (Exhibit D), and (b) *"NPIF Fee(s)"* of $225.00, a down payment of $2,358.00, and *"Ascribed Equity Value of Timeshare Interest(s)"* of $16,188.79; and

      c.     October 10, 2016, conspires with DRII employees Binni Thomas, Tiffany Silva, and Quan Nguyen to obtain / collect, in Novato, Marin County, California, ABEL's signature to the alleged (a) *"DIAMOND RESORTS U.S. COLLECTION PURCHASE AND SECURITY AGREEMENT (California)"* (**"Alleged Purchase Agreement 17634273"**), *"PROMISSORY NOTE Note No. 26073911,"* and various other documents of alleged DRII timeshare contract no. 17634273 (Exhibit E), and (b) *"Wrap Fee(s)"* of $75.00 and a *"Down Payment"* of $2,125.00.

13.     The documents comprising Exhibits C, D, and E make several hundred references to a "loan" or "finance" or "finance charge" or "Amount Financed" or the like or inferences thereto.

14.     The language of each respective subparagraph 14(a) of Alleged Purchase Agreements 17204479, 17396537, and 17634273 is identical to that found in subparagraph 14(a) of Alleged Purchase Agreement 17159350 (*see* paragraph 10, *supra*, pp. 7-8).

15.     Beginning in or about early 2019 and ending in or about late 2019 Complainant Affiant examines all of Complainant Affiant's personal records and every record provided by Defendant with respect to alleged DRII timeshare contract nos. 17204479, 17396537, and 17634273 and determines that:

- **The only rights in the Alleged Membership which ABEL had, used, or enjoyed were purchased with ABEL's money**; and

- **No aspect of the Alleged Membership was purchased with DRII's money**.[6]

Alleged DRII timeshare contract no. 17694421 (January 12, 2017, Exhibit F).

Kauai County, Hawaii.

16.     With the intent to facilitate commission of the crime of theft and obtain ABEL's property by deception with intent to deprive ABEL of ABEL's property, Defendant no later than January 12, 2017, conspires criminally and agrees and, with fraudulent intent not to perform any such promise, commands DRII employees DOUGLAS BOWERS, MICHAEL HATTON, JEFFREY HEALEY, ASHLEY ESPIRITU, and Nora Miranda to promise in behalf of Defendant to give ABEL a purchase-money loan of DRII's money for ABEL to use to purchase the Alleged Membership and cause said employees to obtain from ABEL (a) ABEL's signature or initials to the alleged *"CREDIT SALE CONTRACT Diamond Resorts Hawaii Collection Purchase And Security Agreement"* (**"Alleged Purchase Agreement 17694421"**), *"CREDIT SALE CONTRACT PURCHASE MONEY NOTE $55,298.55,"* and other documents of alleged DRII timeshare contract no. 17694421 (Exhibit F), and (b) *"NPIF Fee(s)"* of $150.00, a *"Down Payment"* of $11,022.00, and *"Ascribed Equity Value of Timeshare Interest(s)"* of $23,136.30.

---

[6 Whereas, there is no evidence that DRII gave value to ABEL: Alleged Note Nos. 23778663, 24866155, and 26073911 are void for failure of consideration (California Code, Commercial Code 3303(b)).]

9.      The documents comprising Exhibit F make numerous references to an alleged loan, e.g., "purchase loan amount," "a loan," "Lender," "Amount Financed," "loan from the seller," "Borrower," "unpaid Principal," "unpaid Interest," etc.

14.     The language of subparagraph 10(a) of Alleged Purchase Agreement 17694421 is identical to that found in subparagraph 10(a) of Alleged Purchase Agreement 17009411T (*see* paragraph 10, *supra*, pp. 7-8).

15.     Beginning in or about early 2019 and ending in or about late 2019 Complainant Affiant examines all of Complainant Affiant's personal records and every record provided by Defendant with respect to alleged DRII timeshare contract no. 17694421 and determines that:

- **The only rights in the Alleged Membership which ABEL had, used, or enjoyed were purchased with ABEL's money**; and

- **No aspect of the Alleged Membership was purchased with DRII's money**.[7]

Alleged DRII timeshare contract no.17583190 (July 7, 2017; Exhibit G).

(Marin County, California).

14.     With intent that co-conspirators promise to make a loan to ABEL for ABEL to use to purchase from DRII the Alleged Membership, but with fraudulent intent not to perform that promise, Defendant criminally solicits and conspires with DRII employees Binni Thomas, Tiffany Silva, and Mark Tinder to obtain / collect, in Novato, Marin County, California, (a) ABEL's signature to the alleged *"DIAMOND RESORTS U.S. COLLECTION PURCHASE AND SECURITY AGREEMENT (California)"* **("Alleged Purchase Agreement 17583190")**,

---

[7 Whereas, there is no evidence that DRII gave value to ABEL: Alleged Note Nos. 23778663, 24866155, and 26073911 are void for failure of consideration (Hawaii Code, Uniform Commercial Code § 104.3303(2)).]

*"PROMISSORY NOTE Note No. 25833148,"* and various other documents of alleged DRII
timeshare contract no. 17583190 (Exhibit G).

15.     The documents comprising Exhibit G make several hundred references to a
"loan" or "finance" or "finance charge" or "Amount Financed" or the like or inferences thereto.

16.     The language of subparagraph 14(a) of Alleged Purchase Agreement 17583190 is
identical to that found in subparagraph 14(a) of Alleged Purchase Agreement 17159350 (*see*
paragraph 10, *supra*, pp. 7-8).

17.     Beginning in or about early 2019 and ending in or about late 2019 Complainant
Affiant examines all of Complainant Affiant's personal records and every record provided by
Defendant with respect to alleged DRII timeshare contract no. 17583190 and determines that:

- **The only rights in the Alleged Membership which ABEL had, used, or
  enjoyed were purchased with ABEL's money**; and

- **No aspect of the Alleged Membership was purchased with DRII's
  money**.[8]

### Greenspoon Marder LLP.

19.     With intent to obtain money from ABEL under false pretenses of principal,
interest, and other sums related thereto due and owing on a nonexistent loan associated with
alleged note no. 25833148 of alleged DRII timeshare contract no. 17583190 (*see* Exhibit G)—
Defendant no later than November 1, 2018, conspires with Gerald Greenspoon, Michael Ellis
Marder, Victor Scott Kline, Richard Wayne Epstein, Jeffrey Aaron Backman, Mitchell Shane
Levine, Julia Stepanova, Greenspoon Marder PA, and Greenspoon Marder LLP, who commence

---

[8 Whereas, there is no evidence that DRII gave value to ABEL: Alleged Note Nos. 17634273 and
25833148 are void for failure of consideration (California Code, Commercial Code 3303(b))).]

against ABEL the Alleged Arbitration (Exhibit H) and appear to win the arbitrator's award February 7, 2020.

### Accounting of theft.

19.    With intent to obtain money by false promises of a loan, with fraudulent intent not to perform those promises, and false pretenses of principal, interest, and other periodic sums related thereto as due and owing on seven (7) alleged DRII timeshare contracts and "loans," Defendant conspired with certain other employees of DRII and through the aforesaid material misrepresentation with intent to deprive ABEL of ABEL's property, and obtained from ABEL the following sums—a true and correct digital copy of proof of DIAMOND's admission of which is available on the Internet at **https://gofile.io/?c=DbD45h** and hereby made fully part hereof as, collectively, Exhibit I, with respect to "payment" terms of the following alleged DRII timeshare contracts:

| Alleged DRII Contract No. | Date | Kauai County, Hawaii | Marin County, California |
|---|---|---|---|
| 17009411T | 01/05/2014 | $21,239.72 | |
| 17159350 | 05/30/2015 | | $7,219.50 |
| 17204479 | 08/24/2015 | | 7,755.09 |
| 17396537 | 03/11/2016 | | 14,500.71 |
| 17634273 | 10/10/2016 | | 10,332.68 |
| 17694421 | 01/12/2017 | 55,298.55 | |
| 17583190 | 07/07/2017 | | 32,704.60 |
| | Totals | $76,538.27 | $72,512.58 |
| | | Grand Total | $148,051.45 |

### IV.    Verification.

Herman David Abel and Debora Susan Abel hereby aver as to the correctness, truth, and authenticity of the contents hereof, and solemnly swear, declare, and state that Complainant Affiant executes this Affidavit on Complainant Affiant's unlimited liability, that Complainant

Affiant is competent to state the matters set forth herein, and that the facts stated herein are true, correct, and complete in accordance with Complainant Affiant's personal knowledge.

Further Complainant Affiant sayeth naught.

Date:  Subscribed and sworn to this twentieth day of the second month in the year of our Lord two thousand twenty [February 20, A.D. 2020], at Novato, California.

_____          _____
Herman David Abel                                     Debora Susan Abel

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA, COUNTY OF MARIN

## Jurat

Subscribed and sworn to,(or affirmed) before me this 20th day of February, 2020, by Herman David Abel and Debora Susan Abel, proved to me on the basis of satisfactory evidence to be the persons who appeared before me.

MARISELA BECERRA
Notary Public - California
Marin County
Commission # 2274168
My Comm. Expires Jan 3, 2023

_____
Notary Public

ALL EXHIBITS REFERENCED IN THE FOREGOING PAGES CAN BE VIEWED AT:

# https://tinyurl.com/yc5wammm

# EXHIBIT C-2

# Certification

The undersigned, Herman David Abel, residing at 64 Montego Key, Novato, Marin County, California 94949, hereby swears that the attached reproduction of Affidavit of Information: Criminal Complaint for Public Notice Filing, Form AOI-022020-BCDA, seven (7) pages in length and dated and notarized February 20, 2020, by Herman David Abel and Debora Susan Abel, is a true, correct, and complete photocopy of a document in my possession.

Date: March 2, 2020

Herman David Abel
Affiant

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California    )
                       )    ss.
County of Marin        )

## Jurat

Subscribed and sworn to (or affirmed) before me this ___2___ day of __March__, 20__20__, by __Herman David Abel__, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

DEBRA J. FOX
Notary Public · California
Marin County
Commission # 2239656
My Comm. Expires May 21, 2022

Notary Public

Form BCDA-022520-CERT

# AFFIDAVIT OF INFORMATION

## CRIMINAL COMPLAINT

## FOR PUBLIC NOTICE FILING

RECEIVED

2020 APR -2  PM 12: 53

State Attorney
17th Judicial Circuit

| | | |
|---|---|---|
| Herman David Abel, and | ) | NO. _____ |
| Debora Susan Abel, | ) | |
| | ) | AFFIDAVIT OF INFORMATION |
| Complainant Affiants, | ) | |
| | ) | ACCESSORY AFTER THE FACT [7 |
| v. | ) | COUNTS]; CRIMINAL ATTEMPT [1 |
| | ) | COUNT]; CRIMINAL CONSPIRACY |
| Leon David Black, | ) | [1 COUNT]; GRAND THEFT IN THE |
| Joshua Harris, | ) | FIRST DEGREE [1 COUNT]. |
| Marc Jeffrey Rowan, | ) | |
| Scott Martin Kleinman, | ) | |
| James Charles Zelter, | ) | |
| John Joseph Suydam, | ) | |
| Robert Kenneth Kraft, | ) | |
| Martin Bernard Kelly, | ) | |
| Anthony M. Civale, | ) | |
| Cindy Zee Michel, | ) | |
| Apollo Global Management, LLC, | ) | |
| Michael Allen Flaskey, | ) | |
| Kenneth Steven Siegel, | ) | |
| Brian Paul Garavuso, | ) | |
| Lisa Marie Gann, | ) | |
| David Francis Palmer, | ) | |
| Jason Frederic Cohen, | ) | |
| Diamond Resorts International, Inc., | ) | |
| Gerald Greenspoon, | ) | |
| Michael Ellis Marder, | ) | |
| Victor Scott Kline, | ) | |
| Richard Wayne Epstein, | ) | |
| Jeffrey Aaron Backman, | ) | |
| Julia Stepanova, | ) | |
| Greenspoon Marder PA, and | ) | |
| Greenspoon Marder LLP, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | **Registered Mail RB 414 473 275 US** |

<u>Introduction.</u>

Complainant affiants Herman David Abel and Debora Susan Abel **(collectively**

**"Complainant Affiant")** hereby present this Affidavit of Information upon probable cause

pursuant to Title XLVI of The 2019 Florida Statutes §§ 777.03(c), 777.04(1) and (3), and 812.014(2)(a)(1), with respect to which, evidence of the above-enumerated offense, committed by the above-named defendants, is provided herewith.

Defendants Leon David Black, Joshua Harris, Marc Jeffrey Rowan, Scott Martin Kleinman, James Charles Zelter, John Joseph Suydam, Robert Kenneth Kraft, and Apollo Global Management, LLC **(collectively "APOLLO")** and Michael Allen Flaskey, Kenneth Steven Siegel, Brian Paul Garavuso, Lisa Marie Gann, David Francis Palmer, Jason Frederic Cohen, and Diamond Resorts International, Inc. **(collectively "DIAMOND")** are charged with *Criminal attempt*, *Criminal conspiracy*, and *Grand theft in the first degree*.

Defendants Gerald Greenspoon, Michael Ellis Marder, Victor Scott Kline, Richard Wayne Epstein, Jeffrey Aaron Backman, Mitchell Shane Levine, Julia Stepanova, Greenspoon Marder PA, and Greenspoon Marder LLP **(collectively "GREENSPOON")** are charged with all above-enumerated offenses.

## Background.

Diamond Resorts International, Inc. **("DRII")** is a timeshare developer headquartered in Las Vegas, Nevada, but who in Kauai County, Hawaii, and Marin County, California (and other places), sells timeshare interests, known as memberships, associated with certain DRII timeshare resort properties.

A common DIAMOND practice is to upgrade a customer's membership by accepting a trade-in of the current timeshare contract, crediting sums given therein, and executing a new contract.

Complainant Affiant has a total of seven (7) such transactions with DIAMOND, i.e., alleged DRII timeshare contract no.:

- 17009411T, January 5, 2014, in Kauai County, Hawaii;;

- 17159350, May 30, 2015, in Marin County, California;

- 17204479, August 24, 2015, in Marin County, California;

- 17396537, March 11, 2016, in Marin County, California;

- 17634273, October 10, 2016, in Marin County, California;

- 17694421, January 12, 2017, in Kauai County, Hawaii; and

- 17583190, July 7, 2017, in Marin County, California,

a true and correct digital copy of each of which is available on the Internet at

**https://gofile.io/?c=DbD45h** and hereby made fully part hereof as, respectively, Exhibit A, B,

C, D, E, F, and G.

In each of the above alleged DRII timeshare contracts, DIAMOND appears to sell

HERMAN DAVID ABEL and DEBORA SUSAN ABEL **(collectively "ABEL")** a timeshare

interest and ABEL appears to purchase / upgrade and enter into a new contract where, in

exchange for an alleged down payment, assorted fees, closing costs, and a signed promissory

note for the benefit of DRII, DIAMOND promises to give Complainant Affiant *"a loan from the*

*seller"* or a *"purchase money loan"* to purchase from DRII certain intangible personal property,

i.e., *"Membership in the Diamond Resorts Hawaii Collection vacation plan"* or *"Membership in*

*the Diamond Resorts U.S. Collection"* **(collectively the "Alleged Membership")**, requiring of

ABEL each time, payments to DRII of alleged principal, interest, and various other related

periodic fees and sums.

At the time of the first four (4) alleged DRII timeshare contracts (Exhibits A through D),

defendant DRII is a publicly traded company on the New York Stock Exchange.

In or about September 2016, defendant APOLLO purchases DRII and takes DRII private.

In or about June 2018, ABEL ceases giving money to DRII and appears to default under terms of the last alleged DRII timeshare contract (i.e., Exhibit G), whereupon DIAMOND cuts off all of ABEL's rights to reserve, use, or occupy any DRII accommodation or to exercise any other right, benefit, or privilege appurtenant to the Alleged Membership.

No later than November 1, 2018, APOLLO conspires with DIAMOND who conspires with GREENSPOON (**APOLLO, DIAMOND, and GREENSPOON hereinafter collectively the "Defendant"**), who appears to commence an arbitration proceeding[1] with the American Arbitration Association against ABEL for alleged default under the alleged promissory note of alleged DRII timeshare contract 17583190 (*see* Exhibit G).

<u>Affidavit.</u>

Complainant Affiant hereby solemnly swears, declares, and deposes as follows:

1.      Complainant Affiant is competent to state the matters set forth herein.

2.      Complainant Affiant has knowledge of the facts stated herein.

3.      All the facts stated herein are true, correct, and complete in accordance with Complainant Affiant's personal knowledge, and if called upon as a witness Complainant Affiant shall so testify.

<u>Plain statement of facts.</u>

4.      Beginning in or about early 2019 and ending in or about late 2019 Complainant Affiant examines all of Complainant Affiant's personal records and every record provided by

---

[1] DIAMOND will never sue ABEL or any other timeshare "customer" in a court of law for an unpaid balance on an alleged DRII purchase-money loan because DIAMOND cannot prove that anything was purchased with DRII's money (i.e., that DRII gave value).

Defendant with respect to the seven (7) above alleged DRII timeshare contracts and determines that during the respective tenor of each said alleged DRII timeshare contract:

- **The only rights in the Alleged Membership which ABEL had, used, or enjoyed were purchased with ABEL's money**; and

- **No aspect of the Alleged Membership was purchased with DRII's money**.[2]

5.      Knowing that DIAMOND had on three (3) occasions committed against ABEL the crime of grand larceny in the second degree and four (4) times the crime of grand larceny in the third degree, with intent that DIAMOND avoid detection of having given ABEL false promises of a loan and failed to loan ABEL anything or give ABEL value but nevertheless having charged, billed, and collected from ABEL false sums of alleged principal, interest, and other related fees totaling $32,704.60 on a nonexistent loan in alleged DRII timeshare contract no. 17583190, GREENSPOON no later than November 1, 2018, conspires with APOLLO and DIAMOND and, with intent to appropriate for APOLLO and DIAMOND's use, knowingly endeavors to obtain, on a permanent basis, property from ABEL with a value constituting grand larceny in the first degree, i.e., $169,255.48 in alleged missed payments, accrued interest, and late fees under the alleged promissory note of alleged DRII timeshare contract no. 17583190, gives APOLLO and DIAMOND aid by commencing American Arbitration Association Case Number: 01-18-0004-0924 against ABEL—a true and correct digital copy of the documents comprising said arbitration proceeding is available on the Internet at **https://gofile.io/?c=DbD45h** and hereby made fully part hereof as, collectively, Exhibit H.

---

[2 Whereas, there is no evidence that DRII gave value to ABEL: The alleged respective promissory note associated with each of the above seven (7) alleged DRII timeshare contracts is void for failure of consideration (Hawaii Code, Uniform Commercial Code § 490:3-303(b); California Code, Commercial Code 3303(b)).]

of proof of DIAMOND's admission of which is available on the Internet at

**https://gofile.io/?c=DbD45h** and hereby made fully part hereof as, collectively, Exhibit I, with

respect to "payment" terms of the following alleged DRII timeshare contracts::

| Alleged DRII Contract No. | Date | Kauai County, Hawaii | Marin County, California |
|---|---|---|---|
| 17009411T | 01/05/2014 | $21,239.72 | |
| 17159350 | 05/30/2015 | | $7,219.50 |
| 17204479 | 08/24/2015 | | 7,755.09 |
| 17396537 | 03/11/2016 | | 14,500.71 |
| 17634273 | 10/10/2016 | | 10,332.68 |
| 17694421 | 01/12/2017 | 55,298.55 | |
| 17583190 | 07/07/2017 | | 32,704.60 |
| | Totals | $76,538.27 | $72,512.58 |
| | | Grand Total | $148,051.45 |

### Verification.

Herman David Abel and Debora Susan Abel hereby aver as to the correctness, truth, and authenticity of the contents hereof, and solemnly swear, declare, and state that Complainant Affiant executes this Affidavit on Complainant Affiant's unlimited liability, that Complainant Affiant is competent to state the matters set forth herein, and that the facts stated herein are true, correct, and complete in accordance with Complainant Affiant's personal knowledge.

Further Complainant Affiant sayeth naught.

Date:   Subscribed and sworn to this twentieth day of the second month in the year of our Lord two thousand twenty [February 20, A.D. 2020], at Novato, California.

_____
Herman David Abel

_____
Debora Susan Abel

*(continued on next page)*

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA, COUNTY OF MARIN

# Jurat

Subscribed and sworn to (or affirmed) before me this _20th_ day of _February_, 20_20_, by _Herman David Abel and Debora Susan Abel_, proved to me on the basis of satisfactory evidence to be the persons who appeared before me.

_____
Notary Public

MARISELA BECERRA
Notary Public - California
Marin County
Commission # 2274168
My Comm. Expires Jan 3, 2023

ALL EXHIBITS REFERENCED IN THE FOREGOING PAGES CAN BE VIEWED AT:

# https://tinyurl.com/yc5wammm

# EXHIBIT C-3

# Certification

The undersigned, Herman David Abel, residing at 64 Montego Key, Novato, Marin County, California 94949, hereby swears that the attached reproduction of Affidavit of Information: Criminal Complaint for Public Notice Filing, Form AOI-022020-USC, seven (7) pages in length and dated and notarized February 20, 2020, by Herman David Abel and Debora Susan Abel and time-stamped "RECEIVED" at 10:01 A.M. February 24, 2020, by the Office of the U.S. Attorney for the District of Nevada (Las Vegas) is a true, correct, and complete photocopy of a document in my possession.

Date: March 2, 2020

Herman David Abel
Affiant

A notary public or other officer completing this certificate
verifies only the identity of the individual who signed the
document to which this certificate is attached, and not the
truthfulness, accuracy, or validity of that document.

State of California )
) ss.
County of Marin )

# Jurat

Subscribed and sworn to (or affirmed) before me this ____ day of _____ , 20____, by
_____ , proved to me on the basis of satisfactory evidence to
be the person who appeared before me.

Notary Public

DEBRA J. FOX
Notary Public - California
Marin County
Commission # 2239656
My Comm. Expires May 21, 2022

Form DN-022520-CERT

# AFFIDAVIT OF INFORMATION
## CRIMINAL COMPLAINT
## FOR PUBLIC NOTICE FILING

RECEIVED

2020 FEB 24  AM 10: 01

U.S. ATTORNEY'S OFFICE
LAS VEGAS, NV

| | |
|---|---|
| Herman David Abel, and<br>Debora Susan Abel,<br><br>      Complainant Affiants,<br><br>           v.<br><br>Leon David Black,<br>Joshua Harris,<br>Marc Jeffrey Rowan,<br>Scott Martin Kleinman,<br>James Charles Zelter,<br>John Joseph Suydam,<br>Robert Kenneth Kraft,<br>Martin Bernard Kelly,<br>Anthony M. Civale,<br>Cindy Zee Michel,<br>Apollo Global Management, LLC,<br>Michael Allen Flaskey,<br>Kenneth Steven Siegel,<br>Charles Alan Bentley,<br>Brian Paul Garavuso,<br>Lisa Marie Gann,<br>David Francis Palmer,<br>Stephen J. Cloobeck,<br>Howard Samuel Lanznar,<br>Jason Frederic Cohen,<br>Corrine Leah Gaxiola<br>Diamond Resorts International, Inc.,<br>Gerald Greenspoon,<br>Michael Ellis Marder,<br>Victor Scott Kline,<br>Richard Wayne Epstein,<br>Jeffrey Aaron Backman,<br>Mitchell Shane Levine,<br>Julia Stepanova,<br>Greenspoon Marder PA, and<br>Greenspoon Marder LLP,<br><br>      Defendants. | NO. _____<br><br>AFFIDAVIT OF INFORMATION<br><br>STATEMENTS OR ENTRIES<br>GENERALLY [19,243 COUNTS];<br>FRAUD BY WIRE, RADIO, OR<br>TELEVISION [99 COUNTS]; |

18 U.S.C. § 4

Introduction.

Complainant affiants Herman David Abel and Debora Susan Abel **(collectively "Complainant Affiant")** hereby present this Affidavit of Information upon probable cause pursuant to Title 18 U.S.C. §§ 4, 1001, and 1343, with respect to which, evidence of the above-enumerated offense, committed by the above-named defendants, is provided herewith.

Leon David Black, Joshua Harris, Marc Jeffrey Rowan, Scott Martin Kleinman, James Charles Zelter, John Joseph Suydam, Robert Kenneth Kraft, Martin Bernard Kelly, Anthony M. Civale, Cindy Zee Michel, and Apollo Global Management, LLC **(collectively "APOLLO")** are charged with all above-enumerated offenses beginning October 10, 2016, and continuing to the present day.

Michael Allen Flaskey, Kenneth Steven Siegel, Charles Alan Bentley, Brian Paul Garavuso, Lisa Marie Gann, David Francis Palmer, Stephen J. Cloobeck, Howard Samuel Lanznar, Jason Frederic Cohen, Corrine Leah Gaxiola, and Diamond Resorts International, Inc. **(collectively "DIAMOND")** are charged with all above-enumerated offenses beginning January 5, 2014, and continuing to the present day, but only those offenses perpetrated during each defendant individual's respective tenure of employment at Diamond Resorts International, Inc.[1]

---

[1] Based on admissions of Diamond Resorts International, Inc. found online, it is Complainant Affiant's belief that the following defendant-individuals were employed by Diamond Resorts International, Inc. during the following respective periods:

- Michael Allen Flaskey:      2010 to the present day
- Kenneth Steven Siegel:      January 2017 - January 2019
- Charles Alan Bentley:       April 2007 - December 2017
- Brian Paul Garavuso:        April 2008 - April 2019
- Lisa Marie Gann:            April 2007 to the present day
- David Francis Palmer:       2010 through December 2018
- Stephen J. Cloobeck:        April 2007 - September 2016
- Howard Samuel Lanznar:      2012 - 2016
- Jason Frederic Cohen:       June 2016 to the present day
- Corrine Leah Gaxiola:       2016 to the present day

Gerald Greenspoon, Michael Ellis Marder, Victor Scott Kline, Richard Wayne Epstein, Jeffrey Aaron Backman, Mitchell Shane Levine, Julia Stepanova, Greenspoon Marder PA, and Greenspoon Marder LLP **(collectively "GREENSPOON")** are charged with all above-enumerated offenses beginning November 1, 2018, and continuing to the present day.

Background.

Diamond Resorts International, Inc. **("DRII")** is a timeshare developer headquartered in Las Vegas, Nevada, but who in Kauai County, Hawaii, and Marin County, California (and other places), appears to sell timeshare interests, called memberships, associated with certain DRII timeshare resort properties.

A common DIAMOND practice is to appear to upgrade a customer's membership by accepting a trade-in of the current timeshare contract, crediting sums given therein, and executing a new contract.

There are a total of seven (7) such transactions, i.e., alleged DRII timeshare contract no.:

- 17009411T, January 5, 2014, in Kauai County, Hawaii;;

- 17159350, May 30, 2015, in Marin County, California;

- 17204479, August 24, 2015, in Marin County, California;

- 17396537, March 11, 2016, in Marin County, California;

- 17634273, October 10, 2016, in Marin County, California;

- 17694421, January 12, 2017, in Kauai County, Hawaii; and

- 17583190, July 7, 2017, in Marin County, California,

a true and correct digital copy of which is available on the Internet at **https://gofile.io/?c=SokvMk** and hereby made fully part hereof as, respectively, Exhibit A, B, C, D, E, F, and G.

Affidavit of Information / Criminal Complaint for Public Notice Filing
Page 3 of 7

In each of the above alleged DRII timeshare contracts, DIAMOND appears to sell HERMAN DAVID ABEL and DEBORA SUSAN ABEL **(collectively "ABEL")** a timeshare interest and ABEL appears to purchase / upgrade and enter into a new contract where, in exchange for an alleged down payment, assorted fees, closing costs, and a signed promissory note for the benefit of DRII, DIAMOND promises to give Complainant Affiant *"a loan from the seller"* or a *"purchase money loan"* to purchase from DRII certain intangible personal property, i.e., *"Membership in the Diamond Resorts Hawaii Collection vacation plan"* or *"Membership in the Diamond Resorts U.S. Collection"* **(collectively the "Alleged Membership")**, requiring of ABEL each time, payments of alleged principal, interest, and various other related periodic fees and sums to DRII.

At the time of the first four (4) alleged DRII timeshare contracts (Exhibits A through D), defendant DRII is a publicly traded company on the New York Stock Exchange.

In or about September 2016, APOLLO purchases DRII and takes DRII private.

In or about June 2018, Complainant Affiant ceases giving money to DRII and appears to default under terms of the last alleged DRII timeshare contract (i.e., Exhibit G), whereupon DIAMOND cuts off all of ABEL's rights to reserve, use, or occupy any DRII accommodation or to exercise any other right, benefit, or privilege appurtenant to the Alleged Membership.

No later than November 1, 2018, APOLLO and DIAMOND conspire with GREENSPOON, who appears to commence American Arbitration Association Case Number: 01-18-0004-0924[2] **(the "Alleged Arbitration")** against ABEL for alleged default under the alleged promissory note associated with alleged DRII timeshare contract no. 17583190 (*see* Exhibit G).

---

[2] DIAMOND will never sue ABEL or any other timeshare "customer" in a court of law for an unpaid balance on an alleged DRII purchase-money loan because DIAMOND cannot prove that anything was purchased with DRII's money (i.e., that DRII gave value). DIAMOND never having loaned ABEL anything, there is no basis for the reporting of any notice on any alleged consumer or real estate transaction to any credit reporting agency.

Form AOI-022020-USC

<u>Affidavit.</u>

Complainant Affiant hereby solemnly swears, declares, and deposes as follows:

1.      Complainant Affiant is competent to state the matters set forth herein.

2.      Complainant Affiant has knowledge of the facts stated herein.

3.      All the facts stated herein are true, correct, and complete in accordance with Complainant Affiant's personal knowledge, and if called upon as a witness Complainant Affiant shall so testify.

<u>Plain statement of facts.</u>

4.      Beginning in or about early 2019 and ending in or about late 2019 Complainant Affiant examines all of Complainant Affiant's personal records and every record provided by Defendant with respect to the seven (7) above alleged DRII timeshare contracts and determines that during the respective tenor of each said alleged DRII timeshare contract:

- **The only rights in the Alleged Membership which ABEL had, used, or enjoyed were purchased with ABEL's money**; and

- **No aspect of the Alleged Membership was purchased with DRII's money.**[3]

5.      Having devised an artifice for obtaining ABEL's money by means of false promises of a loan and fraudulent pretenses and representations of principal, interest, and other related fees and sums due and owing through the aforesaid seven (7) alleged DRII timeshare contracts (Exhibits A through G), for the purpose of executing said artifice:

- DIAMOND, beginning no later than January 2014, begins transmitting to Experian PLC credit bureau by means of wire communication in interstate

[3 Whereas, there is no evidence that DRII gave value to ABEL: The alleged respective promissory note associated with each of the above seven (7) alleged DRII timeshare contracts is void for failure of consideration (Hawaii Code, Uniform Commercial Code § 490:3-3303(b), California Code, Commercial Code 3303(b)).]

Form AOI-022020-USC                    Affidavit of Information / Criminal Complaint for Public Notice Filing

Page 5 of 7

commerce, certain notices and signs regarding ABEL, a true and correct digital copy of proof of which is available on the Internet at **https://gofile.io/?c=SokvMk** and hereby made fully part hereof as Exhibit H;

- DIAMOND, beginning in or about July 2016, begins transmitting to ABEL by means of wire communication in interstate commerce certain notices, advertising, and pictures, a true and correct digital copy of which is available on the Internet at **https://gofile.io/?c=SokvMk** and hereby made fully part hereof as Exhibit I;

- APOLLO, beginning no later than October 2016, for the purpose of executing said artifice, conspires with DIAMOND and causes DIAMOND to begin transmitting to Experian PLC credit bureau by means of wire communication in interstate commerce, certain notices regarding ABEL (see Exhibit H); and

- APOLLO and DIAMOND, beginning no later than November 1, 2018, for the purpose of executing said artifice, conspire with GREENSPOON and cause GREENSPOON to begin transmitting to ABEL by means of wire communication in interstate commerce, certain notices regarding ABEL, a true and correct digital copy of which is available on the Internet at **https://gofile.io/?c=SokvMk** and hereby made fully part hereof as Exhibit J.

### Accounting of DIAMOND's theft.

19.     Beginning January 5, 2014, and concluding June 9, 2017, DIAMOND obtains from ABEL $148,051.45 of ABEL's money as shown *infra*—a true and correct digital copy of proof of DIAMOND's admission of which is available on the Internet at **https://gofile.io/?c=SokvMk** and hereby made fully part hereof as, collectively, Exhibit K, with respect to "payment" terms of the following alleged DRII timeshare contracts:

| Alleged DRII Contract No. | Date | Kauai County, Hawaii | Marin County, California |
|---|---|---|---|
| 17009411T | 01/05/2014 | $21,239.72 | |
| 17159350 | 05/30/2015 | | $7,219.50 |
| 17204479 | 08/24/2015 | | 7,755.09 |
| 17396537 | 03/11/2016 | | 14,500.71 |
| 17634273 | 10/10/2016 | | 10,332.68 |
| 17694421 | 01/12/2017 | 55,298.55 | |
| 17583190 | 07/07/2017 | | 32,704.60 |
| | Totals | $76,538.27 | $72,512.58 |
| | | Grand Total | $148,051.45 |

<u>Verification.</u>

Herman David Abel and Debora Susan Abel hereby aver as to the correctness, truth, and authenticity of the contents hereof, and solemnly swear, declare, and state that Complainant Affiant executes this Affidavit on Complainant Affiant's unlimited liability, that Complainant Affiant is competent to state the matters set forth herein, and that the facts stated herein are true, correct, and complete in accordance with Complainant Affiant's personal knowledge.

Further Complainant Affiant sayeth naught.

Date:   Subscribed and sworn to this twentieth day of the second month in the year of our Lord two thousand twenty [February 20, A.D. 2020], at Novato, California.

_____
Herman David Abel

_____
Debora Susan Abel

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA, COUNTY OF MARIN

**Jurat**

Subscribed and sworn to (or affirmed) before me this 20th day of February, 20 20, by Herman David Abel and Debora Susan Abel, proved to me on the basis of satisfactory evidence to be the persons who appeared before me.

MARISELA BECERRA
Notary Public - California
Marin County
Commission # 2274168
My Comm. Expires Jan 3, 2023

_____
Notary Public

ALL EXHIBITS REFERENCED IN THE FOREGOING PAGES CAN BE VIEWED AT:

# https://tinyurl.com/yc5wammm

# EXHIBIT D

64 Montego Key.
Novato, California 94949.

January 22, 2020.

> **Be advised:** This Demand, Notice, and Warning of Commercial Grace is an important commercial instrument that could affect your property or rights to property or carry other serious consequences.

Intermarketing Media, LLC, doing business as          9114 9014 9645 0948 4960 89.
   Resort Advisory Group
Jason A. Krieck                                        9114 9014 9645 0948 4960 96.
Thomas Hunt McCarty                                    9114 9014 9645 0948 4961 02.
Eric George Kittler                                    9114 9014 9645 0948 4961 19.
Michael Krieck                                         9114 9014 9645 0948 4961 26.
Bo Wilson                                              9114 9014 9645 0948 4961 33.
     27201 Puerta Real, Suite 300
     Mission Viejo, California 92691

David Alan Klein                                       9114 9014 9645 0948 4961 40.
Ten Grove Street
Haddonfield, NJ 08033

Re:     Your alleged July 3, 2018, contract with us.

## Demand, Notice, and Warning of Commercial Grace.

The subject of your alleged contract with us regarding the Diamond Hawaii Collection ( "Your Alleged Contract") is alleged Diamond Resorts International, Inc. ("DIAMOND") contract nos. 17694421 and 17583190 (collectively the "Alleged Diamond Contracts").

At great expense of time, energy, and money, we recently completed analysis of the transactions associated with the Alleged Diamond Contracts and determined that there is no evidence:

- that anything was purchased with DIAMOND's money;
- of a loan from DIAMOND;
- that DIAMOND gave us value;
- of any purchase-money collateral;
- of any security interest in personal property;
- that we ever held any interest in any collateral;
- that we are a consumer debtor to DIAMOND;
- that we are a consumer obligor to DIAMOND; or
- of a consumer transaction.

Whereas, we entered into the Alleged Diamond Contracts believing that we were receiving loans of DIAMOND's money and DIAMOND promised to give us such loans, but omitted to give us a loan and charged us principal, interest, and fees on nonexistent loans: The alleged promissory

notes associated with the Alleged Diamond Contracts are naked,[1] simulated contracts[2] and invalid, legally unenforceable, and void *ab initio* for failure of consideration.

At the time we appeared to enter into contract with Resort Advisory Group July 3, 2018, DIAMOND had no enforceable contractual right[3] against us.

What the foregoing means is that:

- Resort Advisory Group sold us "services" which we did not need and which could not be delivered by Resort Advisory Group by reason of impossibility;

- Every single word uttered by Resort Advisory Group, whether in writing or verbally in person or electronically or over the phone in interstate commerce, with respect to Your Alleged Contract,[4] is false and fraudulent[5] and evidence of either (a) gross negligence,[6] or (b) criminal wrongdoing; and

- All funds given to Resort Advisory Group by us were given by mistake.[7]

### Demand.

Wherefore: Demand is hereby made for return, within twenty (20) days of date of delivery of this Demand, Notice, and Warning of Commercial Grace, the commercially reasonable sum of treble the total amount of money we mistakenly gave Resort Advisory Group in respect of Your Alleged Contract, i.e., 3 X $19,500, or **$58,500.00**.

### Notice and Warning.

Whereas, mistakes are forgivable in law and it is possible that your acts and omissions against and with respect to us were committed or ignored by you due strictly to incompetence, your failure / refusal to give us, in the commercially reasonable manner demanded hereinabove, the aforesaid commercially reasonable sum of $58,500.00, signifies that your aforementioned alleged contract is not a result of *mistake* on your part but rather deception with intent to deprive us of our money and *intentional* [8]; **_whereupon,_** any failure / refusal to honor the above demand, a consensual lien shall arise against the assets, land, and personal property of Intermarketing

---

[1] A naked contract is one made without consideration, and for that reason it is void. . . . John Bouvier, *Bouvier's Law Dictionary*, 3rd rev. (8th ed.), rev. by Francis Rawle (St. Paul, Minn.: West Publishing Co., 1914) (hereinafter "BOUVIER'S"), 2285, s.v. "Naked."

[2] *simulated contract. Civil law.* A contract that, although clothed in concrete form, has no existence in fact; a sham contract. ● A simulated contract can be declared a sham and avoided by an interested party, including a creditor of one of the parties to the contract. *Black's Law Dictionary*, 7th ed., Bryan A. Garner, ed. in chief (St. Paul, Minn.: West Group, 1999), 325, s.v. "Contract."

[3] *Jus ex injuria non oritur.* A right cannot arise from a wrong. BOUVIER'S, 2141.

[4] *Dolus circuitu non purgatur.* Fraud is not purged by circuity. *Id*. at 2131.

[5] *Fraus est celare fraudem.* It is a fraud to conceal a fraud. *Id*. AT 2135.

[6] *Lata culpa dolo æquiparatur.* Gross negligence is equal to fraud. *Id*. at 2142.

[7] Cujus per errorem dati repetitio est, ejus consulto dati donatio est. He who gives a thing by mistake has a right to recover it back ; but, if he gives designedly, it is a gift. Henry Campbell Black, *A Dictionary of Law* (St. Paul, Minn.: West Publishing Co. 1891), 306.

[8] Once a fraud, always a fraud. BOUVIER'S, 2152.

Media, LLC, Jason A. Krieck, Thomas Hunt McCarty, Eric George Kittler, Michael Krieck, Bo Wilson, and David Alan Klein (collectively the "Lien Debtors," individually a "Lien Debtor") in favor of Herman David Abel and Debora Susan Abel (collectively the "Lien Creditor"), in the amount of the aggregate maximum statutory monetary value of the respective criminal offenses committed against Lien Creditor since and including July 3, 2018; *__whereupon__,* Lien Creditor can pursue any and all commercial, civil, or criminal remedies provided by law against Lien Debtors at Lien Creditor's discretion without further notice, including, but not limited to:

- presentment to the San Diego and Orange County, California, and Camden County, New Jersey, District Attorneys; United States Attorneys for the Southern and Central Districts of California and District of New Jersey, Office of Attorney Ethics of the Supreme Court of New Jersey, New Jersey State Bar Association, and the Pennsylvania Bar Association Disciplinary Board of an affidavit of information (criminal complaint) sworn to as true, correct, and complete and documenting and making known any and all offenses under California Code, Penal Code ("CCPC"), the New Jersey Code of Criminal Justice ("NJCCJ"), or Title 18 of the United States Code ("U.S.C.") committed by any Lien Debtor, including, but not limited to, CCPC §§ 182(a)(4), 487(a), and 532(a); NJCCJ §§ 2C:5-2; and 18 U.S.C. §§ 1001 and 1343;

- the invoicing of Lien Debtors in the amount of the respective aggregate maximum statutory monetary value of any and all criminal offenses committed against Lien Creditor or Lien Creditor's interests, due and payable in full within twenty (20) days of the date any such invoice therefor is sent; and

- the filing in any one or more UCC filing offices or real estate recording offices of a UCC1 financing statement to secure the total respective amount of indebtedness of any Lien Debtor to Lien Creditor.

The contents of this Demand, Notice, and Warning of Commercial Grace are binding on every principal and agent re the subject matter set forth herein.

This letter and enclosure shall be entered in evidence in any civil or criminal proceeding that may arise in connection with the subject matter set forth herein.

Please understand the extreme seriousness of this matter and be guided accordingly.

Very truly yours,


_____          _____
Herman David Abel                                 Debora Susan Abel


Enclosure:
    Affidavit of Mailing

Form DNWCG-012220-RAG                3

# Affidavit of Mailing

I am over 18 years of age and not a party to the within action.  My business address is:

> Gretchen Gabriel Babineaux
> 180 Montura Way
> Novato, CA 94949

On the 22nd day of January 2020, I mailed one (1) original of the following:

- **Demand, Notice, and Warning of Commercial Grace, Form DNWCG-012220-RAG,** dated January 22, 2020, signed by Herman David Abel and Debora Susan Abel, three (3) pages in length,

a total of three (3) pages mailed herewith, including all attachment pages (not including this Affidavit of Mailing) by, as shown below, United States Postal Service Priority Mail, in a sealed envelope with postage pre-paid, properly addressed as follows to the following parties:

| | |
|---|---|
| Intermarketing Media, LLC | 9114 9014 9645 0948 4960 89. |
| Jason A. Krieck | 9114 9014 9645 0948 4960 96. |
| Thomas Hunt McCarty | 9114 9014 9645 0948 4961 02. |
| Eric George Kittler | 9114 9014 9645 0948 4961 19. |
| Michael Krieck | 9114 9014 9645 0948 4961 26. |
| Bo Wilson | 9114 9014 9645 0948 4961 33. |
|     27201 Puerta Real, Suite 300 | |
|     Mission Viejo, California 92691 | |
| | |
| David Alan Klein | 9114 9014 9645 0948 4961 40. |
| Ten Grove Street | |
| Haddonfield, NJ 08033 | |

I hereby declare upon penalty of perjury under the laws of the State of California, that the above is true, correct, and complete and that this Affidavit of Mailing is executed January 22, 2020, at Novato, California.

_____
Gretchen Gabriel Babineaux

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA, COUNTY OF MARIN

# Jurat

Subscribed and sworn to (or affirmed) before me this _____ day of _____ 20____,

by _____, proved to me on the basis of satisfactory evidence to be the person who appeared before me.


_____
Notary Public

# USPS Tracking®

**FAQs >**

## Track Another Package +

**Track Packages
Anytime, Anywhere**

Get the free In ormed Delivery® feature to receive
automated nc tifications on your packages

**Learn More**

**(https://reg.usps.com**

**/xsell?app=UspsTools&ref=ho nepageBanner&appURL=https%3A%2F%2Finformeddelivery.usps.com/box/pages/intro/start.action)**

---

**Tracking Number:** 9114901496450948496140

Remove ✕

Your item was delivered in or at the mailbox at 10:55 am on January 24, 2020 in
HADDONFIELD, NJ 08033.

## ✅ Delivered

January 24, 2020 at 10:55 am
Delivered, In/At Mailbox
HADDONFIELD, NJ 08033

**Get Updates** ∨

---

**Text & Email Updates**                                                    ∨

---

**Tracking History**                                                         ∨

---

**Product Information**                                                       ∨

---

**See Less** ∧

# EXHIBIT E-1

DISTRICT ATTORNEY
RECEIVED

## AFFIDAVIT OF INFORMATION
## CRIMINAL COMPLAINT 2020 MAR -4   AM 8: 06
## FOR PUBLIC NOTICE FILING

| | |
|---|---|
| Herman David Abel, and | ) CASE NO. 2020CS0014 |
| Debora Susan Abel, | ) |
| | ) AFFIDAVIT OF INFORMATION |
| Complainant Affiants, | ) |
| | ) CONSPIRACY; CRIMINAL |
| v. | ) PROFITEERING; GRAND THEFT; |
| | ) FRAUD. |
| Intermarketing Media, LLC, doing business as | ) |
|    Resort Advisory Group, | ) |
| Jason Krieck, | ) |
| Thomas Hunt McCarty, | ) |
| Eric George Kittler, | ) |
| Michael Krieck, | ) |
| David Alan Klein, and | ) |
| Bo Wilson, | ) |
| | ) |
| Defendants. | ) |

### Introduction.

Complainant affiants Herman David Abel and Debora Susan Abel hereby present this

Affidavit of Information upon probable cause pursuant to California Code, Penal Code

(**"CCPC"**) §§ 182(a)(4), 186.2(a)(16), 487(a), and 532, with respect to which, evidence of the

above-enumerated offenses, committed by the above-named defendants, through planning and

coordination of individual efforts, with intent to defraud Herman David Abel and Debora Susan

Abel **(collectively "Complainant Affiant")** of money through false representations and

promises with fraudulent intent not to perform those promises, Intermarketing Media, LLC,

doing business as Resort Advisory Group; Jason Krieck, Thomas Hunt McCarty, Eric George

Kittler, Michael Krieck, David Alan Klein, and Bo Wilson,[1] **(collectively the "Defendant")**,

---

[1] Bo Wilson is charged with violations of CCPC §§ 182(a)(4) and 532 only as committed by Bo Wilson in
Bo Wilson's capacity as principal executive of Resort Advisory Group beginning July 1, 2019.

conspired to employ and knowingly and designedly employed a scheme predicated on false
promises of delivery of *"[timeshare contract] termination related Services"* which would
provide Complainant Affiant with relief from enforcement, by timeshare-developer Diamond
Resorts International, Inc. **("DRII")** of certain contractual rights allegedly held by DRII, a
situation which Defendant knew to be nonexistent and upon which promises Defendant intended
Complainant Affiant to rely and upon which Complainant Affiant relied to Complainant
Affiant's detriment, resulting in loss of money by Complainant Affiant in an amount constituting
grand theft.

## Affidavit.

Complainant Affiant hereby solemnly swears, declares, and deposes as follows:

1.     Complainant Affiant is competent to state the matters set forth herein.

2.     Complainant Affiant has knowledge of the facts stated herein.

3.     All the facts stated herein are true, correct, and complete in accordance with
Complainant Affiant's personal knowledge, and if called upon as a witness Complainant Affiant
shall so testify.

## Plain statement of facts.

## Background.

4.     DRII is a timeshare developer who in Kauai County, Hawaii, and Marin County,
California (and other places), sells alleged timeshare interests, called memberships, associated
with certain DRII timeshare resort properties.

5.     A common DRII practice is to upgrade a customer's alleged membership by
accepting a trade-in of the previous alleged timeshare contract, crediting sums given, and
executing a new contract.

6.      On January 12, 2017, in Kauai County, Hawaii, Complainant Affiant upgrades Complainant Affiant's alleged membership with DRII **(the "Alleged DRII Membership")** and enters into a new contract, alleged DRII timeshare contract no. 17694421, trading in the original contract and receiving credit for sums given thereunder.

7.      On July 7, 2017, in Marin County, California, Complainant Affiant again upgrades the Alleged DRII Membership and enters into alleged DRII timeshare contract no. 17583190, trading in alleged DRII timeshare contract no. 17694421 (*supra*) and receiving credit for sums given thereunder.

8.      In or about June 2018, Complainant Affiant ceases giving money to DRII.

9.      On or about 11:25 A.M. December 27, 2019, John Arthur Pressney and Pamela Morgon Pressney lodge with the Office of the San Diego County District Attorney Consumer Protection Unit an Affidavit of Information the subject of which is Defendant, alleging three (3) incidents each of conspiracy, grand theft, and fraud and providing evidence thereof, the original of which is available in the record of this case (Case No. 2020CS0014), a true and correct of which is attached hereto or available digitally at **https://gofile.io/?c=iRKiAQ** and hereby made fully part hereof as Exhibit A.

<u>Relations with Defendant.</u>

10.      On July 3, 2018, Complainant Affiant appears to enter into contract with Defendant by executing Defendant's alleged "Services Agreement" and "STATEMENT OF UNDERSTANDING" **(collectively the "Alleged Contract")**— a true and correct of which is attached hereto or available digitally at **https://gofile.io/?c=iRKiAQ** and hereby made fully part hereof as, collectively, Exhibit B.

11.     The subject of the Alleged Contract is what Defendant describes as

*"termination/transfer"* of Complainant Affiant's alleged timeshare contract with DRII.

12.     Defendant makes, among others, the following express material representations

and promises in the alleged Services Agreement (*see* Exhibit B):

- RA Group will terminate/transfer Your current Timeshare. If your Purchase
  Agreement is not terminated, transferred, or current contract is not rolled back
  to a previous contract or agreed to be by the developer . . . within eighteen
  (18) months of RA-Group's receipt of the entire FEE . . . (paragraph 1a, p. 1)

- Except in the case where You obtained a developer offered mortgage, You
  understand that You are responsible to continue to make all payments on any
  financing used to pay for any part of the Timeshare. . . . You are still
  responsible for the mortgage until the termination/transfer is completed. .
  (paragraph 1b, p. 1)

- [T]he term of this Agreement shall be eighteen (18) months and shall
  terminate upon the earlier of: (i) the termination/transfer, or current contract
  roll back of Your Timeshare . . . . (paragraph 2, p. 2)

- [S]ome resorts/clubs may require a cancellation fee or the like to end an
  ownership. These fees will be no greater than the amount of twelve (12)
  month's maintenance fees, except in the case where all past maintenance fees
  are also required. Should this be the case You will be required to pay the
  fee(s) to the Developer/Club for a successful termination/transfer. (paragraph
  4d, p. 3)

- You are guaranteed that your Timeshare will be terminated/transferred; that
  you [*sic*] will receive an offer from the Assignor of Your Timeshare; Your
  Timeshare will be placed back to a previous [*sic*] traded Timeshare; or that
  You can be relieved of Your entire ownership subject to your full compliance
  with the terms and conditions set forth in this Agreement. (paragraph 5, p. 4)

13.     Receiving no joy from Resort Advisory Group's alleged services, Complainant

Affiant, in self-defense against DRII, beginning in or about early 2019 and ending in or about

late 2019, examines all of Complainant Affiant's personal records and every record provided by

DRII with respect to alleged DRII timeshare contract nos. 17694421 and 17583190 and

determines that:

- The only rights in the Alleged DRII Membership which Complainant Affiant had, used, or enjoyed were purchased with Complainant Affiant's money;

- No aspect of the Alleged DRII Membership was purchased with DRII's money[2]; and

- At the time Complainant Affiant appears to enter into contract with Resort Advisory Group July 3, 2018, (a) DRII has no enforceable contractual right against Complainant Affiant, and (b) Resort Advisory Group's "services" are a ruse.

14.    Beginning no later than July 3, 2018, and continuing to the present day: Through planning and coordination of individual efforts and with intent that others defraud Complainant Affiant of money in Novato, Marin County, California, Defendant agrees with Jason Krieck, Thomas Hunt McCarty, Eric George Kittler, and Michael Krieck that one or more of them will make false promises and representations to Complainant Affiant that he or they will *"terminate/transfer"* a nonexistent contract with DRII, with fraudulent intent not to perform those promises by reason of impossibility (nothing in the subject matter) and thereafter knowingly and designedly, under false pretenses, obtain from Complainant Affiant money an amount constituting grand theft (*infra*).

15.    With respect to the Alleged Contract, Complainant Affiant on the following dates mistakenly gives Defendant the following amounts—a true and correct of proof of which is attached hereto or available digitally at **https://gofile.io/?c=iRKiAQ** and hereby made fully part hereof as Exhibit C:

---

[2 Whereas, there is no evidence that DRII gave value to Complainant Affiant: The alleged promissory notes associated with alleged DRII timeshare contract nos. 17694421 (Hawaii) and 17583190 (California) are void for failure of consideration (Hawaii Code, Uniform Commercial Code § 490:3-303(b); California Code, Commercial Code 3303(b)).]

| Date | Amount |
|------|--------|
| 07/06/2018 | $9,000 |
| 08/08/2018 | 3,500 |
| 09/07/2018 | 3,500 |
| 10/06/2018 | 3,500 |
| **Total** | $19,500 |

16.      In respect of the modus operandi of DRII, Complainant Affiant in or about early 2020 begins documenting the criminal offenses committed by DRII principals and agents against Complainant Affiant and on February 20, 2020, executes an affidavit of information (criminal complaint), sworn to as true, correct, and complete before an officer of the state authorized to administer oaths, making known all such offenses committed under the laws of Hawaii, California, New York, Nevada, and New York and Title 18 of the United States Code, to be lodged with the:

a.      district attorney of Clark County, Nevada; Kauai County, Hawaii; Marin County, California; New York County, New York; and Broward County, Florida— a certified copy of which is either attached hereto or available digitally at **https://gofile.io/?c=iRKiAQ** and hereby made fully part hereof as, respectively, Exhibit D, E, F, G, and H; and

b.      United States attorney for the districts of Nevada, Hawaii, Northern California, Southern New York, and Southern Florida— a certified copy of which is either attached hereto or available digitally at **https://gofile.io/?c=iRKiAQ** and hereby made fully part hereof as Exhibit I; and.

17.      Complainant Affiant on February 24, 2020, lodges with the Office of the District Attorney, Clark County, Nevada, and Office of the United States Attorney for the District of Nevada against certain principals and agents of DRII, an affidavit of information, averring as to

commission of the offenses described in, respectively, Nevada Revised Statutes § 199.480(3)(d) (*see* Exhibit D) and 18 U.S.C. §§ 1001 and 1343 (*see* Exhibit I).

Verification.

Herman David Abel and Debora Susan Abel hereby aver as to the correctness, truth, and authenticity of the contents hereof, and solemnly swear, declare, and state that Complainant Affiant executes this Affidavit on Complainant Affiant's unlimited liability, that Complainant Affiant is competent to state the matters set forth herein, and that the facts stated herein are true, correct, and complete in accordance with Complainant Affiant's personal knowledge.

Further Complainant Affiant sayeth naught.

Date:   Subscribed and sworn to this second day of the third month in the year of our Lord two thousand twenty [March 2, A.D. 2020], at, respectively, Novato and Eureka, California.

_____

Herman David Abel

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA, COUNTY OF MARIN

**Jurat**

Subscribed and sworn to (or affirmed) before me this ___ day of _____ , 20___ , by _____ , proved to me on the basis of satisfactory evidence to be

the person who appeared before me.

DEBRA J. FOX
Notary Public · California
Marin County
Commission # 2239656
My Comm. Expires May 21, 2022

_____
Notary Public

*(continued on next page)*

Debora Susan Abel

A notary public or other officer completing this certificate
verifies only the identity of the individual who signed the
document to which this certificate is attached, and not
the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA, COUNTY OF HUMBOLDT

# Jurat

Subscribed and sworn to (or affirmed) before me this 2nd day of March , 2020 , by
Debora Susan Abel , proved to me on the basis of satisfactory evidence to be

the person who appeared before me.

D. R. HOFFMAN
Notary Public - California
Humboldt County
Commission # 2313009
My Comm. Expires Dec 17, 2023

Notary Public

ALL EXHIBITS REFERENCED IN THE FOREGOING PAGES CAN BE VIEWED AT:

# https://tinyurl.com/yavdwg8z

# EXHIBIT E-2

## AFFIDAVIT OF INFORMATION
### CRIMINAL COMPLAINT
### FOR PUBLIC NOTICE FILING

RECEIVED

MAR 0 4 2020

U.S. Attorney's Office
San Diego, CA 92101

| | |
|---|---|
| Herman David Abel, and<br>Debora Susan Abel,<br><br>    Complainant Affiants,<br><br>        v.<br><br>Intermarketing Media, LLC, doing business as<br>      Resort Advisory Group,<br>Jason Krieck,<br>Thomas Hunt McCarty,<br>Eric George Kittler,<br>Michael Krieck,<br>David Alan Klein, and<br>Bo Wilson,<br><br>    Defendants. | NO. _____<br><br>AFFIDAVIT OF INFORMATION<br><br>FALSE STATEMENTS [1,053 COUNTS];<br>MAIL FRAUD [4 COUNTS]; WIRE<br>FRAUD [27 COUNTS].<br><br><br><br><br><br><br><br><br><br>18 U.S.C. § 4 |

### Introduction.

Complainant affiants Herman David Abel and Debora Susan Abel hereby present this

Affidavit of Information upon probable cause pursuant to Title 18 United States Code **("U.S.C.")**

§§ 4, 1001, 1341, and 1343, in respect of which, evidence of the above-enumerated offenses,

committed by the above-named defendants, having devised an artifice to obtain money from

Herman David Abel and Debora Susan Abel **(collectively "Complainant Affiant")** predicated

on false representations and false promises of *"[timeshare contract] termination related*

*Services"* with respect to nonexistent contracts that Complainant Affiant allegedly had with

timeshare developer Diamond Resorts International, Inc. **("DRII")**, Intermarketing Media, LLC,

doing business as Resort Advisory Group; Jason Krieck, Thomas Hunt McCarty, Eric George

Kittler, Michael Krieck, Bo Wilson,[1] and David Alan Klein (**collectively the "Defendant"**),
used false writings knowing the same to contain materially fictitious statements and, for the
purpose of executing said artifice and obtaining money from Complainant Affiant thereby,
transmitted false writings to Complainant Affiant by means of wire in interstate commerce.

Affidavit.

Complainant Affiant hereby solemnly swears, declares, and deposes as follows:

1.      Complainant Affiant is competent to state the matters set forth herein.

2.      Complainant Affiant has knowledge of the facts stated herein.

3.      All the facts stated herein are true, correct, and complete in accordance with
Complainant Affiant's personal knowledge, and if called upon as a witness Complainant Affiant
shall so testify.

Plain statement of facts.

Background.

4.      DRII is a timeshare developer who in Kauai County, Hawaii, and Marin County,
California (and other places), sells alleged timeshare interests, called memberships, associated
with certain DRII timeshare resort properties.

5.      A common DRII practice is to upgrade a customer's alleged membership by
accepting a trade-in of the previous alleged timeshare contract, crediting sums given, and
executing a new contract.

6.      On January 12, 2017, in Kauai County, Hawaii, Complainant Affiant upgrades
Complainant Affiant's alleged membership with DRII (**the "Alleged DRII Membership"**) and

---

[1] Bo Wilson is charged with violations of CCPC §§ 182(a)(4) and 532 only as committed by Bo Wilson in
Bo Wilson's capacity as principal executive of Resort Advisory Group beginning July 1, 2019.

enters into a new contract, alleged DRII timeshare contract no. 17694421, trading in the original contract and receiving credit for sums given thereunder.

7.      On July 7, 2017, in Marin County, California, Complainant Affiant again upgrades the Alleged DRII Membership and enters into alleged DRII timeshare contract no. 17583190, trading in alleged DRII timeshare contract no. 17694421 (*supra*) and receiving credit for sums given thereunder.

8.      In or about June 2018, Complainant Affiant ceases giving money to DRII.

<u>Relations with Defendant.</u>

9.      On July 3, 2018, Complainant Affiant appears to enter into contract with Defendant by executing Defendant's alleged "Services Agreement" and attached "STATEMENT OF UNDERSTANDING" (**<u>collectively the "Alleged Contract"</u>**)—a true and correct copy of which is attached hereto or available digitally at **<u>https://gofile.io/?c=MGFiAe</u>** and hereby made fully part hereof as, collectively, Exhibit A.

10.     The subject of the Alleged Contract is what Defendant describes as *"termination/transfer"* of Complainant Affiant's alleged timeshare contract with DRII.

11.     Defendant makes, among others, the following express material representations and promises in the alleged Services Agreement (*see* Exhibit A):

- RA Group will terminate/transfer Your current Timeshare.  If your Purchase Agreement is not terminated, transferred, or current contract is not rolled back to a previous contract or agreed to be by the developer . . . within eighteen (18) months of RA-Group's receipt of the entire FEE . . . (paragraph 1a, p. 1)

- Except in the case where You obtained a developer offered mortgage, You understand that You are responsible to continue to make all payments on any financing used to pay for any part of the Timeshare. . . . You are still responsible for the mortgage until the termination/transfer is completed. . (paragraph 1b, p. 1)

- [T]he term of this Agreement shall be eighteen (18) months and shall terminate upon the earlier of: (i) the termination/transfer, or current contract roll back of Your Timeshare . . . . (paragraph 2, p. 2)

- [S]ome resorts/clubs may require a cancellation fee or the like to end an ownership. These fees will be no greater than the amount of twelve (12) month's maintenance fees, except in the case where all past maintenance fees are also required. Should this be the case You will be required to pay the fee(s) to the Developer/Club for a successful termination/transfer. (paragraph 4d, p. 3)

- You are guaranteed that your Timeshare will be terminated/transferred; that you [sic] will receive an offer from the Assignor of Your Timeshare; Your Timeshare will be placed back to a previous [sic] traded Timeshare; or that You can be relieved of Your entire ownership subject to your full compliance with the terms and conditions set forth in this Agreement. (paragraph 5, p. 4)

12.     Receiving no joy from Resort Advisory Group's alleged services, Complainant Affiant, in self-defense against DRII, beginning in or about early 2019 and ending in or about late 2019, examines all of Complainant Affiant's personal records and every record provided by DRII with respect to alleged DRII timeshare contract nos. 17694421 and 17583190 and determines that:

- The only rights in the Alleged DRII Membership which Complainant Affiant had, used, or enjoyed were purchased with Complainant Affiant's money;

- No aspect of the Alleged DRII Membership was purchased with DRII's money[2]; and

- At the time Complainant Affiant appears to enter into contract with Resort Advisory Group July 3, 2018, (a) DRII has no enforceable contractual right against Complainant Affiant, and (b) Resort Advisory Group's "services" are a ruse.

---

[2 Whereas, there is no evidence that DRII gave value to Complainant Affiant: The alleged promissory notes associated with alleged DRII timeshare contract nos. 17694421 (Hawaii) and 17583190 (California) are void for failure of consideration (Hawaii Code, Uniform Commercial Code § 490:3-303(b)); California Code, Commercial Code 3303(b)).]

13.     Beginning July 3, 2018, and continuing to October 6, 2018, Jason Krieck, Thomas Hunt McCarty, Eric George Kittler, Michael Krieck, and David Alan Klein conspire to obtain and knowingly and designedly obtain money from Complainant Affiant by false promises and representations to *"terminate/transfer"* a nonexistent contract with DRII, with fraudulent intent not to perform those representations by reason of impossibility (nothing in the subject matter), and obtain from Complainant Affiant money in an amount constituting grand theft.

14.     With respect to the Alleged Contract, Complainant Affiant on the following dates mistakenly gives DRII the following amounts of money—a true and correct copy of proof of which is attached hereto or available digitally at **https://gofile.io/?c=MGFiAe** and hereby made fully part hereof as Exhibit B:

| Date | Amount |
|------|--------|
| 07/06/2018 | $9,000 |
| 08/08/2018 | 3,500 |
| 09/07/2018 | 3,500 |
| 10/06/2018 | 3,500 |
| **Total** | $19,500 |

15.     In respect of the modus operandi of DRII, Complainant Affiant in or about early 2020 begins documenting the criminal offenses committed by DRII principals and agents against Complainant Affiant and on February 20, 2020, executes an affidavit of information (criminal complaint), sworn to as true, correct, and complete before an officer of the state authorized to administer oaths, making known all such offenses committed under the laws of Hawaii, California, New York, Nevada, and New York and Title 18 of the United States Code, to be lodged with the:

a.      district attorney of Clark County, Nevada; Kauai County, Hawaii; Marin County, California; New York County, New York; and Broward County,

Florida—a certified copy of which is attached hereto or available digitally at

**https://gofile.io/?c=MGFiAe** and hereby made fully part hereof as, respectively,

Exhibit C, D, E, F, and G; and

      b.     United States attorney for the districts of Nevada, Hawaii, Northern

California, Southern New York, and Southern Florida—a certified copy of which

is either attached hereto or available digitally at **https://gofile.io/?c=MGFiAe** and

hereby made fully part hereof as Exhibit H.

    16.     Complainant Affiant on February 24, 2020, lodges with the Office of the District

Attorney, Clark County, Nevada, and Office of the United States Attorney for the District of

Nevada against Defendant and certain other principals and agents of DRII, an affidavit of

information as to commission of the offenses described in, respectively, Nevada Revised Statutes

§ 199.480(3)(d) (*see* Exhibit C) and 18 U.S.C. §§ 1001 and 1343 (*see* Exhibit H).

    17.     For the purpose of executing the above-described artifice (obtaining Complainant

Affiant's money by means of false representations and promises to *"terminate/transfer"* a

nonexistent contract, with fraudulent intent not to perform those representations by reason of

impossibility), Defendant between July 5, 2018, and February 3, 2020, (a) transmits to

Complainant Affiant by means of wire communication in interstate commerce certain writings,

and (b) knowingly causes to be delivered to Complainant Affiant by mail certain written

correspondence—a true and correct copy of which is either attached hereto or available digitally

at **https://gofile.io/?c=MGFiAe** and hereby made fully part hereof as, respectively, Exhibit I.

## Verification.

Herman David Abel and Debora Susan Abel hereby aver as to the correctness, truth, and

authenticity of the contents hereof, and solemnly swear, declare, and state that Complainant

Affiant executes this Affidavit on Complainant Affiant's unlimited liability, that Complainant

Affiant is competent to state the matters set forth herein, and that the facts stated herein are true,

correct, and complete in accordance with Complainant Affiant's personal knowledge.

Further Complainant Affiant sayeth naught.

Date:   Subscribed and sworn to this second day of the third month in the year of our Lord two
        thousand twenty [March 2, A.D. 2020], at, respectively, Novato and Eureka, California.

Herman David Abel

A notary public or other officer completing this certificate
verifies only the identity of the individual who signed the
document to which this certificate is attached, and not
the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA, COUNTY OF MARIN

**Jurat**

Subscribed and sworn to (or affirmed) before me this ___ day of _____, 20__, by
_____, proved to me on the basis of satisfactory evidence to be

the person who appeared before me.

Notary Public

DEBRA J. FOX
Notary Public - California
Marin County
Commission # 2239656
My Comm. Expires May 21, 2022

*(continued on next page)*

Debora Susan Abel

A notary public or other officer completing this certificate
verifies only the identity of the individual who signed the
document to which this certificate is attached, and not
the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA, COUNTY OF HUMBOLDT

# Jurat

Subscribed and sworn to (or affirmed) before me this _2nd_ day of _MARCH_ , 20_20_, by
_Debora Susan Abel_ , proved to me on the basis of satisfactory evidence to be

the person who appeared before me.

D. R. HOFFMAN
Notary Public - California
Humboldt County
Commission # 2313009
My Comm. Expires Dec 17, 2023

Notary Public

ALL EXHIBITS REFERENCED IN THE FOREGOING PAGES CAN BE VIEWED AT:

# https://tinyurl.com/yavdwg8z

# EXHIBIT F

**BARLOW & ASSOCIATES**

A T T O R N E Y S   A T   L A W
20929 Ventura Blvd, Ste  47
Woodland Hills, CA 91364-2103
(818) 369-4432 Telephone

Our File Number

May 17, 2020

Mr. Bryan C. Altman, Esq.                        *SENT BY EMAIL ONLY TO:*
10250 Constellation Boulevard, Suite 2500        *bryan@altmanlawgroup.net*
Los Angeles, California 90067

Mr. William I. Rothbard, Esq.                    *bill@rothbardlaw.com*
2333 Canyonback Road
Los Angeles, California 90049

      *Regarding:  Resort Advisory Group*

Messrs. Altman and Rothbard:

It has come to my attention that you may be considering bringing suit against me and certain former clients of mine in behalf of Resort Advisory Group.

This letter is sent as a courtesy to inform you of the infirmity of any such action and notice as to your joint-and-several liability with Resort Advisory Group for pursuing such course *absent proof of standing to do so.*

Resort Advisory Group markets and sells its services on the presumption of the existence of certain contractual rights held by a timeshare developer against a prospective customer, nearly all of which supposedly arise from a signed promissory note held and enforced by the timeshare developer.

To survive summary disposition, Resort Advisory Group would have to set forth by affidavit (not declaration) or equivalent evidence, facts supporting their claim of invasion of a legally protected interest arising from a contract with a customer; specifically: fact of a loan from the timeshare developer to the customer.

As explained to your client:  The only rights in the timeshare membership / vacation interest that my former clients had, used, or enjoyed were purchased with my former clients' own money and no aspect thereof was purchased with the respective developer's money.

That no timeshare developer ever made a loan to any former client of mine means that (a) no related timeshare promissory note is supported by consideration, (b) all such notes are void and unenforceable for failure of consideration, and (c) Resort Advisory Group has never had an enforceable contract (nothing in the subject matter) with any former client of mine who appeared to sign a promissory note with a timeshare developer.

Page 2
May 17, 2020
Messrs. Altman and Rothbard

Possibly you are unaware that no timeshare developer ever pursues a customer to recover any of the millions in defaulted timeshare "loans."  The reason is that they would have to allege and prove fact of a loan, something they cannot do–but which burden will fall upon you should you proceed against me.

Wherefore, you are hereby given notice that, with respect to any former client of mine, should you undertake, on behalf of Resort Advisory Group, any action against me that takes my time or attention to rectify, you and Resort Advisory Group shall be jointly and severally liable therefor and billed at the rate of $750.00 per hour or any portion of an hour for any and all such time required by me or any attorney hired by me to address such matter, due and payable in full within 15 days of the date any invoice therefor is sent.

You are further advised that the information in the proprietary systems of Resort Advisory Group to which I was given access was only that which was available to me directly from my clients.

In closing, be advised that the affidavits of information lodged against your client for criminal wrongdoing are sworn to as true, correct, and complete (the truth, nothing but the truth, and the whole truth, respectively) and have not been contradicted or disproved; something you would have to do in order to prevail in any action against me or any of my former clients.

This letter and proof of its transmission to you will be entered in evidence in any proceeding that may arise in connection with subject matter set forth herein.

Very truly yours,

BRENT D. BARLOW, ESQ.

BDB/ao
cc: client

# EXHIBIT G

17694421-DRHC Purchase and Security Agreement

## CREDIT SALE CONTRACT

**Diamond Resorts Hawaii Collection**      **Purchase and Security Agreement**

In this Agreement, *seller* means Diamond Resorts Hawaii Collection Development LLC, a Delaware limited liability company. Its address is c/o Customer Service, Diamond Resorts Financial Services, Inc., 10600 West Charleston Boulevard, Las Vegas, Nevada 89135 telephone 702.684.8000. *You*, *your*, and *purchaser* mean each of these people, individually and together:

**PURCHASER 1:**

**Herman David Abel**
Name in full – No initials

Confidential
Street Address
Confidential
City, State & Zip

Confidential
Business Phone     Home Phone

Email Address

**PURCHASER 2:**

**Debora Susan Abel**
Name in full – No initials
Confidential
Street Address
Confidential
City, State & Zip

Confidential
Business Phone     Home Phone

Email Address

**PURCHASER 3:**

Name in full – No initials

Street Address

City, State & Zip

Business Phone     Home Phone

Email Address

**PURCHASER 4:**

Name in full – No initials

Street Address

City, State & Zip

Business Phone     Home Phone

Email Address

---

**Offer to Buy:** By signing this Agreement, you offer to buy a Membership in the Diamond Resorts Hawaii Collection vacation plan (the *Collection*). Your Membership will consist of:

▯ A membership in Diamond Resorts Hawaii Collection Members Association (the *Association*). It is a non-stock, non-profit Delaware corporation, but its principal place of business is located in Clark County, Nevada, and

▯ The right to receive **50000** Points every year.

You may use your Points to reserve the use of a unit (a *Collection Accommodation*) starting in **2017** (your *initial use year*) but not before the closing of your purchase.

The nature of your Membership and your rights as a Member (including your reservation and use rights) are defined, limited and governed by the Collection Instruments described later.

**Purchase Terms:**

| | | |
|---|---|---|
| 1. | *Purchase price* | **$189,315.00** |
| 2. | Plus *other closing costs* | **$900.00** |
| 3. | Less credits (if any) | **$0.00** |

4. Less *trade in value* of any Timeshare Interest conveyed to the Seller as part of your purchase (applies only to "upgrade" sales)

| | |
|---|---|
| a. Ascribed Equity Value of Timeshare Interest(s) | **$23,136.30** |
| b. Other Amounts Owed: | **$0.00** |
| c. Total Trade-in Value (line a minus line b) | **$23,136.30** |
| d. Other Amounts Paid at closing: | **$0.00** |

**TOTAL**      **$167,003.70**

**Payment Due Dates:**
A. Less *initial deposit* received today:
(including closing costs paid today)    **$11,172.00**
B. Less *additional deposit(s):*

| | | |
|---|---|---|
| (1) | Due | **$0.00** |
| (2) | Due | **$0.00** |

C. *Financed* Closing Costs (if any)    **$750.00**

D. *Balance* (due_____, 20___ )    **$155,906.70**
You will pay the balance:

    ☐ in cash   ☐ by way of a loan from the seller
    ☐ using a _____ credit card

If you choose to finance your purchase using a loan from the seller, you must repay the loan in **120** monthly payments of **$2,318.25**. You will make your monthly payments by:

    ☐ Statement   ☐ SurePay (credit or debit card)
    ☐ SurePay (checking or savings account)

Interest will be **12.83**% per year. See your Truth-in-Lending Disclosure Statement for the annual percentage rate and other important terms, including late charges and monthly collection fees. The Truth-in-Lending Disclosure Statement is part of this Agreement.

The Association's annual standard assessment of $ **9,399.00** (estimated) for your initial use year will be billed to you separately. Please see section 6(c) below regarding special assessments.

NOTES: All amounts are stated in and must be paid in U.S. funds. All payments made before closing, except your initial deposit, must be made payable only to the escrow agent.

AAA#0924.DIAMOND.FINAL.000274

## TERMS AND CONDITIONS

**1. Definitions.** In this Agreement, certain words or phrases have special meanings. When they are defined or explained, they appear in italics and bold type, *like this*, so that you can find them easily. Some of them use capital letters to indicate that they have special meanings (for example, "Collection"). Other terms, like "seller" are not capitalized but still have the special meaning given to them. These are some of the defined terms:

(a) *Act* means Chapter 514E, Time Sharing Plans, of the Hawaii Revised Statutes, as amended.

(b) *Blanket lien* means any lien or encumbrance (i) that affects more than one Membership either directly or by reason of affecting an entire Collection Accommodation or the resort in which it is located, and (ii) that secures or evidences the obligation to pay money or to sell or otherwise that transfer property, and (iii) that authorizes, permits, or requires the foreclosure and sale or other loss of use of the property affected. For example, a mortgage on a Collection Accommodation is a blanket lien.

(c) *Collection Instruments* means the following documents and any changes and additions properly made to them from time to time:

(1) *Articles* means the Articles of Incorporation of the Association;

(2) *By-Laws* means the by-laws of the Association;

(3) *Declaration* means the Diamond Resorts Hawaii Collection Declaration of Covenants, Conditions and Restrictions, and Grant of Easements. It is attached as an exhibit to the Trust Agreement;

(4) *Register of Members* means the Association's record of its Members, their personal contact details, and the number of Points of each type assigned to each Member's Membership;

(5) *Regulations* means the rules of the Association, including the rules governing the terms and conditions of Membership, the use of Points, the use of the reservation system, and the general use of Collection Accommodations;

(6) *Trust agreement* means the trust agreement for the Trust described in Paragraph 8.

(7) Any other document or instrument that defines or governs the Collection, together with each Member's Purchase Agreement and Points Certificate.

(d) *Encumbrances* mean rights and interests that one person has in property owned by someone else.

(e) *Escrow agent* means First American Title Insurance Company, a California corporation. Its address is 333 Queen Street, Suite 700, Honolulu, Hawaii 96813; Telephone: (808) 536-3866; Fax No. (808) 545-6187.

(f) *Escrow agreement* means the Collection vacation plan escrow agreement, dated February 23, 2006. It is a contract that the seller has already signed with the escrow agent to provide escrow services for purchases of Memberships in the Collection. It is on file with the Hawaii State Department of Commerce and Consumer Affairs. You have a copy of it.

(g) *Escrow instructions* means your and the seller's instructions to the escrow agent for the handling of funds, notes and other papers and for the closing of your purchase of a Membership. This Agreement and the escrow agreement contain all of these instructions.

(h) *Funds* means money.

(i) *Manager* means the agent hired to be the Association's manager.

(j) *Member* means the owner of a Membership.

(k) *Points* means the currency used by the Collection through which Members reserve the use and occupancy of Collection Accommodations in accordance with the Collection Instruments.

(l) *Points Certificate* means the certificate issued by the Association that identifies a person as a Member and that states the number and type of Points held by him or her.

(m) *Purchase money contract* is defined in the Act and has the same meaning here. In general, it means all negotiable instruments (for example, a check), the Note referred to in Paragraph 3, and any other documents that evidence or contain a promise from you to pay to repay a loan used to pay for the purchase of your Membership and made by the seller or a related company. Such a document is a "negotiable instrument" if the seller could transfer that document to another person who could then force you to pay free from any claim or defense you may have against the seller. This Agreement is not a negotiable instrument and is not a purchase money contract.

**2. Our Basic Agreement.** This Agreement will become effective and legally binding upon both parties when both you and the seller sign it. You agree that the seller can accept or reject this Agreement. If the seller accepts this Agreement, then the seller, subject to Paragraph 3 below, agrees to sell the Membership to you, and you agree to buy it and to make all payments required by this Agreement when due and otherwise to comply fully with all of the terms and conditions of this Agreement and of the Collection Instruments. If the seller rejects this Agreement, your only right is to get a refund of all amounts paid by you, without interest. This Agreement can only be changed in a written document that is signed by both you and the seller.

**3. Payment of Purchase Price.**

(a) The purchase price is stated on line 1 of the "Purchase Terms" on page 1. You may pay it all in cash, or partly in cash and the rest by way of a loan from the seller. If you borrow part of the purchase price from the seller, then you must sign and deliver to the seller a note (the *Note*) using a form provided by the seller and in an amount equal to the loan. You must also give the seller a "security interest" as described in Paragraph 9. The seller may also require that you sign other documents that the seller, in its sole discretion, deems reasonably necessary or appropriate to secure your payment of the Note. You will be subject to all of the terms, provisions, and conditions stated in the Note or in any such other documents and instruments.

(b) If you request a loan, the seller may agree to provide it, but the seller is **NOT** required to do so. You agree that all personal financial information submitted to the seller will be accurate. You authorize the seller to check your credit (whether through a consumer credit reporting agency or otherwise). You promise to notify the seller immediately of any material adverse change in your financial condition that occurs before the closing.

(c) You must use your good faith best efforts to qualify for a loan. If you do so but you cannot qualify for a loan within ten (10) days after the seller signs this Agreement, then:

(1) The seller will send you a written notice saying so; and

(2) You have two options: (i) you may cancel this Agreement and receive a refund of all amounts that you have paid (without interest), or (ii) you may complete your purchase by paying cash at the closing. You must promptly notify the seller of the option that you choose. If the seller does not receive a notice from you within twenty (20) days after its notice that you did not qualify for the loan, then the seller may cancel this contract. If it does, all amounts that you have paid will be refunded to you without interest.

(d) The seller has the right, in its sole discretion, to sell or assign the Note and the Seller Security Interest to anyone else, whether or not such person or entity is affiliated with the seller.

(e) If you pay part of the purchase price by trading in a time share interest in another timeshare plan (your *fee timeshare interest*), then when you sign this Agreement you must also sign and deliver to the seller a deed or other appropriate document (the *deed-back*) transferring your fee time share interest to the seller. The form and content of the deed-back must be satisfactory to the seller in its sole discretion. You must transfer the Fee Time Share Interest to the seller (or to someone else chosen by the seller) free and clear of any liens and encumbrances not expressly approved by the seller. If the seller asks, you must also sign a declaration of

2

AAA#0924.DIAMOND.FINAL.000275

annexation or other document that submits the fee timeshare interest to the Declaration (the *annexation document*). The seller may record the deed-back and the annexation document upon closing. You must pay all costs, expenses, and other obligations related to the Fee Time Share Interest (the *fee timeshare interest obligations*) due before the closing. If the sale of your Membership does not close for any reason, the escrow agent will return the deed-back and the annexation document to you and you will remain liable for the fee timeshare interest obligations.

(f) If the Note, this Agreement, the deed-back, annexation document, or any other document that evidences or secures payment of the purchase price is misplaced or has not been completely and validly signed by you for any reason, the seller has two options:

(1) The seller can cancel this Agreement at any time prior to closing. To do so, the seller must send you a written notice of cancellation and tell the escrow agent to refund all funds paid by you (without interest). After that, this Agreement will terminate and have no further force or legal effect.

(2) The seller can send you whatever document(s) the seller needs for you to sign or re-sign, along with instructions on how to do so. If this happens, then you must promptly sign or re-sign the document(s), have your signature notarized (to the extent indicated), and return them to the seller in accordance with the seller's written instructions. If, for any reason, you fail to do so within seven (7) calendar days after you receive the document(s), you will be in default and the seller will have the rights and remedies described in Paragraph 10.

(g) The amount paid by you for "other closing costs," as shown on page 1, is applied to the expenses incurred by the seller to close the sale, including the cost of preparing documents, applicable general excise tax, and other costs. Any excess is retained by the seller for its expenses in selling the Membership. The other closing costs are not a finance charge and must be paid whether you pay in cash or if seller finances your purchase.

### NOTICE

**ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR.**

**4. Escrow.** The escrow agreement is a separate document and it is not part of our Agreement. But by signing this Agreement, you: (a) give the escrow instructions to the escrow agent; (b) appoint it as your agent to handle your funds and purchase money contracts and the closing according to these instructions; and (c) accept and promise to obey the escrow agreement and the escrow instructions, just as if you had signed the escrow agreement yourself.

The seller will deliver to the escrow agent your initial deposit and any purchase money contract that you sign. But the seller or sales agent may initially hold: (a) your check, if it is payable to the escrow agent; and (b) this Agreement and your Note, until your seven day right to cancel your purchase given in the Act expires. All of your other funds must be sent directly to the escrow agent, who will hold them in keeping with the requirements of the escrow instructions.

By signing this Agreement, you and the seller are instructing the escrow agent: (i) to close the sale when the closing conditions are met; (ii) to deposit all funds in an account authorized by law and chosen by the seller, (iii) to pay the earnings on the funds to the seller in accordance with Section 449-16.5, HRS; (iv) to hold and release the funds as provided by the escrow instructions; and (v) to fill in the blanks in all documents when closing the sale, including, if you get a loan from seller, the date of your Note and the first and last payment due dates. The escrow agent may release your funds and purchase money contracts only as permitted in the escrow instructions. The seller has no right to use any of your funds held by escrow agent until the funds have been delivered to the seller in accordance with the provisions of the escrow instructions.

**5. Vacation Ownership Plan.**

(a) The Collection is a time share use plan under Hawaii law, and your Membership is a form of "right-to-use" time share interest in a time share use plan. You will not receive a deed to any interest in real property.

(b) You understand and agree that unless you buy "Specific Use Points" (which would have to be stated on page 1 of this Agreement), you will **not** have the guaranteed exclusive right to reserve, use, and occupy any particular Collection Accommodation. Rather, in each calendar year you may use and occupy Collection Accommodations during the time periods that you properly reserve in accordance with the Collection Instruments. Because reservations are generally confirmed by the Manager on a first-come, first-served, and space-available basis, you are encouraged to make your reservation requests as far in advance of the desired time periods as the Regulations permit in order to maximize the chances of obtaining confirmed reservations for the times that you want.

(c) The Collection will continue forever unless the Members terminate it in the manner described in the Collection Instruments.

(d) You cannot reserve or use any Collection Accommodation unless you have (i) paid, on time, any and all assessments, personal charges and other amounts charged to you or to your Membership as described in part in Paragraph 6, and (ii) otherwise fully complied with all of the terms, provisions, and conditions of the Collection Instruments.

### 6. Assessments and Personal Charges.

(a) *Assessments* are fees charged by the Association to its Members to pay the Collection costs. *Collection costs* are the costs of owning, operating, and maintaining the Collection and the Collection Accommodations, operating the Association, and conducting its business. You understand and agree that you will be responsible to pay the assessments charged by the Association. If you do not pay, on time, any and all assessments charged to your Membership, then the Association may enforce the Association Security Interest (defined below) and you may lose your Membership. You must pay the assessments for each year whether or not you use and occupy a Collection Accommodation in that year.

There are two kinds of assessments: standard assessments and special assessments.

(b) The *standard assessment* is an annual fee charged by the Association to the Members for their share of regular annual Collection costs. You must pay the standard assessment starting with your initial use year and for each year after that. Your initial standard assessment will be due and you must pay it before you first use and occupy a Collection Accommodation during the year in which your closing occurs. Later standard assessments will be due and payable on a calendar year basis at the time(s) and in the manner set from time to time by the Association's Board of Directors, written notice of which will be provided to each Member. Each year, the Board will set the amount of your standard assessment based on a budget prepared by the Manager and approved by the Board. The amount of your standard assessment may change from year to year.

The standard assessment has two parts: (i) the base standard assessment (a flat amount charged to each Membership), and (ii) the Points standard assessment (an amount charged on a per Point basis).

(c) In addition to standard assessments, you understand and agree that you will be responsible to pay, on time, any special assessments charged to your Membership by the Association, as well as any personal charges that you incur, all in accordance with the provisions of the Collection Instruments. *Special assessments* are fees charged by the Association to the Members for the purpose of dealing with any shortfall in the standard assessments, or to pay for certain other costs described in the Declaration. *Personal charges* are expenses incurred as a result of the act or omission to act of a Member or of someone else occupying a Collection Accommodation assigned to a Member during the time periods reserved or scheduled for use by that Member.

(d) The Association may enforce your obligation to pay the assessments and personal charges in the manner set forth in this Agreement and in Section 9.2 of the By-Laws. Under no circumstances will you be allowed to reserve, use, or occupy any Collection Accommodation, or to exercise any other rights, benefits, or privileges of a Member, unless and until all assessments and

AAA#0924.DIAMOND.FINAL.000276

other amounts that you owe to the Association or the seller have first been paid in full.

**7.   Closing.**  Except as otherwise provided by law, *closing* refers to the time when your Membership takes effect.  Your Membership will not take effect, and the closing will not occur, and your funds will not be disbursed to or for the benefit of the seller, until: (i) the escrow agent has received confirmation that the Association has entered into the Register of Members your name and Membership, and the number and type of Points issued to you; and (ii) the escrow agent has determined that all of the other closing conditions have been met.  The closing conditions are listed in the escrow agreement.  Except as otherwise expressly provided in any of the Collection Instruments, you may not reserve, use, or occupy any Collection Accommodation or exercise any other rights, benefits, or privileges of your Membership until after the closing.  The estimated date of closing is ten (10) days after the expiration of your seven day right to cancel your purchase under the Act.  If, for any reason at all, the closing has not occurred on or before that date, then the seller, in its sole discretion, may either (a) postpone the date of the closing; or (b) cancel this Agreement and direct the escrow agent to refund your funds, without interest or any other earnings on your funds, in which case, this Agreement will be deemed terminated and have no further force or legal effect.

**8.   Title and Title Insurance.**  Your Membership is based on certain real property interests (called *Resort Interests*) in various resorts, hotels and other vacation properties.  Title to the Resort Interests is held in a trust (the *Trust*) for the benefit of the Seller and all Members of the Association pursuant to a recorded Trust Agreement with First American Trust, FSB, a federal savings bank (the *Trustee*).  The Resort Interests were conveyed to the Trustee subject to the Trust Agreement and to the Declaration creating the Collection, but otherwise free and clear of, or otherwise protected from, all blanket liens.  Further, the Trustee owns a title insurance policy insuring the Trustee's ownership of the Resort Interests.  You may inspect the title insurance policies at the offices of the Association.  Because the Trustee, and not you, owns the Resort Interests, you cannot buy real estate title insurance on the Resort Interests owned by the Trustee.

**9.   Security Interests.**  "Security interest" is a legal term.  In general, when you give someone a "security interest" in property, it means that you put up that property as collateral for your promise to do something (for example, to repay a loan).  If you do not keep your promise, the person having the security interest may take the property from you whether by foreclosure or in some other lawful way.

(a)    **Seller's Security Interest.**  If the seller is financing your purchase, then you give the seller a purchase money security interest in the following items as "collateral" for your obligations to obey and perform your obligations under the Note, this Agreement, and the Collection Instruments: (a) your Membership; (b) all rights, benefits and privileges that go with your Membership as established in the Collection Instruments; (c) all rights, benefits, and privileges described in item (b) that you acquire in the future; (d) all replacements or additions to the rights, benefits, and privileges described as items (a) and (b); and (e) all proceeds (money) that you receive for items (a) through (d).  In this Agreement, items (a) through (e) are called the *Collateral* and the interest of the seller in the Collateral is called the *Seller Security Interest*.

(b)    **Association's Security Interest.**  You promise to pay all assessments and personal charges on time, to obey the Collection Instruments, and to perform your duties under them.  You give the Association a security interest in the Collateral as security for your obligations to keep these promises.  In this Agreement, the interest of the Association in the Collateral is called the *Association Security Interest*.  The Association Security Interest is, and always will be, junior and subordinate to the Seller Security Interest.  This is intended to ensure that any money resulting from the sale or other transfer of the Collateral gets paid to the seller before the Association.

(c)    **Financing Statements.**  A "financing statement" is a document that, among other things, lets other people know that you have given someone a security interest in your property.  A continuation statement lets others know that your financing statement is still in effect.  You irrevocably authorize the seller and the Association to file in the appropriate government offices, at any time and from time to time, an initial financing statement, continuation statements, and

amendments to financing and/or continuation statements that provide any information required (1) by Part 5 of Article 9 of the Uniform Commercial Code as adopted in the State of Hawaii or in any other appropriate government jurisdiction, (2) to make the financing statement, continuation statement, or amendment legally sufficient, or (3) to get the appropriate government office to accept the financing statement, continuation statement, or any amendment to either of them.  This information may include, among other things: (i) your name, address and social security number, (ii) if you are not a natural person, your type of organization (for example, a Hawaii corporation) and any organizational identification number issued to you.  You must furnish any such information in writing to the seller or the Association within five days after the seller or the Association asks you for it.  Each person who is one of "you" represents and warrants to the seller and the Association that on the date of this Agreement your domicile is the state shown in your address on page 1 and that your social security number stated on your Truth-In-Lending Disclosure Statement is correct and that you have no other social security number.  You promise that if you change your state of domicile, you will give written notice of the change to the seller and the Association within thirty days after the change.  Your notice must identify your new domicile and residence address.

(d)    **Association as Third Party Beneficiary.**  For purposes of this Paragraph 9 only, the Association is an intended third party beneficiary of this Agreement and has the right to enforce the Association Security Interest granted by you.

**10.   Default.**

(a)    You will be in *default* under this Agreement if (a) you do not pay, or (b) you do not pay on time, or (c) you do not keep any other promise in this Agreement, or (d) you do not perform all of your obligations under this Agreement, your Note, and/or the Collection Instruments, or (e) you misrepresented a material fact in this Agreement or in your credit application.  If you default then you cannot reserve, use, or occupy a Collection Accommodation and you cannot use any other rights, benefits or privileges of your Membership.

(1)    If you default before the closing, then the seller may (i) terminate this agreement, or (ii) enforce this Agreement, or (iii) do anything else permitted by law or this Agreement.  If the seller decides to terminate, then the seller may keep all amounts paid by you to compensate (pay) the seller for your default.  This is not to penalize you.  Instead, our agreement and intent is to agree on (in legal terms, "liquidate") the amount of the seller's damages now because it is very difficult, expensive and impractical to figure out the damages that the seller will suffer if you default.  You instruct the escrow agent to release your funds to the seller if the seller terminates due to your default.  You cannot change or revoke this instruction, and you give up your right and power to do so.  This does not, however, mean that you are giving up or waiving any claim or defense arising out of this sale that you may have against the seller or against someone to whom the seller transfers its rights (an "assignee" of the seller).

(2)    If you fail to keep all of your promises or to perform, on time, all of your obligations under the Note, this Agreement or any of the Collection Instruments after closing, then the seller will give you written notice of your failure.  If you do not cure your failure within ten days (in the case of failure to pay money) or thirty days (in the case of any other failure) after the seller gives such a notice, then you will be in default and the seller may (i) enforce the Seller Security Interest against the Collateral in accordance with Article 9 of the Uniform Commercial Code then in effect in the State of Hawaii; (ii) terminate your Membership and keep all amounts previously paid by you as liquidated damages and not as a penalty; (iii) require immediate payment in full of the entire amount then remaining unpaid under the Note and this Agreement; and/or (iv) do anything else permitted by law or this agreement.

(b)    **IN THE EVENT OF A DISPUTE BETWEEN YOU AND THE SELLER WITH RESPECT TO THE SELLER'S PERFORMANCE UNDER THIS AGREEMENT, THE MATTER IN QUESTION MAY, IN SELLER'S SOLE DISCRETION, BE SETTLED BY ARBITRATION IN ACCORDANCE WITH THE COMMERCIAL ARBITRATION RULES OF THE AMERICAN ARBITRATION ASSOCIATION.**  If a matter in dispute is referred to arbitration, you and the seller must each pay one-half (1/2) of the fees and expenses required to start the arbitration.  You and the seller agree, however, that the arbitrator will decide who must pay the costs and expenses of the arbitration, including attorneys' fees.  You and the seller also agree that any arbitration in connection with this Agreement will be conducted in the City and County of Honolulu, and that the decision of the arbitrator with respect to any

4

such matter in dispute will be final and binding and dispositive of the seller's and your rights and obligations.

Regardless of what this Subparagraph 10(b) may say to the contrary, however, if the seller is unable or fails to comply with the material provisions of this Agreement, then the seller's sole obligation is to refund or cause escrow agent to refund (whichever applies) to you all payments that you previously made under this Agreement, without interest. When your refund has been made, then this Agreement will be deemed canceled, and all rights and obligations under it will immediately terminate. **YOU HEREBY GIVE UP (IN LEGAL TERMS, "WAIVE") ANY AND ALL RIGHTS AND REMEDIES THAT YOU MIGHT OTHERWISE HAVE AT LAW OR IN EQUITY EXCEPT FOR ANY RIGHTS AND REMEDIES THAT, BY LAW, YOU CANNOT WAIVE. THIS WAIVER DOES NOT APPLY, HOWEVER, TO ANY CLAIM OR DEFENSE ARISING OUT OF THIS SALE AND THAT YOU MAY HAVE AGAINST THE SELLER OR AN ASSIGNEE OF THE SELLER.**

**11.   Association Membership.**   Upon closing, you will automatically become a Member of the Association. You agree to be subject to and to comply fully with the Articles, By-Laws, and Regulations.

**12. Your Representations, Warranties, and Acknowledgments.**

You represent and warrant that you (or, in the case of a corporation or other entity, the persons who sign for you) have the legal capacity and the authority to do so. You acknowledge that you have received copies of the Declaration, Articles, and By-Laws. You agree to be strictly bound by, and to comply fully with, the terms, provisions, and conditions of those documents. You also acknowledge and represent that you are buying your Membership for your own personal use and not for its investment potential or any possible rent returns, tax advantages, depreciation, or other financial advantages and that no representations of any nature whatsoever have been made to you concerning investment potential, rent returns, tax advantages, depreciation, or other financial advantages by the seller or any of its salespersons or other agents. You understand that the seller has no resale or rental program for Memberships not owned by the seller. You acknowledge that neither the seller nor any of its sales agents, employees, or other representatives has indicated that you will be assisted in the resale or rental of your Membership in the future. You represent that you do not intend to use any Collection Accommodation as your principal residence. If you have chosen to finance part of the purchase price, then you acknowledge receiving a completed Truth-in-Lending Disclosure Statement, together with a copy of the seller's privacy policy, before you signed this Agreement. All of your acknowledgments in this Paragraph 12 will survive the closing.

You acknowledge and agree that immediately after the closing, the seller will have no further obligations or liabilities of any kind under this Agreement or under any other document or instrument referred to in this Agreement (including these Terms and Conditions) or the Declaration, and that you will look solely to the Association and the Manager, together with any other entities that from time to time become obligated to you as provided in the Collection Instruments, for the fulfillment and satisfaction of any of your rights, benefits, and privileges as a Member of the Collection, and not to the seller.

**13. THE Club®.** The Association has entered into a contract (the *Affiliation Agreement*) with Diamond Resorts International Club, Inc. (*DRIC*), a Florida corporation and an affiliate of the seller. Under the Affiliation Agreement, the Association and the Collection are affiliated with THE Club® . *THE Club®* is not a legal entity or association of any kind. It is a name used to identify an international exchange program owned and operated by DRIC. You will automatically be enrolled in THE Club® upon closing. You will remain a member for so long as you own your Membership and the Affiliation Agreement stays in effect. You must pay the fees charged by DRIC from time to time. The Affiliation Agreement calls for payment by you of an annual membership fee for THE Club® exchange program. Accordingly, when you receive your bill for the annual standard assessments, it will also include an amount reflecting the annual membership fee that you must pay for membership in THE Club® exchange program. Please see THE Club® Disclosure Guide for more

details. Under the Affiliation Agreement, membership in THE Club® may not be transferred without the consent of DRIC, and your transfer of your Membership in the Collection does not, without the consent of DRIC, have the effect of transferring your membership in THE Club®. THE Club® may, but is not obligated to, have a relationship with an external exchange program. At the current time, THE Club® exchange program is affiliated with Interval International, Inc. (*Interval International*), under which Interval International has agreed to make its exchange services available to members of THE Club®. Your Interval International exchange benefits are subject to Interval International's then-current terms and conditions for exchange. You do not have to pay an annual membership fee to Interval International for access to its exchange program, as access to the Interval International exchange program is included in the annual membership fee that you pay for THE Club® membership. However, you must pay all other amounts charged by Interval International relating to your use of its exchange service. The seller makes no representations concerning the current or future services to be provided by THE Club® or Interval International, the cost, continued availability, success or possible failure of THE Club® or Interval International exchange programs, or THE Club's relationship with Interval International. Any representations made regarding Interval International or THE Club® by DRIC or its agents or employees or within the literature, brochures, or videos prepared or provided by DRIC or Interval International are solely the representations of DRIC or Interval International, respectively, and you cannot rely on them as being the representations of the seller.

**14.   No Warranties.** The Resort Interests were transferred to the Trustee "as is." **EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, OR BY APPLICABLE LAW, THE SELLER MAKES NO WARRANTIES, EXPRESS OR IMPLIED, OF ANY TYPE WHATSOEVER ABOUT THE RESORT INTERESTS OR ABOUT THE COLLECTION OR THE COLLECTION ACCOMMODATIONS, OR ANYTHING INSTALLED OR CONTAINED IN THEM. THIS INCLUDES, BUT IS NOT LIMITED TO, WARRANTIES OF HABITABILITY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE. THE SELLER EXPRESSLY DISCLAIMS, AND YOU IRREVOCABLY WAIVE, EACH OF THESE WARRANTIES.** This means, among other things, that the seller does not have to fix any defect, regardless of what causes it or when it is discovered. **THIS WAIVER DOES NOT APPLY TO ANY CLAIM OR DEFENSE ARISING OUT OF THIS SALE AND THAT YOU MAY HAVE AGAINST THE SELLER OR AN ASSIGNEE OF THE SELLER.**

**15.   Our Entire Agreement.** You and the seller agree that this Agreement (including any Truth-In-Lending Disclosure Statement) and any Note signed by you: (i) contains the entire agreement between you and the seller relating to your purchase and financing of your Membership, and (ii) supersedes and replaces any and all prior negotiations, representations, agreements, and understandings, both oral and written, in connection with your purchase and financing of your Membership. Things not written in this Agreement or in your Note and Truth-In-Lending statement are not part of our agreement, even if someone tells you otherwise. You and the seller also agree that this Agreement and the escrow agreement contain your instructions to the escrow agent for the handling of funds, notes and other papers and for the closing of your purchase of a Membership. The seller, however, may give additional instructions to the escrow agent so long as they do not conflict with the escrow instructions provided in this Agreement and the escrow agreement.

**16.   Survival; Assignment.** This agreement is binding on and benefits the seller and each of the purchasers, and anyone who by law or by agreement stands in their place. (In legal terms, such people are called "heirs," "personal representatives," "successors," "successors in trust," and "assigns.") This Agreement will survive (remain in effect after) the closing and will not be deemed merged into entry of your name as owner of the Membership in the Register of Members or delivery of your Points Certificate(s) to you. You cannot sell, transfer, convey, or encumber your Membership except in accordance with the terms, provisions, and conditions of this Agreement and the other Collection Instruments. You acknowledge that the seller has the right, in its sole discretion, to assign some or all of its rights and interests under this Agreement and under any Note that you sign. You cannot assign any of your rights or interests under this Agreement.

**17, Invalid Provisions.** If any part of this agreement conflicts with a law or rule which applies, the law or rule, and not that part of this agreement, will control and must be obeyed. If any part of this Agreement is found to be invalid, the rest will still remain in full force and effect, just as if it never included the invalid part. No matter what else this agreement says, nothing in this agreement requires

AAA#0924.DIAMOND.FINAL.000278

you not to assert against the seller (or any assignee of the seller) any claim or defense arising out of this sale, and nothing in this agreement will be interpreted or construed to mean otherwise.

**18. Hawaii Law; No Jury Trial; Legal Fees.** Except to the extent preempted by the laws of the United States of America, this Agreement shall be exclusively governed by and construed in accordance with the internal laws of the State of Hawaii without regard to Hawaii's choice of law rules. Subject to Subparagraph 10(b) of this Agreement, ANY LAWSUIT OR LEGAL PROCEEDING RELATING TO THIS AGREEMENT, THE NOTE, THE ESCROW AGREEMENT, THE COLLECTION, THE COLLECTION INSTRUMENTS, OR THE Club® MUST BE FILED AND HEARD ONLY IN A FEDERAL OR STATE COURT LOCATED IN HAWAII. The parties irrevocably submit to the jurisdiction of any such court and agree that venue properly lies solely in such courts to the exclusion of all other judicial and non-judicial forums. You promise to do nothing to deprive the Hawaii courts of jurisdiction or venue. This means that the lawsuit or proceedings will take place in Hawaii and you will not try to have them moved elsewhere. **EXCEPT AS OTHERWISE PROVIDED BY ANY LAW THAT APPLIES, YOU AND THE SELLER GIVE UP ANY RIGHT TO A JURY TRIAL IN CONNECTION WITH ANY SUIT OR LEGAL PROCEEDING RELATING TO THIS AGREEMENT, THE NOTE, THE ESCROW AGREEMENT, ANY OF THE COLLECTION INSTRUMENTS, THE COLLECTION, OR THE Club®.** The winner is entitled to collect its costs and expenses, including attorneys' fees, from the other parties.

**19. Notices.** Any party who wants or is required to give notice under this Agreement must put it in writing. A notice will be deemed to have been properly given on the earlier to occur of (a) the day when it is actually received; (b) three (3) business days after it is deposited in the United States mail as first class mail, postage prepaid; or (c) two (2) business day after it is sent via overnight courier service such as FedEx, addressed to the applicable party at its address stated in or at such other address as the receiving party has previously notified the giving party in the manner provided in this paragraph. If there is more than one purchaser, then notice to any of them will be treated as if it was given to all of them. Unless and until written notice of an alternative addressee and address is received by the other party, the last addressee and address as stated by written notice or as provided in this Agreement, will remain in effect for all purposes of this Agreement.

**20. No Recordation.** You cannot record this Agreement in the public records of any county, state, or other place. If you do, the seller can sign and record a document terminating this Agreement and you give the seller a special power of attorney to do so. You cannot revoke this special power of attorney.

**21. Resale And Transfer.** Your rights to sell or otherwise transfer your Membership and the resulting update to the Register of Members are subject to prior approval by the Association and certain other requirements stated in the Collection Instruments.

**22. Miscellaneous.** The captions used in this Agreement are for informational purposes only and do not amplify or limit in any way the provisions hereof. You should read each and every paragraph very carefully and not just the captions alone. Whenever the context requires it, the use of any gender in this Agreement shall be deemed to include both genders, and the use of the singular shall be deemed to include the plural, and the plural shall be deemed to include the singular. Time is of the essence of this Agreement and of each of the terms, provisions, and conditions of it. This means that you agree to perform your promises on time. If a specific date or time period for performance is not stated, you agree to perform as soon as possible. If you fail to do so, you will be in default. Any failure of the seller to enforce any provision of this Agreement does not limit or take away any right to enforce that provision later. This will be true no matter how many times a violation is overlooked or ignored. The exercise of any right or remedy provided by law and/or the provisions of this Agreement shall not preclude the exercise of other consistent rights or remedies unless they are expressly precluded by this Agreement. You here and now grant the seller the right, in its sole discretion, to correct any scrivener's, typographic, or clerical errors in connection with this Agreement or any related documents or instruments, provided that no such correction adversely affects any your rights, benefits, or privileges, or materially alters any of your duties or obligations, under this Agreement or the related documents. Any such corrections must be initialed by an authorized representative of the seller and will be legally binding upon you and anyone who stands in your place, even though you did not initialed or otherwise acknowledged them.

**23. Termination of Agreement with Blocked Persons.** Under United States Presidential Executive Order 13224 (the *Executive Order*), the seller must ensure that it does not transact business with persons or entities determined to have committed, or to pose a risk of committing or supporting, terrorist acts and those identified on the list of Specially Designated Nationals and Blocked Persons (the *List*), generated by the Office of Foreign Assets Control of the U.S. Department of the Treasury. The names or aliases of these persons or entities (*Blocked Persons*) are updated from time to time. If the seller learns that your name appears on the List, the seller can delay the closing pending the seller's investigation into the matter. If the seller is advised and/or determines that you are a Blocked Person, then the seller can terminate this Agreement contract and/or to take all other actions necessary to comply with the requirements of the Executive Order. The provisions of this paragraph will survive closing and/or termination of this contract.

---

**PRIMARY MEMBER:**

**Herman David Abel**

Name

Confidential

Street Address (if not stated above)

Confidential

City, State & Zip (if not stated above)

**THE Club® Exchange:** You understand and agree that you will automatically be enrolled in THE Club® international exchange program . See paragraph 13 for more information on this.

---

**AGENCY DISCLOSURE(S):** Brokerage Firm: **West Maui Resort Partners, L.P** and all licensees employed by or associated with the brokerage firm, represents the Seller in this sale. By signing below, the Buyer and Seller confirm that oral and written disclosure of such representation was provided to them before the signing of this contract. The principal place of business of the broker is on the Island of **Kauai**

AAA#0924.DIAMOND.FINAL.000279

By signing below, (1) you offer to buy your Membership from the seller on the terms contained in this Agreement; (2) you agree that this Agreement will be binding on you if the seller also signs it; and (3) if the seller is financing your purchase, you acknowledge that you received and read a fully completed and dated copy of the attached Truth-in-Lending Disclosure Statement; and (4) you also acknowledge that you have received a copy of this Agreement signed by you and the seller.

NOTICE TO THE BUYER: Do not sign this contract before you read it. When you sign this contract, you are entitled to a copy of it that is filled in, in every necessary respect. You should keep it. This contract is covered by Hawaii's credit sale law, and you have the rights of a buyer under that law. You also may have rights under other state and federal laws.

**CREDIT SALE CONTRACT**

Diamond Resorts Hawaii Collection Development, LLC,
By: Diamond Resorts Developer and Sales Holding Company
Its: Sole Manager

By: *Nora Miranda*

Printed Name: *Nora Miranda / 1/2/17*
Its: Authorized Representative

Date accepted and signed by seller: _____1/12/17_____, 2017

Purchaser's Initial Deposit was received on _1/12/17_, 2017

By   **Douglas - 43330 Bowers**
     (Name of Sales Person)

NOTE: This Agreement is effective only if the seller signs it.
Sales personnel cannot sign for the seller.

ANY PURCHASER HAS, UNDER THE LAW, A SEVEN-DAY RIGHT OF RESCISSION OF ANY TIME SHARING SALES CONTRACT.

By signing below, I/we acknowledge that I/we have been informed of the seven (7) day right of rescission both in writing and orally.

*A. Abel*

**Herman David Abel**

*Debra Susan Abel*

**Debora Susan Abel**

Buyer signed this contract on _1/12/17_, 2017

REV. 1/22/2014_u3122014_7252014_esig_06/21/16

7

AAA#0924.DIAMOND.FINAL.000282

17694421-DRHC Promissory Note

## CREDIT SALE CONTRACT

# PURCHASE MONEY NOTE

$155,906.70
**January 12th, 2017**                                                                          Kauai, Hawaii

### 1.  SPECIAL WORDS

Certain words used in this Note have special meanings, as follows:

"**Note**" means this Note and all changes and extensions to the Note that you and the Note Holder agree to. This is a "purchase money note", since you are giving it to the Lender to pay for your Membership in the Diamond Resorts Hawaii Collection (the "Collection") time share plan. It is secured by the Security Agreement.

"**Debt**" means the unpaid Principal plus any unpaid Interest on it.

"**Principal**" means the sum of **One Hundred Fifty-Five Thousand Nine Hundred Six and 70/100** U.S. Dollars (US**$155,906.70**), or so much of it as may be disbursed from time to time.

"**Interest**" is simple interest, which means that it is charged ("accrues") only on that part of the Principal that is not then paid, and is calculated at the Interest Rate. Interest will be charged on that part of the Principal that has not been repaid, and will be paid in arrears after it has accrued.  Interest will start to accrue on _____, and will continue until the full amount of the Principal has been paid.

"**Interest Rate**" means **Twelve and 83/100** percent (**12.83** %) per year except as otherwise provided in Section 4, below.

"**Lender**" means **DIAMOND RESORTS HAWAII COLLECTION DEVELOPMENT, LLC, a Delaware limited liability company**.  The Lender's address is 10600 West Charleston Blvd., Las Vegas, Nevada 89135.

"**Security Agreement**" means the Purchase and Security Agreement that you have signed and that is dated the same date as this Note. It gives property to the Lender as security to protect the Lender from possible losses that might result if you do not keep the promises you make in this Note and the Security Agreement.  The Security Agreement is incorporated into this Note by this reference.

"**Note Holder**" means the Lender or anyone else who takes this Note by transfer and who is entitled to receive payments under this Note.  You understand that any Note Holder may transfer this Note to someone else.

"**You**" means each person who signs this Note.

"**Borrower's Address**" is Confidential

"**Truth-In-Lending Disclosure**" means the federal Truth-in-Lending Disclosure Statement that you have signed and that is dated the same date as this Note.  The Truth-In-Lending Disclosure contains important disclosure about the terms of your loan and is incorporated into this Note by this reference.

### 2.  BORROWER'S PROMISE TO PAY

In return for a loan that you have received, you promise to pay the Principal, plus Interest, to the order of the Lender or any other Note Holder.

You understand and agree that the Lender may transfer this Note to someone else.

### 3.  PAYMENTS

You promise to pay Principal and Interest by making payments every month beginning on _____, and on the same day of each month after that. Except as otherwise provided in Section 4, each monthly payment will be in the amount of **Two Thousand Three Hundred Twelve and 25/100** US Dollars (US **$2,312.25**), plus a monthly collection fee of **Six Dollars ($6.00)**, for a total monthly payment of **Two Thousand Three Hundred Eighteen and 25/100** US Dollars (US **$2,318.25**).  All payments must be made in U.S. dollars.

You promise to make these payments every month until you have paid all of the Debt.     If, however, on _____, you still owe anything under this Note, you promise to pay those amounts in full on that date, which is called the "maturity date."

1

AAA#0924.DIAMOND.FINAL.000283

You promise to make all payments of Principal and Interest, and all other payments under this Note, at c/o Customer Services, Diamond Resorts Financial Services, Inc., The Lender's address is 10600 West Charleston Blvd., Las Vegas, Nevada 89135, or at a different place if required by the Note Holder.

4.   **INCREASE IN INTEREST RATE AND MONTHLY PAYMENTS, IF APPLICABLE**

You are receiving the Interest Rate stated in Section 1.  If you have authorized the Note Holder to have the monthly payments due under this Note withdrawn automatically from your bank account through a prearranged automatic payment plan ("**SurePay**"), that Interest Rate is a preferred rate.

If (a) you discontinue your SurePay authorization, or (b) your bank does not honor the SurePay authorization, or (c) on more than one occasion your account does not have sufficient funds for a payment when a payment is due, or (d) on more than one occasion a SurePay payment is not made when due for any reason, then the Interest Rate will be increased to <u>Zero</u> percent (<u>0.00</u>%) per year.

Any increase in the Interest Rate will become effective retroactively one day after the date on which the last SurePay payment was made in full, or if no SurePay payment is made, on the date the Interest commences as provided in Paragraph 1 above.  The date on which the increase becomes effective is called the "**Change Date**."

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay in full the Principal that you owe on the Change Date in substantially equal payments by the maturity date at your new Interest Rate.  The result of this calculation will be the new amount of your monthly payment.  The Note Holder will mail or deliver to you a notice that will advise you of the new amount of your monthly payment following the Change Date.

5.   **HOW YOUR PAYMENTS WILL BE APPLIED**

In addition to Principal and Interest, you may have to make other payments as stated in this Note or in the Security Agreement.  For example, you may have to make other payments if you do not keep the promises made in this Note or in the Security Agreement (in other words, if you "default" or are "in default").  The Security Agreement states how your payments will be applied to these charges, to Interest, and to Principal.

6.   **YOUR RIGHT TO PREPAY**

"**Prepayment**" means payment of the amounts due under this Note earlier than the time that you promise to do so.  You may prepay the entire balance at any time as long as you also pay all other amounts you owe the Lender under this Note and the Security Agreement.  You may prepay any part of the unpaid balance in multiples of $10.00 or more at any time you make a monthly payment.  The only effect of a prepayment will be to reduce the remaining unpaid Principal.  You must continue to pay monthly installments in the same amount and on the same schedule as before, until the entire Debt is paid.  You will not be charged any penalty or premium for prepaying.

7.   **LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the Interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any Interest and/or other loan charges will automatically be reduced by the amount necessary to reduce the Interest Rate and/or charges to the permitted limit, retroactively effective as of the date of this Note, and as though this Note originally provided for the reduced Interest Rate and/or loan charge, as the case may be; and (ii) any sums already collected from you which exceeded permitted limits will be refunded to you.  The Note Holder may choose to make this refund by reducing the Principal you owe under this Note or by making a direct payment to you.  If a refund reduces Principal, the reduction will be treated as a partial prepayment.

8.   **BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**

You promise that if the Note Holder has not received the full amount of any monthly payment by the end of ten (10) calendar days after the date it is due, you will pay to the Note Holder a late charge of Fifty Dollars ($50.00) or five percent (5.0%) of the overdue amount, whichever is less.  You promise that you will pay this late charge promptly but only once on each late payment.  The Note Holder will give you notice of the assessment of the late charge prior to the due date of your next payment.  The Note Holder will not assess any late charge after the Note Holder requires you to make immediate payment in full of all amounts you owe under this Note and the Security Agreement.  If, however, the Note Holder reinstates your loan after it requires you to make immediate payment in full, then the Note Holder may charge a late charge on any monthly payment that is due after such reinstatement and that is not paid by the end of ten (10) calendar days after the date it is due.

**(B)   Default**

If you do not pay the full amount of each monthly payment on the date it is due, you will be in default.

**(C)   Notice of Default**

If you are in default, the Note Holder may send you a written notice telling you that if you do not pay the overdue amount by a certain date, the Note Holder may require you to pay immediately the full amount of Principal which has not been

AAA#0924.DIAMOND.FINAL.000284

paid and all Interest that you owe on that amount of Principal.  That date must be at least thirty (30) days after the date on which the notice is delivered or mailed to you.

**(D)   No Waiver By Note Holder**
Even if, at a time when you are in default, the Note Holder does not require you to pay immediately in full as described above, the Note Holder will still have the right to do so if you are in default at a later time.

**(E).   Payment of Note Holder's Costs and Expenses**
You promise that if you default, you will pay to the Note Holder all of the reasonable costs and expenses that the Note Holder incurs in enforcing this Note and the Security Agreement, to the extent not prohibited by law.  Those expenses include, for example, reasonable attorneys' fees, whether or not the Note Holder sues you, if the matter is referred for collection to an attorney or licensed collector who is not a salaried employee or officer of the Note Holder.  You promise to pay all of these costs at once after the Note Holder demands payment of them from you.

**9.   GIVING NOTICES**
Unless applicable law requires a different method, any notice that must be given to you under this Note will be given by delivering it or by mailing it by first class mail to you at the Borrower's Address, or if you give the Note Holder written notice of a change of your address, at the new Borrower's Address stated in such written notice.
Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in the third paragraph of Section 3 above, or if the Note Holder gives you written notice of a change of its address, at the new address stated in such written notice.

**10.   OBLIGATIONS OF PERSONS UNDER THIS NOTE**
If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed.  Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things.  Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note.  The Note Holder may enforce its rights under this Note against each person individually or against all such persons together.  This means that any one of you may be required to pay all of the amounts owed under this Note.  In legal terms, each of you is "jointly and severally" liable.

**11.   WAIVERS**
You and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor to the extent not prohibited by law.  **"Presentment"** means the right to require the Note Holder to demand payment of amounts due.  **"Notice of dishonor"** means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**12.   GOVERNING LAW**
Hawaii law governs the rights and obligations of you and the Note Holder under this Note.  If any provision of this Note is not consistent with Hawaii law then the Hawaii law, and not that provision, will govern.

**13.   SECURED NOTE**
You agree that this Note is secured by the Security Agreement.  It provides, among other things, how and under what conditions you may be required to make immediate payment in full of all amounts that you owe under this Note.

AAA#0924.DIAMOND.FINAL.000285

BY SIGNING BELOW, WE AGREE TO EVERYTHING STATED IN THIS NOTE.

NOTICE

ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR (YOU) COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR (YOU) SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR (YOU) HEREUNDER.

ANY PURCHASER HAS, UNDER THE LAW, A SEVEN-DAY RIGHT OF RESCISSION OF ANY TIME SHARING SALES CONTRACT.

You acknowledge that you have received a copy of this Note, the Security Agreement, and the Truth-in-Lending Disclosure, signed by you and the Lender.

NOTICE TO THE BUYER: Do not sign this contract before you read it. When you sign this contract, you are entitled to a copy of it that is filled in, in every necessary respect. You should keep it. This contract is covered by Hawaii's credit sale law, and you have the rights of a buyer under that law. You also may have rights under other state and federal laws.

CREDIT SALE CONTRACT

_____
Herman David Abel

_____
Debora Susan Abel

_____

_____
"You"


Diamond Resorts Hawaii Collection Development, LLC,

By: Diamond Resorts Developer and Sales Holding Company
Its: Sole Manager

By: _____
Printed Name: _Nora Miranda 4/12/17_
Its: _____Authorized Representative_____
"Lender"

REV. 6-10-08

4

AAA#0924.DIAMOND.FINAL.000287

17694421-DRHC TIL Disclosure

# TRUTH IN LENDING DISCLOSURE STATEMENT

**DEBTOR:**

| | |
|---|---|
| **Herman David Abel** | 26768767 |
| Name | Promissory Note Number |
| **Debora Susan Abel** | |
| Name | |
| | |
| Name | |
| | Confidential |
| Confidential | Home Telephone |
| Address | |
| Confidential | Confidential |
| City/State/Zip | Business Telephone |

CREDITOR: Diamond Resorts Hawaii Collection Development, LLC,   c/o Diamond Resorts Financial Services, Inc.
10600 West Charleston Boulevard, Las Vegas, Nevada 89135

| ANNUAL PERCENTAGE RATE<br><br>The cost of your credit as a yearly rate: | FINANCE CHARGE<br><br>The dollar amount the credit will cost you: | AMOUNT FINANCED<br><br>The amount of credit provided to you or on your behalf: | TOTAL OF PAYMENTS<br><br>The amount you will have paid after you have made all payments as scheduled: | TOTAL SALE PRICE<br><br>The total cost of your purchase on credit including your down payment of: **$34,158.30** |
|---|---|---|---|---|
| 12.8954 % | $122,283.30 | $155,906.70 | $278,190.00 | $312,348.30 |

Your payment schedule will be:

| Number of Monthly Payments | Amount of Each Payment | | | Payments are due monthly beginning |
|---|---|---|---|---|
| | **P & I** | **+ Collection Fee =** | **Total Payment** | |
| 120 | $2,312.25 | + $6.00 = | $2,318.25 | February 26th, 2017  (e) |

**Security:**   You are giving a security interest in the property being purchased in this transaction.

**Late Charge:**   If a payment is more than ten (10) days late, you will be charged a late charge equal to the lesser of: (i) Twenty-Five

**Default Rate:**   Twenty-five Dollars ($25.00) or (ii) ten percent (10%) of the overdue installment. In addition, we may, at our option, increase the rate of finance charge to the maximum lawful rate under applicable law or, if there is no such rate, twenty-five percent (25%) per annum.

**Variable Rate:**   ☐   (This paragraph applies only if checked.) You have agreed to the terms of our "Pre-Authorized Draft Plan" (the "SurePay Plan"). Your participation in the SurePay Plan will terminate immediately upon the occurrence of any of the following events: (i) at any time prior to the Maturity Date, you elect to terminate your participation in the SurePay Plan; (ii) you close the designated bank account; or (iii) on more than one occasion, a SurePay payment is not made when due for any reason (including your failure to maintain a sufficient balance in the designated bank account to cover any required payment). In such event, your interest rate will increase by zero percent (0%) per annum and your monthly payment will increase to the level sufficient to repay all principal, interest and collection fees by your final payment date through equal monthly payments on each payment date. The increase in the interest rate will be effective retroactively to the date of the last payment made under the SurePay Plan, and the increase in payment amount will apply to the next payment due after the last such SurePay payment. If you were to make a single payment under the SurePay Plan and one of the above events were then to occur, your total monthly payment of principal and interest would increase from $2,318.25 to $2,318.25.

**Prepayment:**   If you pay off early, you will not have to pay a penalty.

**Contract Reference:**   See your contract documents for any additional information about non-payment, default, any required repayment in full before the scheduled date, and prepayment rebates and penalties.

"(e)" means estimate

### SEE ITEMIZATION OF AMOUNT FINANCED IN THE PURCHASE TERMS SECTION OF THE CREDIT SALE CONTRACT

The undersigned Buyer(s) acknowledge(s) receipt of a fully completed copy of this disclosure on this date.

| | |
|---|---|
| Signature: **Herman David Abel** | Signature: **Debora Susan Abel** |
| Signature: | Signature: |

**January 12, 2017**
Date

Rev 08/10 - (09152010)

AAA#0924.DIAMOND.FINAL.000288

Diamond Resorts Hawaii Collection

17694421-DRHC Purchaser Acknowledgment

## PURCHASER'S UNDERSTANDING AND ACKNOWLEDGMENT
## OF TIMESHARE MEMBERSHIP PURCHASE

On behalf of Diamond Resorts International®, we welcome you as a Member of one of the most flexible and enjoyable vacation plans anywhere in the world. To help reassure your understanding, please review and initial each of the following items. Unless context suggests otherwise, capitalized terms used have the meaning given them in the Collection Instruments.

1.    I understand title or other beneficial interest to all the timeshare intervals included in Diamond Resorts Hawaii Collection (the "**Collection**") will be held in Trust by an independent Trustee, which holds title on behalf of and for the benefit of all the Collection Members. Additionally, I understand that I will receive a Collection Membership Certificate and an Eagle 9 UCC Vacation Interest Insurance Policy within 6 to 8 weeks after closing. My Membership is intended to be perpetual in nature and can be passed to my heir.

2.    I understand that I am purchasing **50000** Points today at an aggregate purchase price of **$189,315.00.** My first year's maintenance fees on these Points is estimated to be $ **9,399.00** and if my first use year is within the current calendar year, it is estimated that I will be billed within 45 days of this purchase. My first use year begins **2017**, when I will receive my first allocation of timeshare points ("**Points**").

3.    I may use my Points to reserve, use and occupy any *available* Collection Accommodation, up to my available Points allocation, according to the then-current Regulations. I may make a reservation at any Collection resort, in different-sized units, for different lengths of stays, for any time during the year. Unless indicated otherwise in THE Club® Points Directory (the "**THE Club® Points Directory**"), the minimum stay is 2 nights within the Collection and all reservations are subject to availability.

4.    Points are valid only in the year they are allotted, and if not used (or saved), will expire on December 31st of that year. I understand that if I do not use my Points, I may save them for use in the upcoming year by calling the reservation office. The earlier in the current year that I call, the higher number of Points I may save for the next year. If I call prior to **June 30th**, I can save up to 100% of them. If I call by August 31st, I can save up to 50%. I If I call by October 31st, I can save up to 25%. If I call after October 31st, I cannot save any Points.

5.    I understand that I may also borrow Points from the upcoming year to use in the current year by calling the reservation office at any time. When I call, I must be current in my annual assessments (described below in paragraph 14) and I must pay all or a portion of my annual assessments for the upcoming year.

6.    I understand that my Collection Membership entitles me to an allotment on January 1st each year of that number of Points that I have purchased today.

AAA#0924.DIAMOND.FINAL.000289

7.    Diamond Resorts International Club, Inc. ("**DRIC**") has agreed to include Members of the Diamond Resorts Hawaii Collection Members Association ("**Association**") in THE Club exchange program ("**THE Club**"). If I enroll as a member of THE Club®, I can use part or all of my annual allotment of Collection Points to reserve accommodations in any THE Club exchange resort.

8.    I have received and reviewed copies of THE Club Points Directory and THE Club Benefits Directory (together referenced "**THE Club Directory**"), which describe THE Club current exchange resort destinations and their Points values. It also includes instructions for making a reservation and calculating the number of Points that I will need for each of my vacations. I understand that THE Club Directory will be updated periodically, and that the resorts included in THE Club exchange may change without notice.

9.    As described in THE Club Directory, I may make a reservation as early as 13 months in advance of my desired vacation check-in date at any of the Home Collection resorts. I may make a reservation at any other THE Club exchange resort as early as 10 months in advance of my desired vacation check-in date.

10.    I have received THE Club Member Benefits Directory, which describes the various types of Club member benefits such as travel, home and lifestyle, money matters and, depending on the number of points purchased, Loyalty tier benefits. These benefits currently include, but are not limited to, airline flights, cruises, discount cards, legal protection plans, and for Gold and Platinum members, access to Diamond Luxury Selection. I understand that these are incidental benefits, and their terms, may be changed, substituted, or terminated at any time without notice. Some benefits may not be available to all membership types.

11.    When I occupy the accommodations at THE Club exchange resorts, I will abide by THE Club exchange resorts rules and regulations, including the occupancy limits and check-in and check-out times set for the unit.

12.    If I cancel a confirmed reservation less than 91 days before my scheduled arrival date, I will lose some or all of the Points used to make that reservation. If I fail to occupy a unit that I reserved, I will not be refunded my Points used to make that reservation, unless I have also purchased the optional Reservation Protection Plan (RPP) service.

13.    I understand that all Collection resorts and THE Club exchange resort reservations are confirmed pursuant to the Collection and/or exchange rules on a "first-come, first-served" space-available basis and are not guaranteed.

14.    I understand that if I become a member of THE Club, I will automatically become a member of the Interval International exchange program ("II") at no extra cost to me. This membership is exclusively for the purpose of requesting an II exchange using Points and if I request an exchange through II, I will pay an exchange fee to II. I understand that THE Club may change or cancel its affiliation agreement with II at any time.

AAA#0924.DIAMOND.FINAL.000290

15.    I acknowledge that I will be billed annually by the Association an assessment fee, which may be collected together with the membership fee and dues for THE Club. These fees are related to the operation of THE Club and the Collection and cover my share of the resort operation, maintenance and property taxes, which may be modified annually as determined by DRIC or the Association. I understand that I must be current on all fees in order to make reservations, to stay at either a Collection resort, THE Club exchange resort or Interval International resort, to save or borrow Points or to conduct any other transaction relating to my Points.

16.    I have acquired a Collection Membership for my own personal use and enjoyment. No representations of any nature concerning investment potential, refinancing, rental returns, tax advantages, appreciation/depreciation, or other possible financial benefits have been made by Seller or any of its agents. I understand that I may periodically rent or allow others to use my use rights, but that **I may not use the Collection Accommodations for any commercial purposes, including but not limited to commercial renting activities. I understand that public advertising in print or online to seek renters is deemed a prohibited commercial use.**

17.    I may sell my Membership rights, subject to a transfer fee. I acknowledge, however, that my membership in THE Club will terminate upon any transfer and the new owner will be obligated to purchase either a THE Club exchange membership from DRIC, or a Collection membership. No transfer fee or exchange purchase requirement will apply if my Membership passes to my heir upon my death.

18.    I understand that currently, the Seller nor the Developer offer a resale, buyback or rental program.

19.    I understand my Purchase and Security Agreement contains the entire agreement between Seller and me. I have not relied and may not rely upon any representations, whether oral or written, which are not set forth in the Purchase and Security Agreement. I further understand that if permitted by controlling state law, the Collection Instruments, THE Club® Directory, THE Club Exchange Documents, the Interval International Document, the Regulations and the Privacy Policy may be delivered to me electronically in CD form. I understand that hard copies of such documents are available to me upon request.

20.    I understand that, if I fail for any reason to satisfy all of my financial obligations to Seller and the Association on a timely basis, I will be in default under my Purchase and Security Agreement and the Collection Instruments. If such default is not promptly cured, my Membership (ownership) may be terminated, whereupon I will forfeit all amounts previously paid to Seller and to the Association.

21.    By initialing here, I authorize Diamond Resorts International Marketing, Inc., and/or its affiliates and successors to text me or call my cell/telephone number listed below with a telephone dialing system regarding promotional offers, regardless of any prior election to the contrary. I understand that I am not required to give consent as a condition of purchasing any goods or services.

Home Phone: Confidential   Cellular Phone: Confidential

AAA#0924.DIAMOND.FINAL.000291

Each Purchaser signing this Purchaser's Understanding and Acknowledgment of Timeshare Membership Purchase, above initialed by at least one of them, has read and understands the content of the Purchase and Security Agreement. The references to "I," "me," "my," and "myself" above include all Purchasers named below.

PURCHASER:

_____         _____
Signature                                January 12th, 2017
                                         Date
**Herman David Abel**
Printed Name

_____         _____
Signature                                January 12th, 2017
                                         Date
**Debora Susan Abel**
Printed Name

_____         _____
Signature                                January 12th, 2017
                                         Date

_____
Printed Name

_____         _____
Signature                                January 12th, 2017
                                         Date

_____
Printed Name

Rev 7/23/2014

AAA#0924.DIAMOND.FINAL.000292



17694421-DRHC Receipt for Core Timeshare Docs

## RECEIPT FOR CORE TIMESHARE DOCUMENTS

## DIAMOND RESORTS HAWAII COLLECTION

The undersigned acknowledge(s) that the items listed below have been received on the date stated.

1. Credit Sale Contract (signed copy)

2. Notice of Mutual Cancellation Right

3. Purchaser's Understanding & Acknowledgment

4. Disclosure Statement
   ☑ Hard copy ☑ CD-ROM

5. Diamond Resorts Hawaii Collection Trust Agreement

6. Declaration for Diamond Resorts Hawaii Collection

7. Diamond Resorts Hawaii Collection Members Association Documents
   a. Certificate of Incorporation
   b. By-Laws of Association
   c. Operating Budget of Association
   d. Rules and Regulations of Association

8. THE Club® Exchange Program Documents
   a. Disclosure Guide
   b. Articles
   c. Rules and Regulations

9. Loan Documents ( ☑ check if applicable)
   a. Promissory Note
   b. Truth In Lending Disclosure Statement
   c. SurePay Authorization Form
   d. Signature Verification Form
   e. Credit Application
   f. Privacy Policy

_____
Signature

**Herman David Abel**
Printed Name

_____
Signature

**Debora Susan Abel**
Printed Name

_____
Signature

_____
Printed Name

_____
Signature

_____
Printed Name

**January 12th, 2017**
Date

**January 12th, 2017**
Date

**January 12th, 2017**
Date

**January 12th, 2017**
Date

REV. 6/10/2014

AAA#0924.DIAMOND.FINAL.000293



17694421-STD Signature Verification

## SIGNATURE VERIFICATION

I(We), **HERMAN DAVID ABEL and DEBORA SUSAN ABEL**, by my/our execution hereof, hereby certify that the signature(s) below correspond to my/our true and legal name(s).

| | |
|---|---|
| _[signature]_ | _[signature]_ |
| Signature | Signature |
| **Herman David Abel** | **Debora Susan Abel** |
| Printed Name | Printed Name |
| | |
| Signature | Signature |
| | |
| Printed Name | Printed Name |

**WITNESSES:**

| | |
|---|---|
| _[signature]_ | _[signature]_ |
| Signature | Signature |
| Michael B Hatton | ASHLEY ESPIRITU |
| Printed Name | Printed Name |

## ISSUED FOR TRUE COPY

esig01-25-16

AAA#0924.DIAMOND.FINAL.000294



Contract Number _____

# SALES PRESENTATION CONFIRMATIONS

All deeds are held in trust. You are purchasing a beneficial interest in the trust (a.k.a. membership in the Collection). Your membership is perpetual and may be passed on to your heirs. **You will receive your annual allocation of Points on January 1 of every year, with the timely payment of your THE Club® dues and fees.** Your enrollment in THE Club® and Interval International, (II) is automatic and at no additional cost.

Based on the amount of Points available in your account at the time you are making your reservation, you may make a reservation at any resort, any size unit, any length of time in accordance with the reservation rules and procedures. There is a two (2) night minimum stay at most locations.  All reservations are on a first-come, first-served space available basis.  **There is no reservation preference based on the amount of Points you own.**

You may use, save or borrow your Points.  If you wish to save your Points, you may do so online or by calling THE Club® at 1.877.DRI.CLUB (1.877.374.2582).  100% of your annually allocated Points may be saved by June 30, 50% may be saved by August 31 and 25% may be saved by October 31 of your use year.  You can save Points allocated in the current year to the following year.  You can borrow Points from the upcoming year for reservations in the current year anytime. **To borrow Points, you must prepay 75% of the upcoming year's THE Club® dues and fees.  You will not be required to pay when borrowing back saved Points into the current year.**

You will be billed annually for your THE Club® dues and Association maintenance fees.  You must be current on all THE Club® dues and fees to use the system.  The maintenance fee on this purchase of Collection Points is approximately $ _4499___ this year and is subject to change each subsequent year.  The maintenance fee(s) on other Diamond Resorts ownerships is/are approximately $_____.  Your total annual invoice for THE Club® dues and Association maintenance fees will be approximately $_____. **You will still be responsible for any maintenance fee(s) on any other property you may own outside of this purchase.**

The purchase of a Collection Membership should be based upon its value as a vacation experience or for spending leisure time, and not considered for purposes of acquiring an appreciating investment or with an expectation that the timeshare interest may be resold.  You are not allowed to rent reservations for commercial gain or rent to individuals not known to you. Public advertising to seek renters in print or online is prohibited.  If this is found to be the case, your membership will be suspended. **DRI does not have a rental or resale program and does not allow voluntary surrender of memberships.**

**After you pay your first year's THE Club® dues and Association maintenance fees in full,** you will have the option to prepay your subsequent THE Club® dues and Association maintenance fees on a monthly basis.

You can make reservation requests to stay at any of your Collection resorts as early as 13 months in advance of your check-in date and as early as 10 months in advance of your check-in date at all other THE Club® affiliated resorts. **Points from different collections or ownerships cannot be combined for this benefit.**

You will receive your copy of THE Club® Annual Global Reservations Directory that lists all available resorts, their Points values and your Member Benefits.

There are no exchange fees when using your Points to reserve a THE Club® affiliated resort or a resort from THE Club® Select℠ list.

I/We understand THE Club® Select℠ inventory is available for reservations to all THE Club® members in good standing.

I/We understand THE Club® Select℠ weeks reserved using Points or cash at the member rate are exclusively for use by the members who have signed purchase documents.

If you cancel a reservation less than 91 days before arrival you will lose some or all of your Points unless the Reservation Protection Plan is purchased at the time of booking.  The cost of a Reservation Protection Plan is currently $105 and is subject to change.

The exchange fee to reserve a week with II is currently $189.00

PRESENTATION CONFIRMATION v33

18740.0314

**DIAMOND RESORTS**
INTERNATIONAL

AAA#0924.DIAMOND.FINAL.000295

Contract Number _____

# POINTS USAGE ACKNOWLEDGEMENT

My/Our Vacation Counselor has shown me/us the Annual Global Reservation Directory that contains all of the points values for every resort within THE Club® at Diamond Resorts International®. They have shown me/us how to get the best possible value from my/our purchase of collection points.

I/We understand that depending on the resort and time of travel, the **average** points value for a one-week stay is approximately:

| STUDIO / 4,000 | 1 BEDROOM / 5,500 | 2 BEDROOM / 7,500 | 3 BEDROOM / 8,500 |
|---|---|---|---|

Mid-week stays, Sunday – Thursday, are 10% of the weekly value per day. (i.e. studio = 400 points per day.)
Weekend stays, Friday – Saturday, are 30% of the weekly value per day. (i.e. studio = 1,200 points per day.)
Please refer to the Annual Global Reservation Directory for specific point values.



I/We understand for some resorts, if there is availability 59 days or less prior to arrival, then the standard check-in day weekly points values are discounted by 50%. Discounted offers are subject to change as demand dictates and may not apply to the same resorts each month. For short stay points values a 50% discount will apply to all reservations made within 30 days of arrival. **These reservations offer exceptional value for those with flexible travel plans and are offered on a first-come, first-served basis and are subject to availability. Holiday, summer and other highly demanded weeks usually are not available.**

I/We understand, if there is availability, reservations for stays at specific properties as determined by Interval International® exchange requests made less than 30 days prior to the travel date may receive a 50-percent discount applied to the required points as set forth in THE Club® Points Chart. **These reservations offer exceptional value for those with flexible travel plans and are offered on a first-come, first-served basis and subject to availability. Holiday, summer, and other highly demanded weeks usually are not available.**

I/We understand that if I/we elect to use my/our points to pay part of my/our annual maintenance fees, the following rules apply:

1. **Only Platinum Diamond Loyalty members will be able to use their points for this benefit.**
2. **Redemption value for 2016 fees was $0.04 per point, but this is subject to change yearly.**
3. Saved points or borrowed points cannot be used toward the payment of maintenance fees.
4. Points for fee payments must be redeemed November 1 – December 31 for the following year's fees before the due date of the bill. This benefit is only available to Platinum members.
5. After January 1, points may not be exchanged for fee payments for that year's fees.
6. There is a $100 transaction fee, which is subject to change.

I/We understand that if I/we elect to use my/our points for reimbursement for Travel Services the following rules apply:

1. **Point redemption values are $0.07 per point for Valued Members, $0.08 for Silver Members, $0.09 for Gold Members and $0.10 for Platinum Members.**
2. There is a $47 transaction fee, discounted for Loyalty members, which is subject to change yearly.

I/We understand that THE Club® has four different ways to confirm a cruise for a member. The first is THE Club® has an exclusive block with NCL (Norwegian Cruise Line) that allows for a specific set of itineraries to be confirmed for limited sail dates on a first-come, first-served basis. I/we may use our points as if I/we were booking a THE Club® resort.

The second way I/we can use THE Club® to cruise is through our Member Benefits program. This allows the member to contact a team member specifically trained to offer cruise itineraries to a much larger variety of destinations through a much larger network of providers (Carnival, Disney, Princess, Royal Caribbean, etc.). Fees and points explained under #1 will apply, however there is a $100 transaction fee for Cruise member benefits redemption, fee is discounted for loyalty members. Your cruise counselor will inform you of the number of points needed to redeem for your cruise. I/we must pay all up-front costs and will be reimbursed the amount described in the Member Benefits Directory, per point redeemed. Reimbursement checks will be mailed in approximately 30 days from transaction.



The third way I/we can use THE Club® to cruise is the 20/20 program. This benefit is available to all THE Club® members. You will receive the best rates on Carnival Cruise Lines.  Enjoy a fixed point redemption value of $0.20 per point up to 20% of the cruise purchase price. I understand that this benefit cannot be used toward the payment of my maintenance fees nor THE Club® dues. For full details, please see the 20/20 Program Terms and Conditions.

The fourth way I/we can use THE Club® to cruise is the 30/30 program.  This benefit is available to Gold and Platinum members only. Receive the best rates on Cruises.  Enjoy a fixed point redemption value of $0.30 per point up to 30% of the cruise purchase price. I understand that this benefit cannot be used toward the payment of my maintenance fees nor THE Club® dues. For full details, please see the 30/30 Program Terms and Conditions.

29429.0696

**DIAMOND RESORTS**
INTERNATIONAL®
Stay Vacationed.™

# Diamond Dream Holiday Presentation Confirmations

*12,000*

## DIAMOND BONUS POINTS



I/We understand if I/we choose to use bonus points to book THE Club® reservations of my/our choice, the term of eligibility to use these points along with any other qualifying loyalty benefits is from time of qualification until December 31, *2018*



I/We understand increased membership level will not be reflected on my/our account until I/we have fulfilled the qualifications for Diamond Bonus Points activation. Activation occurs when at least 15% down payment has been received and membership setup, or 10% down payment has been received plus four consecutive monthly payments have been made on the purchase loan.

I/We understand Diamond Bonus Points will be exempt from incurring annual per point maintenance fees, however, I/we will be responsible for Club fees applicable to the Bonus Points for the time period in which they may be used.

## DIAMOND DREAM HOLIDAY PACKAGE



I/We understand if I/we choose to use bonus points to book a Diamond Dream Holiday Package, reservations must be made 120 days in advance of arrival.



I/We understand travel must be completed by *1-12-18*, which is 365 days from the purchase date.



I/We understand that all flights must originate and return from the same major U.S. airport; all flights are booked economy coach class and additional restrictions may apply.



I/We understand there will be a $99 reservation fee for all Diamond Dream Holiday reservations.

I/We understand Diamond Loyalty upgrades do not apply to the Diamond Dream Holiday.

I/We understand there are blackout dates five (5) days before and after President's Day, Easter, Independence Day, Thanksgiving Day, Christmas Day and New Year's Day.



I/We understand once confirmed, all Diamond Dream Holiday reservations are final.



I/We acknowledge that I/we have received a Diamond Dream Holiday TRIFOLD Brochure that explains the details of the participation and the telephone number to book my vacation.

26005.0116

**DIAMOND RESORTS**
INTERNATIONAL·
**Stay Vacationed.**

AAA#0924.DIAMOND.FINAL.000297

# EXHIBIT H

# Affidavit of Brent David Barlow.

<u>Introductory Certification.</u>

The Undersigned Affiant, Brent David Barlow, hereinafter "Affiant," hereby solemnly swears, declares, and deposes that:

1.  Affiant can competently state the matters set forth herewith.

2.  Affiant has personal knowledge of the facts stated herein.

3.  All the facts stated herein are true, correct, and complete, in accordance with Affiant's personal knowledge.

<u>Plain Statement of Facts.</u>

4.  At or about 10 A.M. Friday, January 13, 2017, at the Resort Advisory Group ("RAG") offices at 1800 Thibodo Road, Suite 100, Vista, California 92081, Affiant meets Jason Krieck ("Jason") in person for the first time, at which meeting Jason represents that Jason is a former executive with a major timeshare developer and a knowledgeable professional and owner of RAG and that RAG assists victims of fraudulent business practices of timeshare developers.

5.  Following the events described above in paragraph 4, Affiant and Jason agree that RAG will pay Affiant $700 each to review and evaluate the file of certain RAG customers, some of whom will engage Affiant under a separate written retainer / attorney-client agreement wherein Affiant agrees to "…take every pre-litigation step required to seek a withdrawal from and/or cancellation…" of each such RAG customer's timeshare contract.

6.  Beginning shortly after the events described above in paragraph 5, a number of such RAG customers engage Affiant as legal counsel to assist with the respective timeshare matter of each ("Barlow's Client" or "Client" or plural, "Barlow's Clients" or "Clients"), whereupon Affiant and Barlow's Client enter into a separate, stand-alone, written retainer agreement creating an attorney-client relationship which narrowly defines and expressly limits the services that Affiant will provide Barlow's Client ("Retainer Agreement"), a true and correct generic copy of which is attached hereto and made fully part hereof by reference as Attachment A.

7.  Beginning at the time Affiant establishes an attorney-client relationship with each of Barlow's Clients and thereafter, Affiant discloses to Barlow's Client on multiple occasions that the fees paid to Affiant by RAG are administrative in nature, e.g., "RA-Group has paid Attorney a fee for the Services to be rendered hereunder. . . ."  Retainer Agreement (Exhibit A), paragraph 4.

8.  Affiant discloses to each of Barlow's Clients in pertinent part of paragraph 5 of the Retainer Agreement (Emphasis in original):

> Client will ***only*** be obligated to compensate Attorney for legal services rendered if ***a recovery is obtained on Client's behal***f. The fee to be paid to Attorney will be: Thirty-Three and One-Third percent (33⅓ %) of the net recovery

1

9.  Beginning in or about late summer 2017, after Affiant has heard several casual comments from a number of Barlow's Clients, Affiant warns Jason that:

   a.  It is RAG who is being charged by Affiant $700 per customer (*supra*, paragraph 5) and RAG must bear said $700 expense;

   b.  It is improper to characterize the arrangement in subparagraph 9a as *legal fees* being charged to or paid by a RAG customer;

   c.  It is appropriate only for a licensed attorney to charge such fees (i.e., the $700); and

   d.  Regardless of alignment of Affiant and Jason's intentions regarding Barlow's Clients, and notwithstanding specific authorization to disclose to RAG certain information helpful to the prosecution of each Client's claim, once Affiant has been engaged and the attorney-client relationship established, the Client's interests are paramount to Affiant and Affiant owes all duty and obligation, with respect to the matter for which Affiant is engaged, to each such Client.

10.  Over the months following the events described above in paragraph 9, Affiant observes that Jason and Affiant continually evaluate the relationship established and described *supra*, from paragraph 4 onward, to determine what is working and what is not, where said relationship is headed, and how to best prepare for what may come.

11.  In or about October 2017, over the phone, in anticipation of an increase in volume of RAG customer files to be given to Affiant, Jason and Affiant agree to a temporary modification of the financial component of Jason and Affiant's relationship: Jason will pay a flat-fee for services regardless of the volume of RAG customer files Affiant is given to review.

12.  Upon the events described above in paragraph 10, Affiant truly believes that RAG wants to help RAG's customers and that RAG and Affiant share a mutual purpose to serve RAG's customers, whereupon this apparent mutuality of intent:

   a.  Affiant observes RAG to continue collecting and providing Affiant with most of the relevant documents needed by Affiant for new RAG-customer referrals (thereby saving the RAG customer from having to perform the task twice).

   b.  To reduce lag-time with a request from Affiant due to missing information from a RAG customer file, Jason provides Affiant access to the RAG client-relations system, called "Pipeline," and requests that Affiant, using Pipeline's reporting function, notate any action taken by Affiant on any RAG customer file.

13.  With respect to the contents of subparagraph 12b above, the degree of access to Pipeline that Jason provides Affiant is restricted to specific RAG customers referred to Affiant by RAG and gives Affiant access only to information that is otherwise available to Affiant from Barlow's Clients (no access to any confidential or proprietary information of RAG).

14.  Following the events described above, Affiant finds that developers are largely unresponsive to communication from Affiant and, upon a number of inquiries, discovers that Affiant's experience is not unique and that timeshare developers generally refuse to engage or negotiate in good faith with aggrieved customers or customers' respective representative.

2

15. From about December 2017 through about March 2018, Affiant requests of Jason any insight Jason may have about current timeshare-industry trends or alternative approaches that might offer a remedy for the situation described above in paragraph 14.

16. In late spring 2018, Affiant meets a gentleman who:

    a. shares, among other things, results he has achieved on behalf of people facing conditions similar to those facing Barlow's Clients;

    b. describes nontraditional methods but that are grounded in long-standing legal traditions and principles; and

    c. gives an articulate and thoughtful answer to every direct question Affiant asks.

17. Upon the events described above in paragraph 16, Affiant invites said gentleman to come to Affiant's offices later that week to continue the discussion.

18. At the meeting described above in paragraph 17:

    a. Affiant formulates the opinion that said gentleman is intelligent, articulate, pleasant, presentable, calm, and reasonable, but reluctant to share personal details about himself and one who requires strict communication protocols;

    b. Said gentleman tells Affiant about a group through which he operates, describing it as a private association; and

    c. Affiant shares Affiant's struggles on behalf of Barlow's Clients and explains the timeshare transaction and history of the timeshare industry.

19. In the weeks following the events described above in paragraph 18, said gentleman, whom Affiant knows as Dan, introduces Affiant to other members of a private association of which Dan evidently is a founding member, Cooperative Dispute Resolution Society ("CDRS"), and Dan and Affiant undertake an analysis of the timeshare transaction.

20. Following the events described above in paragraph 19, Affiant discovers that certain of CDRS's members have a history of deploying what Affiant determines to be effective, low-cost, commercial solutions with a high degree of flexibility in resolving the matters of other CDRS members.

21. Following the events described above, Affiant develops concerns about the efficacy of efforts being taken by RAG and the effectiveness of the approach Affiant is taking on behalf of Barlow's Clients and observes that:

    a. Once a customer is "in contract" with RAG and RAG refers that customer to an attorney who agrees to handle the dispute with the timeshare developer, RAG's role is reduced to customer relations and maintaining the appearance of relevancy;

    b. A growing number of Clients are informing Affiant that RAG has instructed Clients to cease making "mortgage" payments on said Clients' respective timeshare contract, so as to go into default;

    c.  Timeshare developers are not responding to requests from aggrieved timeshare customers to pursue a compromise, regardless of facts of potential fraud and overreach by said developers' agents;

    d.  Once a timeshare customer defaults, developers unilaterally and without notice terminate the timeshare contract or issue derogatory comments to the credit bureaus or claim the timeshare customer realized a tax benefit and therefore has a tax liability and issue an IRS Form 1099-A or 1099-C;

    e.  Clients are telling Affiant that RAG is informing said Clients that it is the attorney (i.e., Affiant) who is at fault for breaking the promises made at execution of the RAG contract, upon which the Client relied when purchasing RAG services; and

    f.  Barlow's Client, Pam and John Pressney (collectively the "Pressneys"), tell Affiant that RAG told the Pressneys that a significant portion of the $120,000 in fees that RAG charged the Pressneys for timeshare-exit services went to "pay the attorneys" (i.e., Affiant).

22. Following the events described above, Affiant calls Jason and shares with Jason Affiant's concerns described above in paragraph 21 and Jason tells Affiant:

    a.  Barlow's Clients are lying to Affiant and that no one at RAG ever told a customer to "stop making payments" to any developer; and

    b.  RAG earns every penny RAG charges RAG's customers and that Affiant has "no idea how much" running an operation like RAG costs.

23. During and after the events described above in paragraphs 21 and 22, working closely with Dan, Affiant focuses on the fundamental elements of the timeshare contract, starting with exchange of promises, and comes to know that regardless of how the timeshare transaction is characterized in any of approximately 500 timeshare contracts Affiant has personally reviewed, the indicia only *imply* an enforceable contract and Barlow's Client only *appears* to acquire a timeshare interest in exchange for a signed promissory note—because Affiant seeks but is unable to find any fact that shows that:

    a.  any Client received anything from a timeshare developer that was (i) not purchased with that Client's own money, or (ii) purchased with the developer's money; or

    b.  A timeshare developer extended credit to a Client.

24. In mid-June 2018, over the phone, Jason introduces Affiant to David Alan Klein ("Klein"), who represents that Klein is an attorney now working for RAG and Klein's initial charge is "getting the back of the house in order" and implies that Affiant's relationship with RAG will be changing.

25. On August 23, 2018, Affiant attends a meeting at the RAG offices in Vista, California, attended by Ron Makino ("Makino," in charge of RAG Operations) and Bonnie Kulka ("Kulka," in charge of RAG Customer Relations)—with whom, as employees of RAG, Affiant has been interfacing since January 2017—and Jason and Klein.

26. Regarding the aforesaid meeting in the RAG offices August 23, 2018:

    a.   Jason criticizes Affiant for not intervening with one of Barlow's Clients who apparently threatened to go to the press and express said Client's increasing frustration with respect to every aspect of said Client's timeshare experience, which includes that with RAG, whereupon Jason and Kulka depart the room;

    b.   Klein, Makino, and Affiant continue discussing the issue raised in subparagraph 26a (which Affiant shall later discover to be an exaggeration and likely a fabricated pretext); but

    c.   Prior to Affiant's departure from the RAG offices, Jason has a private moment with Affiant during which Jason tells Affiant (i) of all the "great things" Jason and Affiant are going to do together, and (ii) "don't worry" about Jason's criticism of Affiant expressed earlier in said meeting.

27. At or about the time of the events described above in paragraphs 21-26, Affiant has a phone conversation with John Pressney ("John") who, with wife Pam ("Pam"), has timeshare contracts with three timeshare developers—Welk Resort Group ("Welk"), Hilton Resorts Corporation ("Hilton"), and Diamond Resorts International, Inc. ("Diamond")—in which Affiant explains the terms of a settlement that Affiant negotiated with Welk and that it is unlikely Affiant will be able to reach a similar agreement with either Hilton or Diamond, as Hilton and Diamond have been unresponsive to all requests to discuss customer complaints and informs John that:

    a.   John and Pam should not expect a refund from any developer;

    b.   It is likely that Hilton will "foreclose";

    c.   Diamond likely will remain silent and terminate the contract without notice;

    d.   There likely will be a negative impact on both John's and Pam's credit rating as a result of actions taken by the developer;

    e.   John and Pam should expect to receive an IRS Form 1099-C issued by a developer claiming a cancellation of debt; and,

    f.   John and Pam will remain liable to any bank for any (high-interest) credit card facilitated by a timeshare developer to enable John or Pam to make the initial down payment on the timeshare contract.

28. By August 31, 2018, Affiant has received so many reports from Clients about how RAG is denigrating how Affiant is or will be handling each Client's respective matter, both before and after retainer of Affiant by each such Client, and because timeshare contracts, previously assumed to be valid and enforceable, likely lack sufficient consideration, Affiant attempts to speak directly with Jason by phone, but is unable to reach Jason—and thereupon ceases accepting referrals of aggrieved timeshare customers from RAG.

29. Affiant on September 18, 2018, receives an email from Klein stating that Klein is "stepping in as in house/corporate counsel" for RAG and overseeing all RAG legal matters.

30. As of late September 2018, Affiant has about 100 active timeshare cases with Clients referred by RAG—and Jason informs Affiant by phone that any RAG customer referred to

Affiant by RAG "belongs" to him (Jason).

31.   In October 2018, Affiant is contacted by Mike Krieck ("Mike") who introduces himself as
      Jason's brother and the person taking over RAG's operations.

32.   From October 2018 and continuing through the beginning of March 2019, approximately 30
      of Barlow's Clients report to Affiant that said Clients feel harassed by RAG or are confused
      by information provided by RAG (which Affiant surmises are wrongful attempts by RAG to
      interfere with the attorney-client relationship between Affiant and Clients).

33.   On or about March 7, 2019, Affiant delivers information by email to Barlow's Clients in the
      hope of clarifying issues related to Affiant's representation of Barlow's Clients, Affiant's
      relationship with RAG, and the current status of Barlow's Clients' respective matter and the
      timeshare industry generally, a true and correct copy of which email is made fully part
      hereof and attached hereto as Attachment B.

34.   In or about late June 2019, Affiant arranges a July 1, 2019 meeting with Mike for the
      purpose of, as expressed to Mike, discussing continuing tensions between Affiant and RAG
      as related to Barlow's Clients, to share Affiant's growing understanding of the true nature of
      the timeshare transaction, and to explore the possibility of assisting RAG evolve RAG's
      business model to take advantage of Affiant's new knowledge of the contractual relationship
      between timeshare developer and timeshare customer.

35.   Dan, whom Affiant had invited to attend the aforesaid July 1, 2019, meeting, arrives early at
      Affiant's Woodland Hills, California, offices and Mike appears shortly thereafter
      accompanied by an uninvited individual previously unknown to Affiant who identifies
      himself as "Bo" (later identified as William James "Bo" Wilson), represents himself to be
      one of two owners of *Timeshare Compliance* (another "timeshare exit" company), and
      informs Affiant that Bo and Bo's partner have recently acquired and are now the owners of
      RAG.

36.   Shortly after the said July 1, 2019, meeting, Affiant surveys (a) Affiant's knowledge of
      plaintiffs' business operation, (b) the lack of effective results Affiant is achieving on behalf
      of Barlow's Clients while employing a traditional legal approach, (c) Affiant's deepening
      understanding of the timeshare transaction, (d) the potential effectiveness of deploying a
      commercial solution to resolving timeshare disputes, and (e) strides made by CDRS while
      assisting individuals in situations similar to those of Barlow's Clients, and determines
      Affiant would be derelict not to disclose to Barlow's Clients, available alternatives beyond
      what Affiant provides respecting efforts to resolve Barlow's Clients' respective matter and,
      in late August 2019, begins notifying Barlow's Clients about what Affiant has come to learn
      as the true nature of the timeshare transaction— specifically that:

      a.   No loan was ever extended to the Barlow Client by a timeshare developer;

      b.   Disputes involving the contemporary timeshare contract can be resolved more
           effectively through a commercial process;

      c.   CDRS has extensive knowledge and experience with *commercial handlings*;

      d.   A *commercial handling* is not the type of work Affiant performs; and

6

e.  If desired by Barlow's Client, Affiant would facilitate an introduction to CDRS.

37.  Upon the events described above in paragraph 36, Barlow's Clients John and Pam Pressney, Lee Turk, David and Deborah Abel, Glen and Connie Perley, Gil and Eva Castro, Bernie and Carol Bettinelli, Lari Castle, Gene and Jenny Hannah, and Paul and Renee Martinez (collectively "CDRS Members") request and receive from Affiant, introduction to CDRS for the purpose of determining rights and remedies respecting a timeshare dispute.

38.  From the beginning of the events described above to the present day, the only RAG customers with whom Affiant has contact are those individuals with whom Affiant enjoys an attorney-client relationship (i.e., Barlow's Clients) via contact consisting of (a) correspondence referred to in paragraphs 33, 36, and 37 above, (b) communication specifically related to Affiant's representation as attorney for Barlow's Clients, and (c) communication with, between, or among CDRS Members and Affiant.

39.  With respect to services provided to RAG customers by RAG, Affiant is aware that RAG (a) makes an initial "welcome call" during which detailed information is obtained regarding RAG's customer's dispute with a timeshare developer, (b) collects and compiles relevant documentation regarding said dispute, including obtaining a "Letter of Explanation" from the RAG customer, (c) contacts an outside attorney with whom RAG has a referral relationship and providing all relevant information to such attorney, (d) initiates occasional "check-up" calls to the RAG customer, and (e) fields the occasional customer contact / question regarding status of said customer's matter.

40.  The information referred to on page 19, lines 2 to 12, of that certain Amended Complaint (Document 9) in United States District Court for the Central District of California Case No. 8:20-cv-00889 is readily available to Affiant from any of Barlow's Clients.

41.  Beginning in or about early 2020, Affiant observes certain CDRS Members to submit a Demand, Notice, and Warning of Commercial Grace ("DNWCG") to plaintiffs the gravamen of which is:

a.  the respective CDRS Member has spent time and effort to discover that the timeshare contract for which RAG was engaged, at significant cost to CDRS Member, to "terminate/transfer" is invalid for lack of consideration;

b.  RAG is invited to admit the mistake of offering services to the CDRS Member that were impossible to deliver;

c.  a demand for RAG to deliver, as reimbursement and for the CDRS Member's inconvenience, treble the amount the CDRS Member mistakenly gave to RAG;

d.  in the event plaintiffs fail to admit such error, plaintiffs' actions can only be interpreted as intentional;

e.  the CDRS Member shall report any observed wrongdoing to appropriate law enforcement agencies or governing bodies; and

f.  a consensual lien shall arise against plaintiffs in the amount of the aggregate statutory monetary value of crimes committed.

7

42. Shortly after the events described above in paragraph 41, Affiant is informed by each respective CDRS Member described therein that no responsive reply to the DNWCG is received from RAG.

43. At or immediately following the time of the events described above in paragraphs 41 and 42 (and prior to CDRS Members David and Deborah Abel, collectively "Abel," filing any affidavit of information against plaintiffs), Mike expresses to Affiant that RAG would like Affiant to mediate the ongoing dispute between RAG and CDRS Members.

44. In response to the events described above in paragraph 43, Affiant (a) gathers relevant information respecting the claims being asserted against RAG by CDRS Members, (b) explores additional, potential assistance CDRS might provide RAG with the federal lawsuits currently pending against RAG (*see* 9:20-CV-80143, 6:2019-CV-01908), and (c) arranges to meet representatives of RAG for the purpose of discussing RAG's then-current situation with CDRS Members and, Affiant believes, exploring an amicable resolution thereof.

45. On March 2, 2020, Jason, Mike, Bo, and Bo's partner Rich Folk ("Rich") travel to Affiant's offices and meet with Affiant, each of whom presents himself as representing the interests of RAG, Bo and Rich also claiming to be owners of aforementioned *Timeshare Compliance* ("timeshare exit" company).

46. At the meeting described above in paragraph 45, Affiant conveys that (a) Affiant will concede to mediating the dispute between RAG and CDRS Members on the condition that each party acknowledge that Affiant neither represents any party to the dispute nor has offered any legal counsel or advice to any such party, (b) in Affiant's estimation, CDRS Members are asserting a legitimate claim and, based upon what Affiant knows about CDRS, these efforts would not cease, and (c) in the event RAG does not admit to mistake and meet CDRS Members' respective demands, CDRS Members likely would follow through with measures outlined in the DNWCG.

47. At the aforesaid March 2, 2020, meeting, Affiant affirms to Jason that (a) at the time Affiant first introduced CDRS Members to CDRS, Affiant had no intention that Jason or anyone else at RAG be targeted for the conduct outlined in the DNWCG, and (b) Affiant would do all Affiant could to assist in resolving the situation between RAG and CDRS Members.

48. Shortly after the aforesaid March 2, 2020, meeting, Affiant receives a text message from Mike requesting that Affiant ask Abel to hold off filing an Affidavit of Information for a couple of weeks to allow RAG to see about finding the money to resolve the situation.

49. Affiant hereby avers that:

   • *Barlow & Associates* is an unregistered tradename without substance or existence independent of Affiant;

   • *ATTFUND* is the name coined in a business proposal for a litigation-financing service which was never funded and never conducted any business; and

   • *Case in Chief, LLC* is a defunct business undertaking, abandoned no later than January 2017, which provided litigation-support services.

## Certification.

The Undersigned Affiant, Brent David Barlow, hereby swears, declares, and affirms that Affiant executes this Affidavit with sincere intent, that Affiant can competently state the matters set forth herein, that the contents are true, correct, and complete in accordance with Affiant's personal knowledge.

Date:   July 28, 2020

_Brent David Barlow_

Brent David Barlow
Affiant

# Jurat

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

Subscribed and sworn to (or affirmed) before me this _28_ day of _July_____, 20_20_, by _Brent David Barlow_____, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

CLAUDIA JUAREZ-ROCHA
Notary Public - California
Los Angeles County
Commission # 2310131
My Comm. Expires Oct 22, 2023

Notary Public

9

ATTACHMENT A

**BARLOW & ASSOCIATES**

A T T O R N E Y S   A T   L A W
21112 VENTURA BOULEVARD
Woodland Hills, CA 91364-2103
(818) 369-4432 Telephone
(818) 887-0528 Facsimile

Mailing Address:
*X* 20929 Ventura Boulevard, Suite 47
Woodland Hills, CA 91364-2334
☐ 105 Crescent Bay Drive, Suite F
Laguna Beach, CA 92651-1381

Our File Number

### ATTORNEY-CLIENT FEE AGREEMENT

BARLOW & ASSOCIATES, ATTORNEYS AT LAW ("Attorney") and CLIENT ("Client") hereby agree that Attorney will provide legal services to Client on the terms set forth below.

1. **CONDITIONS**
   This Agreement will not take effect, and Attorney will have no obligation to provide legal services, until: (a) Client returns a signed copy of this Agreement to Attorney.  This Agreement will be deemed to take effect as of the date signed by all parties.

2. **SCOPE OF SERVICES AND ATTORNEY'S DUTIES**
   Client hires Attorney to provide legal services in the following matter:

   *Attorney shall endeavor and take every pre-litigation step required to seek a withdrawal from and/or cancellation of Client's timeshare contract and to assist in obtaining a refund from the Developer, if and when possible.*

   Attorney will provide legal services reasonably required to represent Client.  Attorney will take reasonable steps to keep Client informed of progress and to respond to Client's inquiries.  This **Agreement does not cover representation in any lawsuit, trial, post-trial motions on appeal, or in collection proceedings after judgment or proceedings regarding renewal of a judgment, or any other matter not specified herein**.  Attorney is representing Client only in the matter described above.

3. **CLIENT'S DUTIES**
   Client agrees to be truthful with Attorney and not to withhold information.  Further, Client agrees to cooperate, to keep Attorney informed of any information or developments which may come to Client's attention, to abide by this Agreement, and to keep Attorney advised of Client's address, telephone number and whereabouts.  Client will assist Attorney by timely providing necessary information and documents and generally cooperate fully with Attorney in all matters related to the preparation and presentation of Client's claims including immediately delivering to Attorney copies of any documents or information, sent directly to client, related to the matter and informing Attorney of contact by Developer or its agents.

4. **WAIVER OF ATTORNEY CLIENT PRIVILEGE**
   Client and Attorney acknowledge that Client has entered into a separate agreement with Resort Advisory Group, LLC ("ResortAG") and that RA-Group has paid Attorney a fee for the Services to be rendered hereunder.  Given the services provided to Client by RA-Group are consistent with Attorney's efforts hereunder, it may be in the best interest of Client for Attorney to collaborate with RA-Group and share information about Client's case with RA-Group.

   *By initialing here, Client specifically authorizes Attorney to disclose information helpful to the prosecution of Client's claims and expressly waives the Attorney-Client Privilege as to ResortAG and its employees.*

   _____  _____

5. **LEGAL FEES**

Client will **<u>only</u>** be obligated to compensate Attorney for legal services rendered if ***a recovery is obtained on Client's behalf***.  The fee to be paid to Attorney will be:

*Thirty-Three and One-Third percent (33⅓ %)* of the net recovery

The term "net recovery" means *the total value of all amounts received by settlement, in any form, **including any "refund" or "debt forgiveness."*** *In some instances, where settlement includes direct payment to a third-party on Client's behalf (e.g., PayPal) or where Attorney successfully negotiates "forgiveness of debt" from Developer for Client's benefit, Client will be required to issue payment for Attorney Fees directly to Attorney prior to the finalization of the settlement process (see, Example Two, below).*

**Example One**
Attorney negotiates a refund to Client in the amount of $10,000:

NET RECOVERY          $10,000
ATTORNEY FEES         $3,333 (*withheld from Settlement Amount and paid directly to Attorney*)
CLIENT DISTRIBUTION   $6,667 (*balance of Settlement paid to Client after Attorney Fees*)

**Example Two**
Attorney negotiates direct payment to third-parties on Client's behalf and/or "Debt Forgiveness" in the amount of $10,000:

NET RECOVERY          $10,000
ATTORNEY FEES         $3,333 (***paid by Client directly to Attorney****)
CLIENT DISTRIBUTION   $6,667 (*effective Settlement Value to Client after Attorney Fees are paid*)

**\*UNDER EXAMPLE TWO, ATTORNEY FEES MUST BE PAID BY CLIENT BEFORE SETTLEMENT AGREEMENT IS FINALIZED WITH DEVELOPER**

**CLIENT ONLY PAYS ATTORNEY FEES IF THERE IS A "NET RECOVERY" IN THE MATTER, AS DEFINED ABOVE**

***CLIENT UNDERSTANDS THAT THE RATES ARE NOT SET BY LAW BUT ARE NEGOTIABLE BETWEEN ATTORNEY AND CLIENT***

6. **EXPRESS AUTHORITY TO DEPOSIT SETTLEMENT CHECK INTO ATTORNEY-CLIENT TRUST ACCOUNT**
Client hereby expressly grants Attorney the limited authority to endorse, on Client's behalf, any settlement check received in this matter and deposit same into Attorney's Client Trust Account.  Client understands that such Client Trust Account is monitored by the State Bar and imposes a fiduciary duty on Attorney.

7. **CLIENT APPROVAL NOT NECESSARY FOR SETTLEMENT**
Client authorizes Attorney to accept any settlement or compromise of Client's claims without Client's prior approval so long as such settlement or compromise includes the termination of Client's contract with Developer and their continuing financial obligation thereunder.

8. **PROFESSIONAL LIABILITY INSURANCE DISCLOSURE**
Pursuant to California Rule of Professional Conduct 3-410, Attorney is informing Client in writing that Attorney does not have professional liability insurance covering this engagement.

9. **NO TAX ADVICE**
Attorney has not been retained to provide Client with any tax advice concerning any of the services herein described. Any documents prepared by Attorney may have specific tax ramifications. To be sure Client understands and is certain of all the potential tax consequences, Client should consult with tax advisors regarding these matters.

**10. DISCHARGE AND WITHDRAWAL**

Client may discharge Attorney at any time.  Attorney may withdraw with Client's consent or for good cause or if permitted under the Rules of Professional Conduct of the State Bar of California and/or applicable law.

**11. CONCLUSION OF SERVICES**

Client may have access to Client's case file at Attorney's office at any reasonable time.  At the end of the engagement, Client may request the case file.  If no such request is made, Attorney will retain the case file for a period of one (1) year, after which Attorney is authorized by this agreement to have the case file destroyed.  The case file includes Client papers and property as defined in Rule 3-700(D)(1) of the California Rules of Professional Conduct.

**12. RECEIPT OF PROCEEDS**

All proceeds of Client's case will be deposited into Attorney's trust account for disbursement in accordance with the provisions of this Agreement.

**13. DISCLAIMER OF GUARANTEE**

Nothing in this Agreement and nothing in Attorney's statements to Client will be construed as a promise or guarantee about the outcome of this matter. Attorney makes no such promises or guarantees.  Attorney's comments about the outcome of this matter are expressions of opinion only, are neither promises nor guarantees, and will not be construed as promises or guarantees.

**14. ENTIRE AGREEMENT**

This Agreement contains the entire agreement of the parties.  No other agreement, statement or promise made on or before the effective date of this Agreement will be binding on the parties.

**15. SEVERABILITY IN EVENT OF PARTIAL INVALIDITY**

If any provision of this Agreement is held in whole or in part to be unenforceable for any reason, the remainder of that provision and of the entire Agreement will be severable and remain in effect.


**READ, AGREED TO, AND ACCEPTED BY**


"CLIENT"


DATED: _____          _____

                                     CLIENT


DATED: _____          _____

                                     CLIENT


"ATTORNEY"


DATED: _____          BARLOW & ASSOCIATES, ATTORNEYS AT LAW


                                     By:_____
                                          BRENT D. BARLOW, ESQ.

ATTACHMENT B

**Brent Barlow**

| | |
|---|---|
| **From:** | Brent Barlow <brent@barlowlegalgroup.com> |
| **Sent:** | Thursday, March 7, 2019 7:03 AM |
| **To:** | 'Brent Barlow' |
| **Subject:** | REGARDING YOUR TIMESHARE MATTER |

[YOU ARE RECEIVING THIS MESSAGE BECAUSE RESORT ADVISORY GROUP REFERRED YOUR MATTER TO THIS LAW FIRM *and* IT IS OUR INTENTION TO CORRECT CERTAIN INFORMATION THAT YOU MAY HAVE RECEIVED ABOUT HOW YOUR MATTER IS BEING HANDLED]

It appears some confusion has been created that may impact you and your matter.  While we hope you have not been affected, we are providing information here intended to illuminate and clarify the current situation.  As your attorney, the only accurate information you should rely on about the status of your legal matter is from this law firm.

*To the best of our understanding, we believe the following is a general outline of what has transpired as related to your timeshare:*

- You purchased a timeshare that you eventually became dissatisfied with and wanted to get rid of – the developer made a series of promises and representations that were untrue;
- You were contacted by Resort Advisory Group and were convinced they could get you out of your timeshare contract;
- You entered into a contract with Resort Advisory Group and agreed to pay them a fee, which you may have been told was based on the balance remaining on your timeshare contract and/or led to believe some portion of this fee was going to pay an attorney;
- Resort Advisory Group referred your matter to Barlow & Associates, Attorneys at Law;
- We reviewed your matter, confirmed it met our criteria, and agreed to take your case; and,
- You engaged this firm under the terms of a written retainer agreement to obtain a cancellation of your timeshare contract and you were required to *pay the attorney no money whatever* (there is a provision in our agreement authorizing us to participate in any money we recover from the developer by way of refund).

*Respecting your specific matter, for which we were engaged:*

- We agreed to "*take every pre-litigation step required to seek a withdrawal from and/or cancellation of* [your] *timeshare contract and to assist in obtaining a refund from the Developer, if and when possible*";
- Under our written retainer agreement, the attorney-client relationship exists between you and this law firm, we honor the duty owed to you as our client, and we have zealously represented your interests in this regard;
- No special relationship exists between this law firm and Resort Advisory Group (the source referring your matter);
- We charge third-party referral sources, such as Resort Advisory Group, a small administrative setup fee, of several hundred dollars, which is expressly not paid for any legal service provided to you;
- Absolutely **no fees or costs are required to be paid by you to this law firm** (however, again, there is a contingency fee provision in our retainer agreement and we participate in any refund we obtain from the developer); and,
- We neither endorse nor participate in any fees charged by a third-party company referring your matter to us and we inform them that it may be illegal if you are led to believe such charges imposed are for "legal fees" or that *they* are providing legal services.

1

*You may have also experienced any or all of the following:*

- Resort Advisory Group apparently sent a letter to a number of our clients implying that this firm had abandoned their case and containing misleading information about their matter, to wit, that we:

   *"…unilaterally terminated your representation without your consent.  You should be aware that Mr. Barlow has been paid, in full, to represent you in this matter.  This termination of representation, without your consent, may constitute a breach of Mr. Barlow's fiduciary duty to you as Mr. Barlow's client.*

   *"It has also come to our attention that Mr. Barlow's "Termination of Representation" letter also contained false and/or misleading information relative to his representation and his relationship with RA Group.*

   *"As a result of the foregoing, we will be reviewing your file for referral to another attorney, without additional costs to you, who will exercise due diligence in attempting to remove the burdens of your timeshare and who will not unilaterally terminate your attorney - client relationship without advance notice to you and good cause."*

- After this, Resort Advisory Group looks to have sent a follow-up correspondence to a number of our clients creating additional confusion.  If you received such correspondence, it contained certain misleading statements, among which are:

   *"To minimizes [sic] the delay of switching attorneys in your case, as changing lawyers in the middle of a case can be like changing pilots in the middle of a flight. It would take time for a new attorney to become familiar with your file… His firm will continue following up with the developer, allowing time for this information to be processed by them.*

   *"Mr. Barlow's office will be copying Client Services on any/all communications, ie., [sic] letters, drafts, pleadings, orders, written and verbal, related to your case, via Dropbox, or email.*

   *"In closing, we have agreed to continue working as a team, in efforts to successfully resolve your timeshare cancellation matter, in a most expeditious manner."*

- Most recently, wrongfully interfering with the attorney-client relationship and further confusing our clients, Resort Advisory Group appears to have asked a number of our clients to "discharge" this law firm by sending a letter, which we believe was drafted by Resort Advisory Group, stating:

   *"Please accept this letter as formal notice that you are hereby released from any obligation and or contract to litigate on my behalf or to represent me as legal counsel, effective immediately.*

   *"Please forward to me final actions you may have taken on my behalf, in my timeshare cancellation matter, along with any and all records, transcripts, and documents relating to my case.*

   *"Thank you in advance for your cooperation."*

First, we are not privy to the terms of your contract with Resort Advisory Group nor are we aware of the fees that they are charging you or the services they are providing.  We hope you are happy with their services and feel that you are receiving value for the money you are paying them.

Nonetheless and for the avoidance of doubt, we never abandoned your matter or "unilaterally terminated your representation without your consent" and have continued to diligently pursue its resolution.  We also never agreed to "continue" representing you because we never stopped representing you.  While it has no effect on our

representation of you in your timeshare matter, you should be aware that our relationship with Resort Advisory Group has come to an end.  In short, we became aware of a number of issues causing us concern, which we attempted to discuss with Resort Advisory Group, but that were never resolved.  Further, they have abused our relationship with a number of our clients and created confusion with many of them.  In the end, we will not do business or have a relationship with a people we cannot trust.

We have been consumer protection attorneys for some time and, as such, it is our ardent desire to **help and protect people who have been taken advantage of** – and you fall squarely in this category.  Leaving aside the legal and ethical duties that we – as attorneys – owe our clients, in your situation it is in our best interest to do everything in our power to get you out of your timeshare contract quickly and to secure as large a refund from the developer as possible.  It is only by getting you a refund of the money you paid to the timeshare company that we earn a living.  We accepted your case on a *Contingency Fee*, which is a sum of money lawyers receive as a fee **only if the case is won**.  It is disingenuous to represent that the fee paid by Resort Advisory Group – an agreed amount of $700 in your matter – is intended to cover anything other than the initial costs of our representation of you in this matter.

Also, it seems that Resort Advisory Group believes that they have a right to insinuate themselves into your relationship with your attorney and direct your actions.  However, based on a number of conversations we have had with clients who, like you, were referred to us by Resort Advisory Group, it appears that they are seeking to justify the fees being charged to clients for matters they simply refer to an attorney to resolve.  Again, we do not claim to know the extent of the services they are providing you, but many of our clients report that all they have really done is made a few calls "checking up" on how things are going and largely blamed the attorney for delay.  Further, it has been repeatedly reported to us that our clients have been told by Resort Advisory Group to "stop paying their mortgage" despite their written agreement with Resort Advisory Group expressly stating that the client (you) understand that you "are responsible to continue to make all payments" and that you are "still responsible for the mortgage."  We are unclear what is actually going on, but this practice, if true, is a cause of great concern.

WHERE THINGS STAND as related to your timeshare matter.  When we first became aware of the conspiracy of fraud taking place in the timeshare industry we were disgusted.  It seemed that everyone involved in this enterprise was making people promises they never intended to keep and doing everything they could to defraud people of money which most cannot afford to pay.  We committed to do everything we could to help people obtain justice.

At the time, these developers were receiving a small number of cancellation requests; there were few who were trying to help individuals defrauded by these timeshare companies.  It was relatively straightforward – we would perform our due diligence, gather the facts, prepare and submit a demand package, and engage the developer in negotiations that typically resulted in a cancellation of the timeshare contract and often a refund of some portion of the money paid by our clients.

Recently however, there has been an explosion of these "timeshare exit companies" who, often, are a group who last week were *selling* timeshares and this week decided they could make more money convincing people they could *get them out* of their timeshares – typically doing little more than telling people to stop making their mortgage payments, with the knowledge that the developer will – at some point – cancel the timeshare contract for failure of payment.  The result is that now these developers face hundreds of cancellation demands every week.

The developers' response has been to undertake a survival strategy and adopt a posture of denying, delaying, and ignoring claims asserted by consumers.  With increasing frequency, developers simply deny claims out of hand, refuse to engage in meaningful settlement discussions, and – once we have demonstrated an unwillingness to go away – unilaterally and without formal notice cancel the contract (the process may include the developer filing for foreclosure if a deed is involved).  It is a bitter pill to swallow and we do not enjoy being the bearer of such news.

In our opinion, the timeshare companies are engaged in a massive fraud.  These companies have spent millions of dollars to create the illusion that this is a *real estate* transaction.  However, under the strictest definition of law, all

3

they have done is create a debt on *intangible property* (timeshare vacation membership).  People have essentially purchased nothing more than the right to pay these companies unreasonable amounts for which they are supposed to be able to enjoy the benefits of membership and vacation at their leisure.  Technically, once in default, the "debt" is extinguished by operation of law.  Still, the developers continue making threats and claiming that all sorts of harm will follow unless the account with the developer is brought current; they may take action further harming these individuals including making derogatory remarks to the credit reporting agencies, wrongfully issuing tax forms creating tax liabilities, and leaving people to pay enormous bills to credit card companies for "fees" charged by the timeshare company.

While some find a benefit to owning a timeshare, too often this becomes an unbearable financial burden that people are desperate to get out of.  This fraud begins when they lock you in a ballroom for hours on end and repeatedly tell you what a great deal they have for you and that you would be foolish to pass up this opportunity.  The timeshare companies then engage in a process of intimidation and attempt to overwhelm you, beginning with lengthy contracts of as many as 100 pages, telling you that this timeshare will be yours forever and will be passed down to your children after you are gone, and that they will come after you unless you pay them.  This may sound familiar.

It is a scam.  These timeshare companies are in the business of getting you to continue paying them for something you neither want nor, often, can afford.  They rely on the fact that most people will never sue them because of the cost and inconvenience involved.  These companies are betting that people will be discouraged in the knowledge that if they do sue *and* win at trial, it is unlikely the judgment will exceed the cost in attorney fees, time, and hassle.  Therefore, making it unlikely that a lawsuit is something that the developer will ever have to deal with.  Moreover, the traditional approach of submitting a demand and hoping the developer responds has become little more than an exercise in futility; we face in the timeshare company an adversary who refuses to engage and does not play by the rules.  It is becoming a difficult but not impossible situation.

WHAT ARE YOU TO DO?  We would like to discuss with you the status of your matter and explore the options available at this point.  There are a few things that can be done, which we would be happy to explain further.  We will continue to pursue your matter, as we agreed, but are concerned that the current approach will likely create issues that are outside the scope of our representation and about which it is important that you are aware.

You may decide to consult with Resort Advisory Group.  If you paid them a significant fee and continue to have confidence in them, it is certainly reasonable for you to ask them what they are planning to do to help you with your situation.

*For the record, we have never nor will we ever ask you for money*.  We are probably the only ones in this whole nightmare that can make that claim.  Our only concern is that you are informed about your situation and that you are making good decisions.  We have found that when people are deceived or are not provided with complete information they end up making bad decisions.  It is our desire to help you, to answer any question you may have about your situation, and to ensure that your interests are being represented.

Again, we are not aware of the extent of your relationship with Resort Advisory Group or the services they are providing.  Nothing that precedes may be true to your specific situation.  In truth, we would hope that you are completely satisfied with the services Resort Advisory Group is providing and that you see real value for the money you have paid them.  However, out of an abundance of caution, we want to make sure you have all the information bearing on your situation and have you know that we will do everything in our power to continue assisting you.

We will follow whatever direction you provide.  If you would like to dismiss this law firm, you only need to respond to this email and inform us that is your desire.  Otherwise, we would request that you contact our offices at your earliest convenience to discuss where your matter stands and what further assistance we can provide.

Thank you.

_____

**BRENT D. BARLOW, ESQ.**
**BARLOW *and* ASSOCIATES**
*www.barlowlegalgroup.com*
*844.488.0449 toll-free*
*818.369.4432 local*
*818.887.0528 fax*

*Striving to be environmentally conscious, we avoid printing and limit communication to email as much as possible.*

# EXHIBIT I



**RESORT ADVISORY**
——— GROUP ———

May 18, 2018

John & Pamela Pressney
# Confidential

### Re: Addendum to Service Agreements

Mr. & Mrs. Pressney,

This Addendum to the three Resort Advisory Service Agreements (Welk, Diamond, and Hilton) all dated April 20th, 2018 shall serve as acknowledgment wherein; the Resort Advisory Group Service Agreement Fees, as indicated in Section 4a, of each of the three Agreements, combine for a total of $118,515.47 (Welk $23,085, Diamond $31,090.04, and Hilton $64,340.43). The total combined fee will broken into a $64,340.43 Deposit which will be paid today, leaving a balance of $54,175.04 to be paid via 24 monthly installments of $2,257.30. The installments will begin in June 2018, with payments due on the 18th of each month.

The rest of the agreements remain unchanged.

READ, AGREED TO, AND ACCEPTED BY:

Resort Advisory Group

By: _____

Print: ERIC KITTLER
OFFICE MANAGER
Date: MAY 18, 2018

John & Pamela Pressney

Sign: _____

Print: JOHN A. PRESSNEY

Date: 5-18-2018

Sign: _____

Print: Pamela M. Pressney

Date: 5-18-2018