Dana Delman, Esq. (SBN 167307)
John Vukmanovic, Esq. (SBN
DELMAN VUKMANOVIC LLP
2600 Michelson Drive, Suite 1700
Irvine, California 92612
Telephone: (949) 852-3590
Facsimile: (310) 300-1017
Email: dana@delvuklaw.com
       john@delvuklaw.com

Attorneys for Defendants John Pressney, Pamela Pressney, Herman Abel, Debora Abel, Morris Hannah, Virginia Hannah, Lee Harris Turk, Bernardo Bettinelli, Carol Bettinelli, Lari Castle, Gilbert Castro, Eva Castro, Paul Martinez, Renee Martinez, Glenn Perley and Connie Perley

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTERMARKETING MEDIA, LLC, et al, | Case No.: 8:20-cv-00889-JLS-DFM |
| Plaintiffs, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT, OR, ALTERNATIVELY, EACH CLAIM THEREIN ALLEGED AGAINST THE MOVING PARTIES** |
| vs. | |
| BRENT DAVID BARLOW, et al, | |
| Defendants. | |
| | Date: February 12, 2021<br>Time: 10:30 a.m.<br>Ctrm: 10A |

## I. INTRODUCTION

The moving Defendants ("Defendants" or "RAG Clients") request that the Court dismiss the claims alleged against them in the first amended complaint ("FAC") for failure to state a claim upon which relief can be granted.[1]  Fed. R. Civ. P. 12(b)(6) ("Rule 12(b)(6)").

Defendants' defenses are simple: all of the activities in which they engaged were privileged either pursuant to California's litigation privilege or the federal Noerr-Pennington doctrine that protects First Amendment rights to petition activity. These simple privileges defeat all of Plaintiffs' claims against the RAG Clients. Plaintiffs allege several other claims and acts against the Barlow and CDRS defendants.  Using conclusory allegations, Plaintiffs claim, without any factual allegations, that the RAG Clients' attempts to get their money back from Plaintiff Resort Advisory Group ("RAG") somehow involved them in an extortionate RICO conspiracy.  Plaintiffs are wrong and, although not actionable at this juncture, their inclusion of their financial victims as defendants is yet another act of abuse that constitutes abuse of process and malicious prosecution.  All of the RAG Clients' acts were privileged and therefore the FAC against them should be dismissed in its entirety.  The only allegations that connect them as co-conspirators are conclusory and thus need not be considered in ruling on this motion.

/ / /

/ / /

---

[1] The claims against the RAG Clients are: first cause of action for RICO violation; third cause of action for threat to injure business; fourth cause of action for violation of the Defend Trade Secrets Act; fifth cause of action for violation of the Hobbs Act; sixth cause of action for violation of 18 USC § 1957; seventh cause of action for data fraud – Cal. Penal Code § 502; tenth and eleventh causes of action for interference with contractual relations and prospective economic relationships; twelfth cause of action for false light; thirteenth cause of action for defamation and libel; sixteenth cause of action for quantum meruit; seventeenth cause of action for misappropriation and misuse of confidential information; eighteenth cause of action for extortion and wrongful threat of criminal and civil prosecution; nineteenth cause of action for abuse of process; and the twenty-fifth cause of action for injunctive relief.

1

## II. SUMMARY OF BACKGROUND FACTS

The following is a summary of the background, all supported by Defendants' declarations filed concurrently herewith. Although some of these facts are not properly considered on this motion, Defendants set them forth here so the Court understands the background and their desperation to right the wrongs that have been committed against them.

RAG defrauded the RAG Clients of hundreds of thousands of dollars by claiming that RAG could help them get out of onerous timeshare contracts without hurting their credit. Many of the Defendants are elderly and RAG's representatives used high-pressure sales tactics in meetings that lasted several hours to convince them to sign contracts before the meeting was over or possibly lose the opportunity. The contracts they signed (Defendants' Declarations, Exhibits 1) were one-sided and, using boilerplate language, essentially attempted to alleviate RAG of its blatant misrepresentations used to convince their victims to fork over money for RAG to basically do nothing. RAG took their money and referred them to attorney Brent Barlow, who RAG paid to simply write a few letters. If they wanted any more services, they would have to separately pay Barlow for such work.

Defendants John and Pamela Pressney sued RAG in Orange County Superior Court for elder abuse and other torts. RAG moved to compel arbitration and the Court denied the motion on the grounds that the RAG contract was unconscionable. Set forth herein is the Pressneys' story as an example. The other RAG Clients' stories are equally appalling.

"John" of RAG cold-called the Pressneys to convince them to pay RAG to get them out of their expensive timeshare contracts. On April 20, 2018, the Pressneys met with Tom McCarty at RAG's offices. Together they went through the Pressneys three timeshare contracts and talked about the developers' fraudulent sales tactics.

McCarty, on RAG's behalf, subjected the elderly Pressneys to undue pressure and influence and manufactured upsetting, coercive, and unexpected circumstances

2

to wear down the Pressneys to sign with RAG. First, McCarty spent several hours interviewing the Pressneys relating to their four timeshare purchases (with Diamond, Hilton and Welk), including the amounts owed on them and the maintenance fees.  He asked them personal questions, including whether they had disabilities, and learned that John has diabetes and Pamela suffers from multiple sclerosis.  Ironically, McCarty noted that the timeshare companies exploit elders with disabilities in pushing the timeshares and implied this was elder abuse. McCarty wrote down the numbers to show the purported cost of the four timeshares for the rest of their lives. McCarty kept pushing the Pressneys to end all four timeshares and sign the RAG contract, including by representing that RAG's fee in excess of $118,000 would be a lot less than the Pressneys would spend over the life of the timeshares, implying the Pressneys would never be able to retire if they kept *even one* timeshare, and telling the Pressneys they would be paying timeshare fees into their 80s.  As a result, the Pressneys grew more and more alarmed and stressed through the day.

McCarty also made it clear that time was of the essence because time windows to challenge the timeshares were purportedly "closing."  McCarty repeatedly told the Pressneys that they were lucky they qualified for RAG's services, because "very few" timeshare owners qualify and the Pressneys had to act "quickly" or lose the window of time to make the "challenge."  After the Pressneys had been in RAG's offices for around seven hours and late into the evening, the elderly plaintiffs had only snacked on croissants and were tired, hungry, pressured and stressed. McCarty finally convinced the Pressneys that the issues were urgent and time-sensitive and that the Pressneys needed to sign the RAG agreement right away, without delay, including because Mr. Pressney was going out of town the next day for work.

At the end of the meeting, they signed a contract with RAG. RAG demanded a check up front for its entire fee of $118,515.  Ultimately, the Pressneys negotiated

3

a lower up-front fee and monthly payments, though this still required credit card advances, as well as withdrawals from a credit line and distributions from their IRA. The Pressneys had informed RAG that they did not have the money to pay RAG's fee and would have to put it on credit cards. Yet, RAG's calculations of the cost of RAG's services failed to include the cost of borrowing on the credit cards to pay RAG's fee to get out of the timeshares.

Instead of providing any services to get the Pressneys out of their timeshares, RAG essentially referred Plaintiffs to an attorney, Brent Barlow, who was paid a very small portion of the money the Pressneys paid to RAG to send cease and desist letters and a demand letter.

Based on RAG's representations, the Pressneys believed that the timeshares would be canceled and that their credit would not be affected because they were challenging the timeshare purchases based on the developer's fraudulent sales tactics, which they had discussed during the meeting.

Ultimately, however, the Pressneys discovered that RAG had mislead them, including as to the reasons upon which the Pressneys would be extricated from the timeshares, the use of a timeshare foreclosure process, the effect of such foreclosure(s) on their credit, and their subsequent large tax liability by way of a 1099-C for the canceled debt.  Only then did the Pressneys realize that RAG was not delivering a safe, legal or economically sound method to exit their timeshares, but rather the "service" was going to ruin their credit, which they could have done on their own by simply stopping the timeshare payments and waiting for their credit scores to plummet.

In total, the Pressneys paid RAG $71,112.33. They have been paying credit card interest on this amount since mid-2018. Their credit scores were negatively impacted as a result of taking RAG's advice to stop paying the timeshares.  RAG told them that their scores would not be negatively affected because RAG would use a service called Tradeblok to save their credit.  This was a useless service that only

4

disputed the negative credit reports, and in turn the creditors verified the non-payment, which caused the derogatory (and truthful) credit item to remain on the Pressneys' credit reports.

RAG did not understand why the timeshares violated the law and essentially did nothing more than charge tens of thousands of dollars for a referral to a lawyer who was paid very little to write a few letters. The Pressneys thereafter were able to end all four timeshares using CDRS' services, which charged them $6,000.00 per timeshare cancellation, or a total of $24,000. The Pressneys owe more than $120,000 on their credit cards attributable to RAG's bad acts and sharp practices.

Although the Pressneys had saved for retirement, neither can retire as a result of the abhorrent cost of the RAG contract which, with interest, comprises most of their existing credit card debt, the fact that RAG provided no services commensurate with the $118,515 allegedly contracted, and further as a result of the cost to litigate this lawsuit. The Pressneys asked their lawyer, Mr. Barlow, for help. Mr. Barlow referred them to CDRS and vouched for CDRS, who charged them $24,000 to get out of their timeshare contracts.

The other RAG Clients have eerily similar stories of the same high-pressure and fraudulent sales tactics to convince them they needed RAG's services, which it turns out were useless. (*See* Defendants' Declarations).

As set forth in the FAC, the RAG Clients trusted Mr. Barlow and because of his referral to CDRS, they trusted CDRS. CDRS prepared demand letters, criminal complaints and state bar complaints for them to sign and send, which they did. While the documents included legal theories and analysis, they all believed and still believe that the documents they signed were and are accurate. All of them just want their money back from RAG. RAG chose instead to add salt to the wounds and sue the clients they defrauded.

As much as RAG would like this Court to believe that the RAG Clients had some nefarious motive to extort money, those are simply unsupported conclusory

5

allegations to try to save their claims from the litigation privilege and other First Amendment protections. They cannot because stripped of the hyperbole and conclusory allegations, the RAG Clients simply exercised their right to seek redress through proper legal channels.

The RAG Clients never authorized CDRS or Barlow to make any unlawful demands and trusted their guidance in an arena with which they were unfamiliar. The FAC does not allege even one fact to support a conclusion that these ten victims were part of any conspiracy to do anything. All they wanted was their money back and they used legal and protected means to accomplish that goal.

### III.  LEGAL STANDARD

Rule 12(b)(6) provides for dismissal of a claim for relief for "failure to state a claim upon which relief can be granted." To survive a motion to dismiss, a claimant must "allege enough facts to state a claim to relief that is plausible on its face." *Turner v. City and County of San Francisco*, 788 F.3d 1206, 1210 (9th Cir. 2015). In a 12(b)(6) motion, "all well-pleaded allegations of material fact [are accepted as true] and construe[d] in the light most favorable to the non-moving party." *Padilla v. Yoo*, 678 F.3d 748, 757 (9th Cir. 2012). However, "conclusory allegations of law and unwarranted inferences" are "are insufficient to avoid" dismissal under 12(b)(6). *Associated Gen'l Contractors v. Metro. Water Dist.*, 159 F.3d 1178, 1181 (9th Cir. 1998). "[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

As indicated below, each of Plaintiffs' claims against the RAG Clients fail to state a claim upon which relief may be granted and, therefore, each of the claims should be dismissed.

### IV.  ARGUMENT

Plaintiffs allege that the Barlow and/or CDRS parties engaged in many acts that form the basis of the claims, including misappropriation of trade secrets;

interference with economic advantage; breach of fiduciary duty and RICO violations. Most of the purported tortious acts did not involve the RAG Clients, who are alleged co-conspirators or aiders and abettors by virtue of the fact that they sent demand letters to Plaintiffs and submitted criminal and state bar complaints naming one or more of the Plaintiffs. Other than that, Plaintiffs cannot point to any acts that they took, but rather bootstrap them into torts allegedly committed by the Barlow and/or CDRS parties. All of the RAG Clients' acts are privileged and therefore not actionable. The state law claims are precluded by California's litigation privilege and the federal claims are precluded by the Noerr-Pennington doctrine.

### A. California's Litigation Privilege Precludes the State Law Claims

Plaintiffs' California law claims against Defendants are all barred because they are wholly based on privileged publications (the "litigation privilege"). Section 47 of the California Civil Code ("§ 47") provides in pertinent part: "A privileged publication or broadcast is one made: . . . (b) In any . . . (2) judicial proceeding, (3) in any other official proceeding authorized by law, . . ..."

The litigation privilege "applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." The privilege applies "even though the publication is made outside the courtroom and no function of the court or its officers is involved." *Silberg v. Anderson* (1990) 50 Cal. 3d 205, 212. Where applicable, the privilege confers immunity for statements made by parties, counsel and other participants in the proceeding.

The litigation privilege applies to all tort claims except malicious prosecution. *Id.* at 215-216. The privilege extends even to communications otherwise within the scope of § 47(b) that are perjurious or confidential. *Jacob B. v. County of Shasta* (2007) 40 Cal. 4th 948, 959-960. If otherwise applicable, the

7

litigation privilege applies even if the communication was made with *malice* or *intent to harm*. *Kashian v. Harriman* (2002) 98 Cal. App. 4th 892, 913 (privilege applies without regard to "motives, morals, ethics or intent").

**The demand letters are privileged pre-lawsuit communications.** Many of the demand letters are attached as exhibits to the FAC, but some are missing. All of them are attached to Defendants' declarations as Exhibits 2 thereto.[2] The litigation privilege protects statements made in the course of judicial proceedings, including those preliminary to filing suit. § 47(b)(2); *Dove Audio, Inc. v. Rosenfeld, Meyer & Susman* (1996) 47 Cal. App. 4th 777, 783 (privilege applies to statements made in preparation for sending complaint to Attorney General). The demand letters are absolutely privileged and cannot form the basis for any of Plaintiffs' claims.

**The criminal complaints to the District and U.S. Attorneys are privileged communications.** "[R]eports made by citizens to police regarding potential criminal activity are communications of the specified type, and fall within the section 47 privilege." *Devis v. Bank of America* (1998) 65 Cal.App.4th 1002, 1007-1008.

> The reason for this rule is set out in *Williams v. Taylor* (1982) 129 Cal.App.3d 745, 181 Cal.Rptr. 423: "... a communication concerning possible wrongdoing, made to an official governmental agency such as a local police department, and which communication is designed to prompt action by that entity, is as much a part of an 'official proceeding' as a communication made after an official investigation has commenced. [Citation.] After all, '[t]he policy underlying the

---

[2] The FAC includes copies of several of the demand letters and complaints as exhibits. However, not all of the RAG Clients' privileged communications are attached to the FAC. Defendants respectfully request that the Court consider those missing documents submitted herewith as exhibits to Defendants' declarations pursuant to the incorporation by reference doctrine. Plaintiffs are not required to attach all relevant documents to the complaint. *See e.g., Davis v. HSBC Bank Nevada, N.A.* (9th Cir. 2012) 691 F.3d 1152, 1159-1160 (court may incorporate documents by reference into the complaint for purposes of deciding the motion). Such documents may be considered if the complaint refers to the document, which is central to the plaintiff's claim and no party questions the authenticity of the document. *United States v. Corinthian Colleges* (9th Cir. 2011) 655 F.3d 984, 999

privilege is to assure utmost freedom of communication between citizens and public authorities whose responsibility it is to investigate and remedy wrongdoing.' [Citation.] In order for such investigation to be effective, 'there must be an open channel of communication by which citizens can call ... attention to suspected wrongdoing. That channel would quickly close if its use subjected the user to a risk of liability for libel.... The importance of providing to citizens free and open access to governmental agencies for the reporting of suspected illegal activity outweighs the occasional harm that might befall a defamed individual.... [Citation.]"

*Id.* at pp. 753–754. The privilege applies even if the report is false. *Hagberg v. California Fed. Bank* (2004) 32 Cal. 4th 350, 364-367 (2004) The *Hagberg* Court held that a false statement by bank to police that customer had presented an invalid check was absolutely privileged under aspect of official proceedings privilege applicable when a citizen contacts law enforcement personnel to report suspected criminal activity and to instigate law enforcement personnel to respond. *See also, Passman v. Torkan* (1995) 34 Cal.App.4th 607 (1995) (complaint to district attorney absolutely privileged even if defamatory). Defendants request that the Court consider all of their criminal complaints in deciding this motion pursuant to the incorporation by reference doctrine. (Defendants' Declarations, Exhibits 3).

**The State Bar complaints are privileged communications.** The litigation privilege applies to state bar complaints. *See Chen v. Fleming* (1983) 147 Cal.App.3d 36 (privilege applied to a complaint to the State Bar concerning an attorney). Thus, the RAG Clients' state bar complaints regarding Plaintiff David Klein are privileged and cannot form the basis of any claims. Defendants request that the Court consider all of their bar complaints in deciding this motion pursuant to the incorporation by reference doctrine. (Defendants' Declarations, Exhibits 4).

**B. The Noerr-Pennington Doctrine Bars Plaintiffs' Federal Claims.**

Prelawsuit demand letters, and criminal and state bar complaints are likewise protected under the "Petition Clause" of the First Amendment of the U.S. Constitution to assure "breathing space" for the right of access to the courts.

*See* e.g., *Sosa v. DIRECTV, Inc.* (9th Cir. 2006) 437 F3d 923, 933 (prelawsuit demand privileged); *Ferguson v. Waid* (9th Cir. 2020) 798 F. App'x 986 (state bar complaint protected petition activity); *Empress LLC v. City and County of San Francisco* (9th Cir. 2005) 419 F.3d 1052, 1056 ("Under the Noerr-Pennington doctrine, those who petition all departments of the government for redress are generally immune from liability"). The Noerr-Pennington doctrine applies to RICO claims. *Sosa, 437 F.3d at 932-933*.

### C. The Third Cause of Action Fails as a Matter of Law

Plaintiffs' third cause of action is based on the federal criminal statute 18 U.S.C. § 875, Interstate Communications, as a cause of action. This claim fails because there is no private right of action. "A private individual may sue under a federal statute only when Congress intended to create a private right of action. *Gonzaga Univ. v. Doe* (2002) 536 U.S. 273, 284-85. 18 U.S.C. § 875 does not authorize a private cause of action, therefore, it does not provide a basis for federal question jurisdiction. As a result, the claim fails as a matter of law.

## V. CONCLUSION

For all the foregoing reasons, Defendants respectfully request that the Court dismiss Plaintiffs' fifteen claims against them, or, alternatively, one or more of those claims, for failure to state a claim for which relief may be granted.

Respectfully Submitted,

DATED: September 11, 2020        DELMAN VUKMANOVIC LLP

By: ____/Dana Delman/_____
Dana Delman, Esq.
Attorneys for Defendants John Pressney, Pamela Pressney, Herman Abel, Debora Abel, Morris Hannah, Virginia Hannah, Lee Harris Turk, Bernardo Bettinelli, Carol Bettinelli, Lari Castle, Gilbert Castro, Eva Castro, Paul Martinez, Renee Martinez, Glenn Perley and Connie Perley